## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| FIRST BRANDS GROUP, *et al.*, | : | Case No. 25-90399 (CML) |
|  | : |  |
| Debtors.[1] | : | (Jointly Administered) |
|  | : |  |

|  |  |  |
|---|---|---|
| FIRST BRANDS GROUP, *et al.*, | : |  |
| Plaintiffs | : | Adv. Pro. No. 25-03803 (CML) |
|  | : |  |
| v. | : |  |
|  | : |  |
| PATRICK JAMES, THE PATRICK JAMES | : |  |
| TRUST, ALBION REALTY, LLC, ALESTER | : |  |
| TECHNOLOGIES LLC, BATTERY PARK | : |  |
| HOLDIGNS LLC, BOND STREET ASSET | : |  |
| MANAGEMENT LLC, IGNITE ACQUISITION | : |  |
| HOLDINGS LLC, LARCHMONT LLC, PEGASUS | : |  |
| AVIATION, LLC, JOHN DOE(S) 1-100, AND | : |  |
| ABC CORPORATION(S) 1-100, | : |  |
| Defendants | : |  |

## EMERGENCY MOTION TO VACATE OR AMEND ORDER GRANTING
## TEMPORARY RESTRAINING ORDER

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

This motion seeks an order that may adversely affect you.  If you oppose the motion, you should immediately contact the moving party to resolve the dispute.  If you and the moving party cannot agree, you must file a response and send a copy to the moving party.  Your response must state why the motion should not be granted.  If you do not file a timely response, the relief may be granted without further notice to you.  If you oppose the motion and have not reached an agreement, you must attend the hearing.  Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.

Emergency relief has been requested.  If the Court considers the motion on an emergency basis, then you will have less than 21 days to answer.  If you object to the requested relief or if you believe that the emergency consideration is not warranted, you should file an immediate response.  Emergency relief is requested not later than <u>November 5, 2025</u>.

If Court sets a hearing on this motion, the movant will notice all interested parties in advance of the hearing.

Represented parties should act through their attorney.

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ......................................................................................................... 1

II.    BACKGROUND ............................................................................................................ 5

III.    ARGUMENT ................................................................................................................. 5

   A.   The TRO Must Be Vacated Because Debtors Made None of the Required
Showings for Extraordinary Relief. ............................................................................ 5

      1.   The Debtors Did Not and Cannot Show a Substantial Likelihood of Success On
the Merits. ............................................................................................................... 6

      2.   The Debtors Did Not and Cannot Show a Substantial Threat of Imminent
Irreparable Injury. ................................................................................................ 13

      3.   The Balance of the Equities Favors the Enjoined Parties. ............................. 16

      4.   The TRO Substantially Harms Members of the Public. ................................. 18

   B.   Even If It Is Not Vacated, the TRO Must Be Modified. ........................................... 19

IV.    RELIEF REQUESTED ............................................................................................... 22

V.    STATEMENT PURSUANT TO LOCAL RULE 9013-1 ................................................. 22

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE LOPEZ:

Patrick James, The Patrick James Trust, Albion Realty, LLC, Alester Technologies LLC, Battery Park Holding LLC, Bond Street Asset Management LLC, Ignite Acquisition Holdings LLC, Larchmont LLC, Pegasus Aviation, LLC (collectively "Defendants"), by and through their attorneys, Debevoise & Plimpton LLP and Quinn Emanuel Urquhart & Sullivan LLP, hereby file this Emergency Motion to Vacate or Amend the Court's Order Granting Temporary Restraining Order (Adv. ECF 14) ("TRO") and respectfully state as follows in support of this motion (the "Motion"):

## I.    INTRODUCTION

1.      By this Motion, Defendants seek relief from the TRO.  It is grossly overbroad; it was entered on an expedited basis and *ex parte* without any showing of urgency; and it was obtained without any notice or any opportunity for the Defendants to respond to the outrageous allegations put forth through the threadbare, conclusory, and patently misleading Emergency *Ex Parte* Application for Preliminary Injunction Relief, Including an Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Request for Hearing (the "Application") and accompanying affidavits.  The Debtors made none of the showings required to secure extraordinary relief, much less on an *ex parte* basis, and instead appear focused on creating sensationalist headlines regarding one-sided monetary transfers without acknowledging the substantial transfers *into* First Brands Group from Mr. James and affiliated entities.

2.      Recklessness abounds in the Application and particularly the underlying affidavit.  The Debtors allege fraud and abscondment with no detail.  *First*, by their own admission, the investigation is in its early stages.[2]  But this work should have been done ***before***

---

[2]    Federal Rule of Civil Procedure 65(b)(1), incorporated herein by Federal Rule of Bankruptcy Procedure 7065, states "[t]he court may issue a temporary restraining order without written or oral notice to the adverse party or

the Debtors decided to smear Mr. James and obtain an injunction freezing his assets.  *See* Moore Aff. ¶ 15 ("more work needs to be done); ¶ 27 (review of off-balance-sheet practices is "subject to ongoing investigation"); ¶ 32 ("The Company's advisors are currently reviewing to determine which transactions and proceeds related to the Onset Facility benefitted either the applicable SPV Debtors or FBG or if fair consideration was never received by the FBG subsidiaries for inventory and PP&E transferred"); ¶ 35 ("While the Debtors' investigation remains ongoing …").  *Second*, because the work has not been done, the Debtors are left to allege something as significant as a fraudulent scheme "upon information and belief."  This empty phrase appears throughout the Moore Affidavit.  *See id.* ¶¶ 26, 28, 29, 30, 31, 34, 35, 37, 39, 45, 46, 47, 52, 53, 55, 58.  *Third*, the Debtors tacitly concede that crucial facts must be vetted before they provide the basis for claims, including fraud claims.  This includes cornerstone allegations made weekly "upon information and belief"—like whether or not Mr. James "fabricated and sold non-existent receivables" (¶ 26); whether inventory purchases were for less than reasonably equivalent value (¶ 28); "whether Mr. James personally directed distributions from the Company to his trust" (¶ 37); whether "there was no legitimate business reason for Mr. James to transfer hundreds of millions of dollars from First Brands to Patrick James Trusts;" (¶ 39); and whether "Mr. James also intentionally comingled First Brands' business accounts with personal funds and used First Brands' funds for his and his family's personal expenses and personal business" (¶ 45).  These are severe contentions.  Mr. James and the bankruptcy process generally deserve significantly more than the short shrift the Debtors have given them.  *Finally*, "exigency"—a requirement under Fed.

---

its attorney only if:  (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  That showing was not made. *See* ECF No. 20 (Attorney Certification).

R. Civ. P. 65(b)(1)—is purportedly made out in a single paragraph in an attorney declaration that contains no specifics about historical transfers, amounts, and transferors.  The *ex parte* emergency relief requested here required much more substance in the application.  *See* ECF No. 20 (alleging without an ounce of support that "the significant immediate risk that Defendants, if given notice of this motion, will seek to dissipate property of the estates beyond the reach of the Debtors or this Court.  A freeze of Defendants' assets … is necessary to protect the value of the bankruptcy estate from the risk of further, and potentially permanent, diminishment").

3.      The TRO grants sweeping relief—denying the Defendants the ability to access basic fundamental rights or even comply with the law (for example, preventing the ability to pay taxes or employ legal counsel to mount a defense) and threatens to shut down the business of several operating entities' employees, customers, vendors and other counterparties, by preventing them from engaging in even the most basic business operations.  *See* TRO ¶ 4.  In its current form, the TRO surely will wipe out several companies; and Debtors will have not only failed to maximize value as their fiduciary obligations require—but they will have destroyed value.  The TRO also prevents Defendants from exercising even fundamental rights, *e.g.*, retaining counsel.

4.      Belying the Debtors' claim that immediate irreparable damages would occur if the TRO was not granted, the Application and accompanying papers do not identify a single element of recent conduct by the Defendants or any other enjoined party that warrants such a drastic measure, instead relying on speculation and accusations about past conduct that are contradicted by the Complaint's own allegations as well as other evidence submitted herewith.  Among other facts that are missing include the date of any challenged transfer; the Debtor-entity whose property was transferred; and the immediate and subsequent transferees.  Instead, the papers imprecisely smear Mr. James without any particularity.  Such recklessness is not a basis for injunctive relief.

Applicable bankruptcy and non-bankruptcy law, including particularly long-standing Constitutional principles, requires much more.

5.      And by the Debtors own admission, the Debtors rushed this application. In addition to admitting repeatedly that more work needs to be done, they concede the Special Committee's work is ongoing; its investigation is not complete. Yet, the estates fired off a pleading that was short on details. Alleging even basic fraudulent transfer requires a date-by-date, payment-by-payment, and transaction-by-transaction recitation.[3] The Application makes no effort to do this for any of the wild allegations it makes concerning third-party factoring, inventory-financing, and alleged comingling.

6.      The TRO should be vacated because: (1) the Debtors have not shown a likelihood of success on the merits; (2) the Debtors' have not shown any imminent irreparable injury and the harm allegedly suffered by the Debtors is compensable by money damages; (3) the balance of hardships does not tip decidedly toward the Debtors; to the contrary, the hardship falls overwhelmingly on Defendants and other enjoined parties; and (iv) the public interest favors vacatur of the TRO.

7.      In the alternative, the Court should amend the TRO to address its most glaring deficiencies, to wit, preventing it from wiping out value of non-Debtor businesses by permitting such business to continue to pay ordinary course operating expenses and permitting Defendants to make tax payments, payroll payments, rent payments, or other payments or transfers required by

---

[3]      *See, e.g.*, *In re DBSI, Inc*., 445 B.R. 351, 354-55 (Bankr. D. Del. 2011) ("[T]o plead a fraudulent transfer action, Trustees must set forth the facts with sufficient particularity to apprise the Individual Defendants fairly of the charges made against them so that they can prepare an adequate answer …. identifying one of the following four factors: the date of the transfer, the amount of the transfer, the name of the transferor, and the name of the transferee").

law and to pay counsel, accounting, or other professional fees to assist in their defense of this adversary proceeding and related litigations, investigations, or proceedings.

8.      And in any event, given the gravity of the ex parte relief secured by the Debtors and the potential for irreparable harm to Defendants, Defendants respectfully request that the Court certify as final any Order granting a preliminary injunction.

## II.      BACKGROUND

9.      On September 28, 2025 (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases in this Court.

10.     On November 3, 2025, the Debtors initiated this adversary proceeding by filing a complaint (the "Complaint") and the Application seeking, among other things, a temporary restraining order "freezing the assets of Patrick James and any and all companies he owns and controls in connection with the misappropriation and potential dissipation of funds belonging to the Debtors' estates."

11.     On November 3, 2025, the Bankruptcy Court granted the Application and issued the TRO.

## III.      ARGUMENT

**A.      The TRO Must Be Vacated Because Debtors Made None of the Required Showings for Extraordinary Relief.**

12.     The issuance of a TRO "is an extraordinary remedy that requires the applicant to unequivocally show that need for its issuance." *Sacal-Micha v. Longoria*, 449 F. Supp. 3d 656, 662 (S.D. Tex. 2020).  Indeed, the U.S. Supreme Court has recognized that a temporary restraining order is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazureck v. Armstrong*, 520 U.S. 968 (1997).  "The stringent restrictions imposed by ... Rule 65(b) on the availability of ex parte

temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). Accordingly, temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Id.*

13.     "Because a temporary restraining order, like a preliminary injunction, is an extraordinary remedy, it should not be granted unless the movant has 'clearly carried the burden of persuasion on' on all for requirements" with "specific facts," *Stone Metals Am., LLC v. Eubank*, 2020 U.S. Dist. LEXIS 18639, at *5 (N.D. Tex. Feb. 5, 2020), namely, "(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer [imminent] irreparable injury if the [TRO] is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the [TRO] will not disserve the public interest." *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 252-53 (5th Cir. 2009).

### 1.     The Debtors Did Not and Cannot Show a Substantial Likelihood of Success On the Merits.

14.     The Debtors' purported "showing" in support of their claims is riddled with speculation and innuendo—far from the required "prima facie" showing of a substantial likelihood of success on the merits. *In re Dernick*, 2019 WL 236999, at *2 (Bankr. S.D. Tex. Jan. 16, 2019); *see also Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572–73 (5th Cir. 1974) (the movant must "clearly carr[y] the burden of persuasion" to show a substantial likelihood of success on the merits).

15.     As a threshold matter, the Debtors' Application itself acknowledges that the Debtors' investigation into their potential claims is incomplete, yet tries to justify the relief it seeks

based on the Debtors' failure, to date, to uncover "documentation" relating to the transfers at issue. *See, e.g.*, Application ¶ 21 ("The transaction documents that the Debtors have uncovered to date fail to show that Mr. James' transfers were made for any legitimate business purpose."); *id.* ¶ 49 ("It is unclear if fair value was ever received by First Brands for the funds transferred to Archive Health."). A proponent of a TRO bears the burden to investigate and come forward with specific, well-supported facts demonstrating that its claims are likely to succeed on the merits *before* securing injunctive relief. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (proponent of temporary injunctive relief must carry burden of persuasion by "a clear showing"). A TRO cannot be based on the fact that the Debtors, to date, have not uncovered evidence refuting their assumptions and speculation. *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.").

16.     Further underscoring the incomplete investigation and one-sided narrative that the Debtors presented in service of the extraordinary relief they sought, the Debtors create the specter of "misappropriation" and fraudulent transfers by making blanket assertions that hundreds of millions of dollars were moved out of the Debtors to Defendants—but conveniently skip over the fact that hundreds of millions of dollars were reinvested into First Brands by Mr. James and related entities over the years. Indeed, the Complaint obliquely acknowledges that such substantial reinvestments were made, stating that "[t]he Debtors also understand that during this period, funds may have been transferred into the Company from Mr. James or his affiliated entities," but attempts to fault Mr. James because he "never provided a comprehensive accounting of the amounts or purposes of all of the transfers made between and among First Brands and Mr. James

and his affiliated entities." Compl. ¶ 35. This flips the burden onto Mr. James to *disprove* a fraudulent transfer to avoid injunctive relief. That is not and cannot be the standard.

17. Indeed, the Debtors' recent communications to Mr. James' counsel have taken the explicit position that money transferred through non-debtor entities owned by Mr. James were transferred to and/or for the benefit of First Brands Group. *See, e.g.*, Ex. A, Letter from Weil, Gotshal & Manges LLP to Debevoise & Plimpton LLP (Oct. 24, 2025) (asserting that "FBG paid €27.5M through Butterworth Capital Management, LLC for the sale of the Novares Subsidiaries and assumed certain liabilities"). Other documentation supports that sizeable monetary transfers can and did occur from non-debtor entities owned by Mr. James to First Brands Group. *See* Ex. B (identifying a series of transfers totaling approximately $40 million from Global Technologies to the First Brands Group in the summer of 2025).

18. Similarly, the Complaint alleges that a "Bowery Finance II" account was used in connection with alleged misappropriation of funds as a "slush fund"—yet acknowledges in the same breath that nearly $12 billion flowed through the account from 2022 through 2025. That is far more than any amount the Defendants are accused of "misappropriating" from the Company. To this end, the Complaint admits that the purported "slush fund" account was in fact used to "facilitate repayments due to Onset and the factoring companies." Compl. ¶ 30. Notably, Bowery Finance II is not named as a defendant in this action, suggesting that the record reflects that Bowery Finance II was not in fact used to "misappropriate" funds from the Debtors. In light of the large amounts that, the Debtors admit, were reinvested into the Company, the Complaint's unsupported assertions that Mr. James misappropriated substantial sums from the Company on a net basis are neither credible nor a sufficient evidentiary basis on which to predicate extraordinary *ex parte* relief.

19.     The unsupported nature of the Debtors' "showing" in support of the TRO goes still further.  The Debtors present no accounting or other specifics with respect to the bare accusation that "[o]ver $700 million was funneled from First Brands directly to Mr. James and his affiliated entities from 2018 to 2025." Compl. ¶ 70.  Nor do they identify which purported transfers actually fell within any applicable lookback period to their claims,[4] instead opting to allege amounts purportedly transferred over a much longer time period, perhaps to present the Court with an eye-catching headline number in service of their desired narrative.  Nor do Debtors even attempt to recognize or account for the substantial inflows into First Brands Group from Mr. James and/or related entities.

20.     Numerous of the Debtors' allegations that Mr. James deployed funds obtained from First Brands for "personal uses" likewise appear unsupported by an evidentiary record or well-founded asset tracing; instead, many such allegations appear to be based entirely on the unsupported mental leap that, if funds were transferred within time frame roughly close to personal expenditures by Mr. James, such funds must have been used for that personal expenditure.  *See, e.g.*, Motion ¶ 20 ("Money transferred from First Brands to Mr. James also occurred in close proximity to his acquisition of various real estate properties and cars."); *id.* ("in the two months prior to purchasing a home in the Hamptons on August 31, 2021, Mr. James received over $1 million from First Brands").  The Debtors' conclusory speculations in this regard cannot form the basis for a sweeping TRO freezing all of Defendants' assets and bank accounts for nearly all purposes.  *See Thompson v. Veterans United Home Loans*, 2025 U.S. Dist. LEXIS 114170, at *8 (E.D. Tex. Jun. 3, 2025) ("Because of these pleading deficiencies, '[t]he conclusory, speculative, and vague nature of [plaintiff's] motion for a temporary restraining order ... is [also] fatal to his

---

4       *See* 11 U.S.C. § 548(a)(1) (two-year lookback period); Ohio Rev. Code. Ann. §§ 1336.04(A) (four-year lookback period); 6 Del. Code. § 1304(a) (same).

motion.") (quoting *Zurovetz v. Argenbright*, 2021 U.S. Dist. LEXIS 49847, at *2 (E.D. Tex. Feb. 8, 2021)); *Garza v. Barker*, 2021 U.S. Dist. LEXIS 158834, at *2 (E.D. Tex. Aug. 3, 2021) ("Given his conclusory allegations, he has failed to clearly carry the burden of persuasion as to all elements necessary for a preliminary injunction/temporary restraining order.").

21.     The Debtors' other scattershot attempts to impute nefarious intent and impropriety to routine transactions follow a similar pattern.  For example, the Application and the Moore Affidavit contend that "from 2021 through 2025, First Brands transferred approximately $8 million from First Brands to [Mr. James'] son-in-law's 'wellness' company, Archive Health LLC [and] [a]t least one transfer to Archive Health was requested by Mr. James' son-in-law to help 'cover payroll.'"  Moore Aff. ¶ 49.  The Affidavit further contends—without support or any apparent attempt to investigate: "It is unclear if fair value was ever received by First Brands for the funds transferred to Archive Health."  *Id.*  The truth is that there is nothing "unclear" about these payments at all and had the Debtors bothered to make even the most basic inquiry of Defendants or their counsel, they would have learned that such payments were legitimate expenses associated with the company's role in providing health clinic services to approximately 7,000 families of First Brands factory employees in both the U.S. and Mexico.

22.     Most gallingly, all of these accusations were first made in a sealed court pleading, without the Debtors ever taking the time to ask the Defendants or their counsel about them.  There has been no formal or informal information request related to the speculative accusations in the Application and the accompanying Complaint.  Given the Debtors' own admission that they have little documentary record to support their conclusions, it would seem that they should have at least made inquiries as to the purpose of certain transfers and other activity before filing pleadings and seeking emergency preliminary relief from this Court.

23.     Just as the Application lacks foundation in facts, it also fails as a legal matter.  The equitable causes of action alleged in the adversary complaint carry the potential for monetary relief only in so far as the funds at issue can be traced to the alleged violation.  *Whitney Nat'l Bank v. Air Ambulance by B&C Flight Mgmt. Inc*., 2006 WL 8459812, at *2 (S.D. Tex. Apr. 13, 2006) ("The cases are clear that a court may not reach a defendant's assets unrelated to equitable relief sought in litigation and 'freeze' them so that they may be preserved to satisfy a potential money judgment.").  The Debtors have not even attempted such tracing here, fundamentally undermining any plausible claim that they have shown a likelihood of success on the merits of these claims.

24.     Rather than carry their burden to show particular funds against which they are likely to recover, Debtors have sought an injunction that broadly restrains the Defendants' disposition *any* of their of assets without any effort to link those assets to the alleged fraud.  This is a strong indication that the preliminary relief that the Debtors are seeking is not in fact in service of their equitable claims but an eventual claim for money damages.  The law does not permit this.  *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) (preliminary injunction unavailable to prevent the defendant from transferring assets in which no lien or equitable interest is claimed); *see also Newby v. Enron Corp*., 188 F. Supp. 2d 684, 701 (S.D. Tex. 2002) (In order "to avoid the limits of Grupo Mexicano[,] . . . plaintiffs seeking asset-freezing injunctions [must] meet the 'substantive requirements for obtaining [equitable] relief[.]" (quoting *United States ex rel. Rahman v. Oncology Associates P.C.*, 198 F.3d 489, 492 (4th Cir.1999))); *see also SC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc*., 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003) ("A preliminary injunction in this case would be issued in aid of the collection of a money judgment, not final equitable relief, an outcome barred by Grupo Mexicano.").

25.     Likewise, given that the complaint sounds in fraud, Debtors have failed to satisfy their obligations under Rule 9(b) to plead with particularity the particular statements that they allege are fraudulent and a plausible basis to believe they were made with scienter.  *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019) ("When the Rule 9(b) pleading standard applies, the complaint must contain factual allegations stating the 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).  Like their failure to engage in tracing, the Debtors' cavalier assertion of fraud without any specificity as to which particular statements they allege are fraudulent, who made them, and why, are fatal to their claim that they have demonstrated a reasonable likelihood of success on the merits.

26.     Contrary to their Application, none of the Debtors' cited case law supports their extraordinary request for *ex parte* preliminary relief based on speculations drawn of an admittedly incomplete and inconclusive investigation.  For example:

- The asset freeze in *Schmidt v. Platinum Partners Value Arbitrage Fund LP*, Adversary No. 16-3237, Dkt. 7 was supported by specific documentary evidence "attached to the application" that "demonstrated" purportedly "illegal financial maneuverings" and enabled the court to find "that the funds were likely to leave the United States and th[e] Court's practical ability to control them."

- *Sommer v. Harvie*, Adversary No. 22-03259, Dkt. 5 & 12, did not impose a blanket asset freeze at all and instead merely enjoined defendants from transferring specific "proceeds from the sale of the River Bend Property."

- *In re Team Systems International, LLC*, 2023 WL 1428572 (Bankr. D. Del. 2023) *declined to impose a blanket asset freeze*, opting instead "to take a more 'surgical' approach to freezing only those assets necessary to satisfy file valid claims" and then only after a preliminary injunction hearing at which all parties presented evidence and were able to examine witnesses.

- *Ball v. Soundview Composite Ltd (In re Soundview Elite LTD) et al.*, 543 B.R. 78, 120 (Bankr. S.D.N.Y 2016) is another preliminary injunction case (not a TRO), granting an asset freeze where the bankruptcy court found that the defendant had transferred the debtor's property in violation of the court's order in the bankruptcy case.

- *Kalsi Eng'g, Inc. v. Davidson*, 2014 WL 12540550, at *2 (S.D. Tex. Sept. 2, 2014) is still another preliminary injunction case, which imposed a freeze after a PI hearing at which the Plaintiff presented "voluminous and detailed evidence" in support of its application, including live testimony, bank statements, and bank checks.

27.     Far from showing a substantial likelihood of success on the merits, the Complaint is replete with unsupported, speculative allegations that are destined to fail when put to the scrutiny of adversarial litigation—perhaps further underscoring why the Debtors sought the TRO *ex parte* in the first place.

> **2.      The Debtors Did Not and Cannot Show a Substantial Threat of Imminent Irreparable Injury.**

28.     To succeeds on an application for a TRO, an applicant must demonstrate substantial threat of harm that is imminent and irreparable.  *Beyhaqi v. Noem*, 779 F. Supp. 3d 919, 922 (S.D. Tex. Apr. 2025); *see also Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 651 (N.D. Tex.

2021) ("An injunction is appropriate only if the anticipated injury is imminent and not speculative."). For an injury to qualify as "imminent" there must be a substantial, concrete, and not speculative, risk that it is likely to occur in the absence of preliminary relief. *Beyhaqi v. Noem*, 779 F. Supp. 3d 919, 922 (S.D. Tex. Apr. 2025). Further, it is black-letter law that an injury is not irreparable if the movant can be made whole by an award of damages or other relief at the conclusion of the proceeding. *Texas v. U.S. Dep't of Homeland Security*, 700 F. Supp. 3d 539, 546 (W.D. Tex. 2023) ("Harm is irreparable only 'if it cannot be undone through monetary remedies.'" (quoting *Intertox America v. PPG Industries, Inc.*, 736 F.2d 194, 202 (5th Cir. 1984)); *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013) ("An irreparable injury is one that cannot be undone by monetary damages and one for which monetary damages would be especially difficult to calculate."); *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

29.      Where, as here, a proponent of the TRO is seeking to restrain another party's funds on the basis of an asset dissipation theory, the Debtors must show with reference to specific transactions, *e.g.*, by date, amount, transferor, that the Defendants and Enjoined Parties are actively transferring assets in a manner that would render them judgment proof or have engaged in such conduct in the recent past. *See Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 707 (S.D. Tex. 2002) ("In the cases in which such a prejudgment asset-freezing injunction is granted, the courts have been presented with allegations and evidence showing that the defendants were concealing assets, were transferring them so as to place them out of the reach of postjudgment collection, or were

14

dissipating the assets."). The Debtors come nowhere close to showing imminent and irreparable harm on such a theory.

30. As to imminence, there is no evidence whatsoever that Mr. James or any of the other Defendants are or have been actively transferring their own assets so as to render themselves judgment proof, nor is there evidence that they have done so in the recent past. Indeed, the Application does not even point to any recent transfers made from First Brands to Mr. James or the James Entities, nor any meaningful dissipation of assets by Mr. James or the James Entities— referring to three examples of payments between 2019 and 2025.

31. Instead, the Application sought the TRO based not on recent conduct suggesting imminent harm, but rather based on complaints about purported past actions by Defendants, primarily with the active participation of the Debtors themselves, dating as far back as 2018. But complaints about past conduct are insufficient to justify the extraordinary relief provided in the TRO. *Lindsey v. Texas*, 2025 WL 2677885, at *3 (N.D. Tex. Aug. 29, 2025), *adopted by* 2025 WL 2677389 (N.D. Tex. Sept. 18, 2025) ("It is well-settled that a movant cannot demonstrate irreparable injury via allegations of past conduct 'when there is no showing of any real or immediate threat that the plaintiff will be wronged again.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983))); *id.* at *3 ("To the extent Lindsey fears that Defendants will again violate his constitutional rights simply because he alleges that they have before, this fear, however sincere it may be, is insufficient as a matter of law to constitute the immediate risk of irreparable harm without other evidence").

32. Nor is there any shred of evidence that Mr. James will abscond to, or has sought to conceal assets in, a foreign jurisdiction, as the Application misleadingly implies. While Mr. Moore tries to create this impression by asserting in his affirmation that Mr. James is a "Malaysian

national," Mr. James has not been a Malaysian citizen since 1988.  The fact of the matter is that Mr. James is a U.S. citizen who has lived and worked in the U.S. for more than 40 years, has extensive family ties here, and has invested substantial sums of money in U.S. companies, including the Debtors themselves.  Any suggestion otherwise is irresponsible and not well taken.  Moreover, the Application cites no facts suggesting that Mr. James has transferred or will transfer any assets to other foreign jurisdictions or otherwise beyond the reach of the bankruptcy court.  At bottom, the mere fact that a person was born abroad is not, and cannot be, a substitute for a substantial evidentiary showing that such person is likely to dissipate his assets, as required to secure injunctive relief.[5]

### 3.    The Balance of the Equities Favors the Enjoined Parties.

33.    "A preliminary injunction is to be issued only when the balance of hardships favors the party seeking the injunction.  This calculation requires a court to consider 'the competing claims of injury and . . . the effect on each party of the granting or withholding of the requested relief.'  A district court therefore can only perform this task after identifying 'the most serious possible injury' that can be claimed by either party."  *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 336–37 (5th Cir. 2013) (citations omitted).

34.    Here, the Enjoined Parties will suffer a litany of catastrophic harms from the TRO, whereas the Debtors have not made any showing that they will be harmed in its absence.

35.    *First*, the TRO prohibits the Defendants, including Mr. James, as well as "all other persons or entities acting in concert with any of them," (together, the "Enjoined Parties") from

---

[5] As to the Application's attempts to cast aspersions over Mr. James's personal life—asserting that he and his family lead a "lavish lifestyle"—the Debtors' second-guessing of Mr. James's past personal financial decisions is not grounds for entry of a restraining order in the absence of evidence that such expenditures are likely to continue and are of such a magnitude that they would render the Defendants judgment-proof. *Lindsey v. Texas*, 2025 WL 2677885, at *3 (N.D. Tex. Aug. 29, 2025); *Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 707 (S.D. Tex. 2002).  The Debtors presented no such evidence in the Application or its supporting materials.

16

"disposing of any and all assets that are controlled by the Defendants or any entities owned or controlled by the Defendants," including "[a]ny and all funds in any and all bank accounts of any other entities in Defendants' control."  This breathtakingly broad restriction arguably applies not only to Mr. James and the other Defendants, but also to numerous non-debtor operating businesses owned by Mr. James (the "Operating Businesses"), notwithstanding that there is not a shred of evidence (or even conclusory allegations) that any of them are involved in alleged wrongdoing or otherwise received funds from the Debtors.  Such businesses include:

- The Eitek Business[6]:  a business offering automotive interior technologies and products based in Austria. https://www.fidelium-partners.com/en/portfolio/eitek-gmbh/

- The Peterson Business[7]:   the largest privately held spring manufacturer in North America that designs, manufactures and supplies springs, snap-rings, wire forms, clips, clamps, stampings, and a variety of sub-assemblies. https://www.pspring.com/products/stampings/.

- The Meteor Business[8]:  a business that develops and manufactures automotive sealing systems, such as weatherstrips and other rubber components.   https://meteor-group.com/working-at-meteor/

If the Operating Businesses are unable to access their bank accounts or other assets, they will be unable to pay their employees, fulfill customer orders, satisfy tax, pension, or other regulatory obligations, or pay rent or other amounts necessary to maintain day-to-day operations and would have to cease doing business altogether.  *Cf. Mobile Med Work Health Sols., Inc. v. Moore*, 2024 WL 6815707, at *3 (W.D. Tex. Oct. 11, 2024) (denying motion for temporary restraining order to freeze defendant's assets because movant failed to show "that their 'threatened injury outweigh[ed] the threatened harm to defendant'" where "[a] freeze on [d]efendants' assets would

---

[6]   Eitek GmbH.
[7]   Peterson American Corporation d/b/a Peterson Spring.
[8]   Meteor Holdings, S.a.r.L. and Meteor Acquisitions S.a.r.L.

substantially hamper their ability to conduct day-to-day business, potentially leading to downstream effects that could hurt their business in the long term").

36.     The court could not possibly have intended the TRO to force the Operating Business to cease operations in this matter, even on an interim basis.   Indeed, Defendants approached the Debtors for confirmation that the TRO did not prohibit the Operating Business from making ordinary course business expenditures and sought a negotiated resolution of this issue and the Debtors did not agree, opting instead to treat this issue as an opportunity to seek even more onerous restrictions on the ability of the Operating Business to operate, notwithstanding that there is no evidence that they have been used facilitate any allegedly wrongful conduct by Defendants.

37.     *Second*, because the only expenditures permitted by the TRO are for "Living Expenses," Mr. James and the other Defendants are also prohibited from making payments on account of tax or other legal obligations, or paying legal, accounting, or other professional advisors, rendering them effectively unable to defend themselves in this and other proceedings and delivering victory to the Debtors by default.   Such result is contrary to well-settled law.   *See Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 328 (1938) (Courts may "not enjoin acts" that are "lawful").

### 4.     The TRO Substantially Harms Members of the Public.

38.     The TRO must also be vacated because it substantially harms members of the public.   As discussed above, the TRO effectively requires the Operating Businesses, as well as Mr. James' family office, to cease operations by denying them access to funds in their bank accounts.   If these businesses are forced to shut down, employees will lose their jobs, customers' orders will go undelivered, and the Debtors will have effectively destroyed a portion of the value they purport to seek to recover on behalf of their creditors, notwithstanding that none of these harmed individuals and groups had anything to do with the purported wrongdoing at issue in this adversary proceeding.   Such result is irreconcilable with the requirement that injunctive relief be tailored to

minimize harm to the public good.  *Cf. Ramirez v. Collier*, 595 U.S. 411, 432-33 (2022) (explaining that injunctive relief should be "tailored" to balance the "respective [public] interests" at stake); *VanDerStock v. Garland*, 625 F. Supp. 3d 570, 586 (N.D. Tex. 2022) (explaining that the court "tailored the scope of the preliminary injunction with careful attention to avoid further upsetting the balance of . . . competing public interests").

> **B.**     **Even If It Is Not Vacated, the TRO Must Be Modified.**

39.     If the TRO is not vacated, it should be modified to comply with law.  It is well-settled that injunctive relief must be (i) narrowly tailored, so as not to be overbroad and (ii) specific, so as to provide the enjoined party adequate notice of exactly the acts it is forbidden from taking.  *See, e.g.*, *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 (5th Cir. 1975).  "[T]he broadness of an injunction refers to the range of proscribed activity, while vagueness refers [to] the particularity with which the proscribed activity is described."  *Id.*

40.     Here, multiple aspects of the TRO are unduly vague and overly broad and therefore require modification.

41.     For example, the TRO is hopelessly vague as to who, specifically, is enjoined by the order.  This is because the TRO's definition of "Enjoined Parties" encompasses not only the nine listed Defendants, but also "*all other persons and entities acting in concert with any of them*."  TRO ¶ 1.  The TRO does not identify which persons or entities are encompassed by this language nor does it specify what it means to "act in concert" with the Defendants, much less whether it applies to only persons or entities acting in concert with such Defendants with respect to certain acts or any and all act of Defendants.  *See Schmidt v. Lessard*, 414 U.S. 473 (1974) ("As we have emphasized in the past, the specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague

to be understood. [] Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.").  Combined with the overbreadth of the prohibitions listed in paragraph 3 of the TRO against disposition of any and all assets of entities owned or controller by the Defendants, a rank-and-file employee of the Operating Businesses, for example, could become an "Enjoined Party" and violate the TRO simply by virtue of cashing their paycheck.  Protecting against this sort of "contempt by hindsight" is exactly why injunctions must be specific and narrowly tailored. *Schmidt v. Lessard*, 414 U.S. 473.

42.    For similar reasons, the TRO is overbroad to the extent it purports to enjoin persons or entities for whom there is no evidence (or even allegations) that they participated in or were in any way involved in any wrongdoing, such as the Operating Businesses.  At a minimum, the TRO should be clarified to permit the Operating Businesses to continue to make ordinary course use of their bank accounts and engage in otherwise ordinary course operations.  *See John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004) ("[T]he scope of injunctive relief is dictated by the extent of the violation established.  The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order.").

43.    The same can be said of the scope of the restrictions placed on the Defendants' use of their own assets, bank accounts, or other funds.  For example, other than the exceedingly narrow carveout for Mr. James's "Living Expenses" (which is not clearly described, leaving more questions than answers about TRO on this score), Defendants are prohibited from transferring any assets whatsoever, meaning they are prohibited from making tax payments, payroll payments, rent payments, or other payments or transfers required by law.

44.     Mr. James and the other Defendants are also prohibited from using their own funds to pay counsel, accounting, or other professional fees to assist in their defense of this adversary proceeding and related litigations, effectively barring them their right to counsel and to defend the claims against them in this Court and other venues.

45.     Accordingly, to the extent it is not vacated, the TRO should be modified, at a minimum, so as to:

- Clarify that the Enjoined Parties comprise only the nine named Defendants and those acting at their direction or within their control;

- Provide that the Operating Businesses shall be permitted to engage in (and, for the avoidance of doubt, Financial Institutions (as defined in the TRO) shall be permitted to facilitate) activities and payments necessary to continue their operations in the ordinary course of business, including payments, purchases, and transfers of money related to ordinary-course payroll and employee benefit programs, purchases of materials, services and supplies necessary and appropriate to continue ordinary-course business operations, payment of expenses associated with freight, taxes, legal fees, utilities, rent and related lease obligations, insurance and related surety bonds or letters of credit, leases, payments to customers to the extent arising in the ordinary course of business associated with existing customer programs and practices, and payment of other obligations as necessary to permit ordinary business operations, such as required to maintain the existing cash management system of the Operating Businesses, all to the extent such expenses are due and owing in the ordinary course (and not accelerated);

21

- Permit Defendants to make tax payments, payroll payments, rent payments, or other payments or transfers required by law; and

- Permit Defendants to pay counsel, accounting, or other professional fees to assist in their defense of this adversary proceeding and related litigations, investigations, or proceedings.

## IV.    RELIEF REQUESTED

46.    For all the reasons stated herein, the Court should vacate the TRO and grant such other relief as the Court deems necessary and proper.

## V.    STATEMENT PURSUANT TO LOCAL RULE 9013-1

47.    Pursuant to Local rule 9013-1(i), Defendants state that an emergency exists because, without the relief requested with respect to the TRO and as discussed above, the Operating Business will be unable to access their bank accounts and other assets in order to meet their ordinary course obligations, including, among others things, with respect to ordinary-course payroll and employee benefit programs, purchases of materials, services and supplies necessary and appropriate to continue ordinary-course business operations, payment of expenses associated with freight, taxes, legal fees, utilities, rent and related lease obligations, insurance and related surety bonds or letters of credit, leases, payments to customers to the extent arising in the ordinary course of business associated with existing customer programs and practices, and payment of other obligations as necessary to permit ordinary business operations.  The requested relief is needed immediately to prevent the Operating Business from being forced to ceased operations on account of the restrictions contained in the TRO.

Dated: November 4, 2025
Respectfully submitted:

| | |
|---|---|
| **QUINN EMANUEL URQUHART & SULLIVAN, LLP** | **DEBEVOISE & PLIMPTON LLP** |

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

/s/ Cameron M. Kelly
Cameron Kelly (TX SBN: 24120936)
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: (713) 221-7000
Email: cameronkelly@quinnemanuel.com

-and-

Michael B. Carlinsky (*pro hac vice* pending)
William A. Burck (*pro hac vice* pending)
James C. Tecce (*pro hac vice* pending)
Scott Hartman (*pro hac vice* pending)
Eric S. Kay (*pro hac vice* pending)
Reece Pelley (*pro hac vice* pending)
Grace Sullivan (*pro hac vice* pending)
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000
Email: michaelcarlinsky@quinnemanuel.com
williamburck@quinnemanuel.com
jamestecce@quinnemanuel.com
scotthartman@quinnemanuel.com
erickay@quinnemanuel.com
reecepelley@quinnemanuel.com
gracesullivan@quinnemanuel.com

**DEBEVOISE & PLIMPTON LLP**
Natasha Labovitz (admitted *pro hac vice*)
Erica S. Weisgerber (admitted *pro hac vice*)
Matthew Sorensen (admitted *pro hac vice*)
Chris Ceresa (admitted *pro hac vice*)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909-6000
Email: nlabovitz@debevoise.com
eweisgerber@debevoise.com
mjsorensen@debevoise.com
cjceresa@debevoise.com

*Attorneys for Defendants Patrick James, The Patrick James Trust, Albion Realty, LLC, Alester Technologies LLC, Battery Park Holding LLC, Bond Street Asset Management LLC, Ignite Acquisition Holdings LLC, Larchmont LLC, Pegasus Aviation, LLC*

## <u>CERTIFICATE OF SERVICE</u>

  I, Cameron Kelly, certify that on November 4, 2025, I caused a true and correct copy of the foregoing document to be served by the Court's CM/ECF system on all parties entitled to notice, and was served by electronic mail on the Debtors' counsel.

       */s/ Cameron M. Kelly*
       Cameron Kelly