## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **FIRST BRANDS GROUP, LLC**, *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |

## EMERGENCY MOTION OF DEBTORS FOR ORDER (I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER OBLIGATIONS AND (B) CONTINUE COMPENSATION AND BENEFITS PROGRAMS IN ORDINARY COURSE, AND (II) GRANTING RELATED RELIEF

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 9:00 A.M. (PREVAILING CENTRAL TIME) ON OCTOBER 1, 2025.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **THE DEBTORS HAVE REQUESTED THAT A HEARING BE CONDUCTED ON THIS MATTER ON OCTOBER 1, 2025, AT 9:00 A.M. (PREVAILING CENTRAL TIME).**
>
> **PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1-832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

EXHIBIT

A

> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows:

## Relief Requested

1. By this motion (the "**Motion**"), pursuant to sections 105(a), 363(b), and 507(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors request entry of an order (i) authorizing the Debtors to (a) pay Workforce Compensation Obligations and Employee Benefit Obligations (each, as defined below) and related expenses, fees, and costs attendant to the foregoing (collectively, the "**Workforce Obligations**"), and (b) maintain, and continue to honor and pay amounts with respect to the Debtors' business practices, programs, and policies for their employees as such were in effect as of the Petition Date and as such may be modified or supplemented in the ordinary course of business; and (ii) granting related relief.

2. A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**"). The monetary relief sought in the Proposed Order is discussed in further detail below and summarized in the following chart:

| Outstanding Prepetition Obligations | Total Relief Requested |
| --- | --- |
| Workforce Compensation Obligations | $16,310,000 |
| Employee Benefit Obligations | $17,410,000 |
| **Total Workforce Obligations** | **$33,270,000** |

**Background**

3.      On September 24, 2025, Global Assets LLC and 12 of the Debtors in the above-captioned chapter 11 cases each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  Commencing on September 28, 2025 (the "**Petition Date**"), First Brands Group, LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these chapter 11 cases.

4.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

5.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"),[2] filed contemporaneously herewith and incorporated herein by reference.

**Jurisdiction and Venue**

6.      The Court has jurisdiction and authority to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

### Debtors' Workforce

7.     As of the Petition Date, the Debtors collectively employ approximately 6,000 employees, approximately 5,970 of which are full-time[3] employees (the "**Full-Time Employees**") and approximately 30 of which are part-time employees (the "**Part-Time Employees**" and, together with the Full-Time Employees, the **"Employees"**).[4]  All of the Employees are located in the United States.  Approximately 1,200 of the Debtors' Employees are salaried, and approximately 4,800 are paid on an hourly basis.

8.     Further, approximately 1,830 (31%) of the Debtors' Employees (the "**Union Employees**") are represented by five (5) international and local unions (the "**Unions**"), including (i) United Auto Workers (UAW), (ii) United Steelworkers (USW), (iii) Plastic Workers Union, (iv) Chemical & Production Workers Union, and (v) Service Employees International Union (SEIU).  The Debtors are party to eight (8) collective bargaining agreements (collectively, the "**CBAs**") with the Unions.

9.     In addition to the Employees, the Debtors rely on services from a supplemental workforce that fluctuates from time to time but is currently comprised of approximately twelve (12) temporary employees sourced by third-party staffing agencies (the "**Temporary Employees**"), and approximately twelve (12) independent contractors who the Debtors pay directly (the "**Independent Contractors**" and together with the Temporary Employees, the "**Supplemental Workforce**").

---

[3]     An Employee is considered full-time if such Employee is scheduled to work at least 40 hours per week.

[4]     For the avoidance of doubt, the term "Employees" does not include the Temporary Employees or Independent Contractors (each as defined herein).  Compensation of the Temporary Employees and Independent Contractors is discussed more fully below.

10.     The Debtors' Employees and Supplemental Workforce (collectively, the "**Workforce**") are critical to the success of the Debtors' business, responsible for ensuring, among other things, that the Debtors' sales, technology, engineering, and operational segments run smoothly and that customer satisfaction is met on a daily basis.  The specialized skills and knowledge of the Workforce pertaining to the Debtors' infrastructure and operations are essential to ensuring a smooth transition into chapter 11 and maximizing estate value.

<b><u>Workforce Compensation Obligations</u></b>

11.     The Debtors' outstanding prepetition obligations related to compensation of the Workforce (collectively, the "**Workforce Compensation Obligations**") are summarized in the following chart and described in further detail below:

| Outstanding Prepetition Obligations | Total Relief Requested |
|---|---|
| Wages, Salaries, and Other Compensation | $5,590,000 |
| Expense Reimbursements | $40,000 |
| Withholding Obligations | $1,570,000 |
| Payroll Fees | $340,000 |
| Supplemental Workforce Obligations | $260,000 |
| Bonus and Profit Sharing Programs | $8,510,000 |
| **Total Workforce Compensation Obligations** | **$16,310,000** |

**A.     Wages, Salaries, and Other Compensation**

12.     In the ordinary course of business, the Debtors incur and pay various compensation-related obligations under various plans, programs, and policies offered to Employees.  The Debtors' payroll obligations generally include wages and salaries.  In addition to their normal wages, non-exempt[5] Employees are eligible for overtime pay at rates that vary by

---

[5]     An Employee may be exempt (i.e., not subject to overtime) or nonexempt (i.e., required to be paid overtime at time and a half) pursuant to the *Fair Labor Standards Act*.

5

facility.[6]  Salaried Employees are paid semi-monthly and hourly Employees are paid weekly in arrears.  On average, the Debtors' gross monthly payroll is approximately $52,840,000, which is paid either by direct deposit or delivery of a physical check.

13.     As of the Petition Date, the Debtors estimate owing approximately $5,590,000 on account of prepetition payroll obligations, including accrued but unpaid wages and salaries (the "**Unpaid Compensation**").[7]  The Debtors do not believe that any Employees are owed Unpaid Compensation in an amount exceeding the $17,150 priority cap imposed by section 507(a)(4) of the Bankruptcy Code (the "**Priority Cap**").

**B.     Expense Reimbursements**

14.     In the ordinary course of business, the Debtors reimburse certain Employees for reasonable and customary expenses incurred in the scope of their employment (collectively, the "**Expense Reimbursements**").  Expense Reimbursements generally include business-related expenses, such as travel, business entertainment, lodging, meals and other necessary expenses. Employees at the corporate-level seeking reimbursement of business-related expenses must submit physical receipts to their supervisor for approval before the reimbursement request is forwarded to payroll.  Non-corporate-level Employees are required to submit reimbursement requests through Concur Technologies, Inc., an expense reimbursement platform, unless the applicable expense was paid via a corporate credit card.[8]  The Debtors review, audit, and approve all such reimbursable

---

[6]     At a majority of the Debtors' facilities, non-exempt Employees are eligible for overtime at a rate of one and one-half times their regular rate for all hours worked in excess of 40 hours per week.

[7]     In the ordinary course of business, the Debtors also pay fees to individuals serving as board members.  Such fees are part of the Debtors' Workforce Compensation Obligations; however, no such fees are accrued and outstanding as of the Petition Date.

[8]     Additional information regarding the Debtors' credit card program and related requests for relief are included in the Cash Management Motion filed contemporaneously herewith.

expenses before reimbursing an Employee. On average, the Debtors estimate that they pay approximately $30,000 per month on account of Employee Expense Reimbursements.

15.     As of the Petition Date, the Debtors estimate owing approximately $40,000 on account of Employee Expense Reimbursements. By this Motion, the Debtors seek authority to pay all outstanding prepetition Employee Expense Reimbursements and to continue reimbursement of Employee Expense Reimbursements in the ordinary course of business.

## C.     Withholding Obligations

16.     For each applicable pay period, the Debtors deduct certain amounts from each Employee's gross pay, including 401(k) contributions and other pre- and after-tax deductions payable pursuant to certain of the Employee Benefits (as defined below) discussed herein and, where applicable, various garnishments, such as tax levies, child support, spousal support, and other court-ordered garnishments (collectively, the "**Deductions**").[9] On average, the Debtors deduct approximately $5,180,000 in payroll Deductions per monthly payroll cycle via Workday, Inc. ("**Workday**"), the Debtors' payroll administrator and processor, which OneSource Virtual, Inc. ("**OSV**"), remits to the appropriate third-party recipients on behalf of the Debtors.

17.     In addition to the Deductions, federal and state laws require the Debtors to withhold from Employees' gross pay amounts related to federal, state, and local taxes (collectively, the "**Withholdings**"), including income, Social Security, and Medicare taxes, for remittance to the appropriate taxing authorities. The Debtors are also required to match, from their own funds, amounts for Social Security and Medicare taxes and to pay additional amounts for federal and state unemployment insurance based on a percentage of gross payroll (collectively, the "**Employer**

---

[9]     Certain of the Deductions, particularly with respect to the Health Benefits Plans, FSAs, and HSAs (each, as defined below), are discussed further below in connection with the Employee Benefit Obligations.

**Payroll Taxes**" and, together with the Withholdings, the "**Payroll Taxes**").  On average, the Debtors pay approximately $11,310,000 in Payroll Taxes per monthly payroll cycle, which Workday and OSV deduct and remit to the appropriate third-party recipients on behalf of the Debtors.[10]

18.     As discussed above, the Debtors employ approximately 1,830 Union Employees.  Such Union Employees make certain Union-specific contributions that are withheld from their pay, including, but not limited to, Union dues and contributions (the "**Union Obligations**" and, together with the Payroll Taxes and the Deductions, the "**Withholding Obligations**").  The Debtors withhold the Union Obligations from the Employee Wages of the Union Employees and remit the withheld amounts to the Unions.  On average, the Debtors deduct and remit approximately $180,000 per month on account of the Union Obligations.  The Debtors do not make any separate contributions to the Unions on behalf of the Union Employees.

19.     As of the Petition Date, the Debtors estimate that they owe or are required to remit approximately $1,570,000 on account of prepetition Withholding Obligations.  To the extent any prepetition Withholding Obligations have not been forwarded to the appropriate third-party recipients as of the Petition Date, the Debtors seek authority by this Motion to forward all such amounts.  The Debtors seek authority to continue to forward Withholding Obligations to the applicable third-party recipients on a postpetition basis, whether or not such amounts relate to the prepetition period or postpetition period, in the ordinary course of business and consistent with past practice.

---

[10]     The Debtors have separately sought authority to pay workers' compensation claims through the Insurance Motion, filed contemporaneously herewith.

## D.    Payroll Fees

20.    Workday serves as the administrator and processor of the Debtors' payroll and benefits obligations and OSV facilitates direct deposits to the appropriate third-party recipients and ensures proper tax and benefits withholdings are made.  On average, the Debtors pay Workday administration fees totaling approximately $280,000 per quarter (the "**Workday Fees**"). Additionally, the Debtors pay OSV payroll processing fees in arrears totaling approximately $30,000 per month (the "**OSV Fees**" and together with the Workday Fees, the "**Payroll Fees**").

21.    As of the Petition Date, the Debtors estimate owing approximately $340,000 on account of the Payroll Fees.  By this Motion, the Debtors seek authority to pay all such Payroll Fees, whether or not such amounts relate to the prepetition period or postpetition period, as they come due in the ordinary course of business.

## E.    Supplemental Workforce Obligations

22.    *Temporary Employee Obligations*.  At various times, and depending on their particular needs at any given time, the Debtors utilize the services of two (2) third-party staffing agencies, Jobandtalent Inc. and Focus Workforce Management, Inc. (collectively, the "**Staffing Agencies**") to engage the Temporary Employees to work for the Debtors on limited engagements.  The Temporary Employees provide fundamental services in key areas, such as warehouse and inventory management.  When required, the Staffing Agencies source Temporary Employees directly to the applicable Debtor.

23.    The Debtors do not pay wages, withhold taxes, or provide benefits to the Temporary Employees.  Rather, the Debtors make payments to the Staffing Agencies based upon the number of hours worked by the Temporary Employees.  In turn, the applicable Staffing Agency pays the Temporary Employees' wages minus any administrative fees, including, among other things, any benefit contributions.  On average over the past twelve months, the Debtors have

incurred approximately $290,000 in the aggregate on account of the Temporary Employees, including fees owed to the Staffing Agencies (collectively, the "**Temporary Employee Obligations**").  As of the Petition Date, the Debtors estimate owing approximately $100,000 on account of accrued but unpaid Temporary Employee Obligations.

24.     *Independent Contractor Obligations*.    In addition to the Temporary Employees, the Debtors utilize Independent Contractors from time to time to perform discrete tasks, including, but not limited to various back office functions.  The Independent Contractors are paid pursuant to invoices for their services.  To date in 2025, the Debtors have paid the Independent Contractors approximately $270,000.  As of the Petition Date the Debtors estimate that they owe approximately $160,000 on account of accrued, but unpaid amounts to Independent Contractors (the "**Independent Contractor Obligations**" and together with the Temporary Employee Obligations, the "**Supplemental Workforce Obligations**").

25.     It is critical that the Debtors are able to continue honoring their obligations with respect to the Supplemental Workforce.  As described above, the Supplemental Workforce is essential to the Debtors' ordinary course operations and remaining current with respect to the Supplemental Workforce Obligations will help minimize unnecessary disruption to the Debtors' operations at a critical time in these chapter 11 cases as the Debtors seek to stabilize their business. Accordingly, the Debtors request authority to continue to retain the Supplemental Workforce and pay the Supplemental Workforce Obligations, whether or not such amounts relate to the prepetition period or postpetition, as they come due in the ordinary course of business.

**F.     Bonus and Profit-Sharing Programs**

26.     *Bonus Program*.  As part of the Workforce Compensation Obligations, the Debtors also maintain, in the ordinary course, a bonus program designed to motivate and reward their salaried Employees at both the corporate and site levels (the "**Bonus Program**").  The Bonus

Program is maintained entirely in the discretion of the Debtors' management.  As part of the Bonus Program, all of the Debtors' salaried Employees are eligible to receive annual performance-based cash bonuses, commonly a predetermined percentage of base salary as set forth in the employee's offer letter and tied to the annual performance of the Debtors and the individual (each, a "**Discretionary Bonus**").  In August 2025, the Debtors informed 321 non-executive[11] salaried Employees that they were deferring payment of Discretionary Bonuses earned by such Employees in 2024 to November 2025 (the "**2024 Deferred Bonuses**").  As of the Petition Date, the Debtors estimate they owe approximately $8,500,000 on account of the 2024 Deferred Bonuses.

27.     By this Motion, the Debtors seek authority, but not direction, to pay unpaid prepetition obligations related to the 2024 Deferred Bonuses.  For the avoidance of doubt, the Debtors do not seek authority to make payments on account of the 2024 Deferred Bonuses to any Insiders (as defined by section 101(31) of the Bankruptcy Code) or executives.  These bonuses are an integral component of these employees' overall compensation, and they have relied on receiving them in connection with their continued employment.  Failure to pay the 2024 Deferred Bonuses would risk significant harm to morale and retention, which in turn could adversely impact the Debtors' operations.  Accordingly, authorizing payment of the 2024 Deferred Bonuses is essential to maintaining workforce stability and maximizing value for the Debtors' estates.

28.     The Debtors also seek authority, but not direction, to continue the Bonus Program in the ordinary course; *provided*, that (i) the Debtors do not seek authority to continue the Bonus Program or make any payments under the Bonus Program as it relates to any Insiders and

---

[11]     The Debtors' executives consist of approximately 30 individuals who make up the Debtors' most senior Employees.  The Debtors are not seeking authority to pay any amounts to the executives at this time.

(ii) any necessary approvals related to the Bonus Program will now be provided by the Debtors' Chief Restructuring Officer.

29. ***Profit Sharing Program***.  In the ordinary course of business, Debtor Walbro LLC ("**Walbro**") pays Union Employees up to 4% of the profits of the Cass City, Michigan facility (the "**Profit Sharing Program**") as governed by the CBA with Local 9699, UAW.  The applicable portion of the Debtors' gross margin at such facility is prorated among eligible Employees based on the Employees' hours of work during the applicable year and seniority level.  The Debtors pays obligations arising under the Profit Sharing Program annually following the calendar year in which the profits were accrued, usually in April.  In April 2025, the Debtors paid approximately $79,000 on account of obligations arising under the Profit Sharing Program in 2024.  By this Motion, the Debtors seek authority to continue the Profit Sharing Program in the ordinary course consistent with historical practices.

30. ***Deferred Compensation Plan and Trust***.  The Company maintains a nonqualified deferred compensation plan (the "**Deferred Compensation Plan**"), which is an unfunded plan maintained primarily for the purpose of providing deferred compensation benefits for a select group of management or highly compensated employees for purposes of the Employee Retirement Income Security Act of 1974.

31. As of the Petition Date, there are 27 current Employees entitled to participate in, and 18 Employees with account balances in, the Deferred Compensation Plan (the "**DCP Participants**").  Under the Deferred Compensation Plan, the Company makes "employer contributions" to the Deferred Compensation plan on behalf of the DCP Participants each year, which contributions generally vest based on the DCP Participants' continued employment over a three-year period.  DCP Participants may receive distributions following

vesting or upon the occurrence of certain permissible payment events, in accordance with Section 409A of the Internal Revenue Code. The Debtors maintain notional accounts for DCP Participants that track the contributed amounts and credit such account with gains and losses based on hypothetical investments. As of the Petition Date, the DCP Participants' aggregate balance in the Deferred Compensation Plan totaled approximately $13,340,000. For the avoidance of doubt, the Debtors do not intend to make any postpetition contributions or disbursements on account of the Deferred Compensation Plan.

32.     In connection with the Deferred Compensation Plan, the Debtors maintain a "rabbi trust" (the "**Deferred Compensation Trust**") with Principal Trust Company ("**Principal**") for the benefit of the DCP Participants. As of the Petition Date, there is approximately $3,730,000 of assets in the Deferred Compensation Trust. Because the Deferred Compensation Trust is a "rabbi trust," the DCP Participants have no preferred claim on, or any beneficial ownership interest in, any assets of such trust. The Debtors pay Principal a quarterly administrative and service fee of $4,000, and as of the Petition Date the Debtors estimate that they owe Principal approximately $10,000 for accrued, but unpaid fees related to the Deferred Compensation Trust. The Debtors request authority, but not direction, to pay all outstanding prepetition administrative and service fees incurred on account of the Deferred Compensation Trust, and to continue to pay all administrative and service fees related to the Deferred Compensation Trust on a postpetition basis, in the ordinary course of business. The Debtors are not requesting an order relating to the account balances of DCP Participants pursuant to this Motion, and any such relief will be sought pursuant to separate order of the Court.

### Employee Benefit Obligations

33.     In the ordinary course of business, the Debtors make various benefit plans and programs available to their Employees. These benefit plans, programs, and practices fall

within the following categories: (i) obligations relating to unpaid and paid leave benefits for Employees (collectively, the "**Employee Leave Benefits**"); (ii) medical, prescription drug, dental, and vision benefits, including health savings accounts and flexible spending accounts, life insurance, accidental death and dismemberment ("**AD&D**") insurance, short-term and long-term disability insurance, voluntary supplemental insurance programs, and certain other benefits (collectively, the "**Health and Welfare Benefits**"); (iii) a 401(k) retirement savings plan, a 401(h) retirement healthcare plan, pension plans, non-qualified plans, and Other Post-Employment Benefit (OPEB) plans (the "**Retirement Benefits**"); and (iv) discretionary non-Insider severance (the "**Non-Insider Severance**") (each of (i)–(iv), an "**Employee Benefit**," collectively, the "**Employee Benefits**," and the obligations owed thereunder, the "**Employee Benefit Obligations**").

34.     The outstanding prepetition Employee Benefit Obligations are summarized in the chart below:

| Outstanding Prepetition Obligations | Total Relief Requested |
|---|---|
| Employee Leave Benefits | $10,840,000 |
| Health and Welfare Benefits | $4,230,000 |
| Retirement Benefits | $1,550,000 |
| Non-Insider Severance | $790,000 |
| **Total Employee Benefit Obligations** | **$17,410,000** |

A.      **Employee Leave Benefits**

35.     Employee Leave Benefits include, among other things, paid time off ("**PTO**"), employee and family sick leave, parental leave, holidays, bereavement leave, jury duty, voting leave, and military leave.  All Full-Time Employees accrue up to 15 days or 120 hours of PTO per year, prorated by pay period, and up to five days of accrued but unused PTO may be carried over from the prior calendar year.  Part-time Employees are eligible to accrue up to between

40 and 120 hours of PTO on a pro-rated basis, depending on their level of seniority. Upon termination of employment, eligible Employees receive a cash payout for accrued but unused PTO up to the Employee's last day of employment with the Debtors.

36. As of the Petition Date, the Debtors estimate an aggregate of approximately $10,840,000 in Employee Leave Benefits have accrued, some of which may become payable during the chapter 11 cases, although the amount is dependent upon when Employees take time off and/or terminate their employment. By this Motion, the Debtors request authority to continue providing the Employee Leave Benefits in the ordinary course of business and to pay any prepetition amounts that may be owing with respect to the Employee Leave Benefits.

**B.     Health and Welfare Benefits**

37. The Debtors offer several Health and Welfare Benefits to eligible Employees, including (i) medical (including prescription drug coverage), vision, and dental plans, (ii) health savings accounts and flexible spending accounts, (iii) life insurance, AD&D insurance, and short-term and long-term disability benefits, and (v) other voluntary health and welfare programs.

38. *Medical Plans*. The Debtors' medical coverage for Employees is provided through self-insured medical plans (the "**Medical Plans**"). Consociate Health ("**Consociate**") administers the Medical Plans for all of the Debtors except for Debtors Eagle Casting, LLC ("**Eagle Casting**") and Eagle Machining, LLC ("**Eagle Machining**"), which are administered by Blue Cross Blue Shield ("**BCBS**"). Aetna Inc. ("**Aetna**") provides a network of healthcare providers for the Medical Plans administered by Consociate (the "**Aetna/Consociate Plans**") while BCBS provides a network of healthcare providers for the Medical Plans it administers (the "**BCBS Plans**"). Enrollment in the Aetna/Consociate Plans entitles Employees to prescription drug coverage managed by Livinity while enrollment in the BCBS Plans entitles Employees to

prescription drug coverage provided by BCBS. The administrative costs of prescription drug coverage are included in the administrative fees paid to Consociate and BCBS, respectively.

39.     The Medical Plans are available to full-time Employees working 30 hours or more per week and their eligible dependents which may include legal spouses and domestic partners, dependent children up to age 26 and dependent children over age 26 who are incapable of self-support. The Debtors estimate that approximately 3,300 active Employees are covered under the Medical Plans as of the Petition Date. The Debtors paid approximately $26,300,000 in 2024 on account of claims, contributions, and fees arising under the Medical Plans. The Debtors pay Consociate approximately $160,000 per month to administer the Aetna/Consociate Plans. As of the Petition Date, the Debtors estimate that Consociate is owed approximately $160,000 in accrued but unpaid administrative fees and Aetna is owed approximately $70,000 in accrued but unpaid fees on account of the Aetna/Consociate Plans. There are currently approximately $1,330,000 in open claims under the Consociate/Aetna Plans. As of the Petition Date, the Debtors estimate that BCBS is owed approximately $50,000 in accrued but unpaid fees on account of the BCBS Plans and there are currently approximately $420,000 in open claims under the BCBS Plans.

40.     ***Dental Plan***. In addition to the Medical Plans, the Debtors offer a self-insured dental plan administered by Delta Dental of Ohio ("**Delta Dental**") to eligible Employees (the "**Dental Plan**"). Approximately 3,900 Employees have coverage under the Dental Plan. The Debtors pay Delta Dental approximately $110,000 per month to administer the Dental Plan. As of the Petition Date, the Debtors estimate that Delta Dental is owed approximately $160,000 in accrued but unpaid claims, premiums, and administrative fees on account of the Dental Plan.

41.     ***Vision Plan***. VSP Vision ("**VSP**") administers the Debtors' self-insured vision care plan (the "**Vision Plan**" and together with the Medical Plans and the Dental Plan, the

"**Health Benefits Plans**"). Approximately 2,500 Employees have coverage under the Vision Plan. The Debtors pay VSP approximately $10,000 per month to administer the Vision Plan. As of the Petition Date, the Debtors estimate that VSP is owed approximately $10,000 in accrued but unpaid claims, premiums, and administrative fees on account of the Vision Plan.

42. By this Motion, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Health Benefits Plans, and to continue honoring obligations related to the Health Benefits Plans on a postpetition basis, in the ordinary course of business.

43. *Health Savings Accounts and Flexible Spending Accounts*. Employees enrolled in the Debtors' high-deductible Medical Plan may enroll in a health savings account (each, an "**HSA**"), and Employees not enrolled in the Debtors' high-deductible Medical Plan or contributing to an HSA may enroll in a flexible spending account (each, an "**FSA**"). During the annual enrollment period, eligible Employees may choose to designate a portion of their pre-tax wages or salary towards their HSA or FSA, as applicable, up to the maximum amount permitted by the Internal Revenue Service, which they can then use for eligible healthcare expenses. Pursuant to the HSA and FSA plans, the Debtors withhold funds from the HSA and FSA plan participants' pre-tax payroll. Approximately 2,000 Employees are enrolled in an HSA, and approximately 223 Employees are enrolled in an FSA.

44. The Debtors pay Consociate approximately $10,000 per month to administer the HSAs and FSAs for all of the Debtors except for Eagle Casting and Eagle Machining. The Debtors pay Health Equity approximately $1,000 per month to administer the HSAs and FSAs for Eagle Casting and Eagle Machining. Employees participating in HSA plans are entitled to a $250 contribution from the Debtors to their HSA each quarter provided that such

Employees make qualifying wellness visits to on-site Archive Clinics (described in further detail below). The Debtors' quarterly contributions to HSAs for visits to the Archive Clinics have averaged approximately $300,000 per quarter in 2025. As of the Petition Date, the Debtors estimate that they owe approximately $291,000 in accrued but unpaid amounts related to the HSAs and FSAs, which includes the quarterly contribution for the third quarter of 2025. The Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the HSAs and FSAs, and to continue honoring obligations related to the HSAs and FSAs on a postpetition basis, in the ordinary course of business.

45. ***Archive Health Clinics***. The Debtors also contract with Archive Health LLC ("**Archive**") to provide onsite family care clinics at certain of the Debtors' facilities (the "**Archive Health Clinics**"). Such clinics provide comprehensive primary care, annual physical and screenings, family health, urgent care, prescription refills, nutrition, and lifestyle coaching services. The Debtors pay Archive approximately $400,000 per month in connection with the Archive Health Clinics, including both service fees which vary by facility and cost and expense reimbursements. As of the Petition Date, the Debtors estimate that they owe approximately $930,000 to Archive on account of obligations related to the Archive Health Clinics.

46. ***COBRA***. Under the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), Employees who are terminated, or covered family members who become ineligible for coverage due to divorce or age, have the right to continue health benefits for a limited period of time and under certain circumstances. The Debtors provide COBRA benefits as required by law through Anthem Blue Cross Blue Shield Association ("**Anthem**"). The COBRA benefits are administered by Consociate for all of the Debtors except Eagle Casting and Eagle Machining.

Case 25-90088 Document 361 Filed in TXSB on 09/29/25 Page 19 of 40

COBRA benefits for Eagle Casting and Eagle Machining are administered by Chard Snyder.

Employees who elect COBRA continuation coverage are responsible for paying the full cost of

such coverage at the statutory rate.  As of the Petition Date, approximately 29 of the Debtors'

former Employees have elected to receive COBRA continuation coverage.

47.     In exchange for administration of the Debtors' COBRA program,

Consociate is entitled to a monthly administration fee of approximately $10,000 per month and

Chard Snyder is entitled to an administration fee of approximately $100 per month.  As of the

Petition Date, the Debtors estimate that they owe or are required to remit approximately $50,200

to Anthem, Consociate, and Chard Snyder on account of the COBRA benefits.  By this Motion,

the Debtors request authority to continue offering the COBRA benefits and to pay any amounts

that may be owing with respect to such benefits, whether or not such amounts relate to the

prepetition period, as they come due in the ordinary course of business.

48.     ***Welfare Benefit Programs***.  The chart below outlines the available welfare

benefit programs available to Employees, including those the Debtors pay directly

(each, a "**Benefit Provided by Debtors**") and voluntary programs the Debtors fund through

Deductions from participating Employees (each, a "**Voluntary Benefit**"):

| Type of Benefit | Provided by Debtors/Voluntary |
|---|---|
| Health Savings Accounts / Flexible Spending Accounts | Voluntary Benefit |
| Basic Short- and Long-Term Disability Insurance | Benefit Provided by Debtors |
| Basic Life Insurance and AD&D Insurance | Benefit Provided by Debtors |
| Voluntary Life and AD&D Insurance | Voluntary Benefit |
| Voluntary Accident Insurance | Voluntary Benefit |
| Voluntary Critical Illness | Voluntary Benefit |
| Employee Assistance Program | Benefit Provided by Debtors |

49.    ***Benefits Provided by Debtors***.  Through Symetra, the Debtors offer basic life insurance (the "**Life Insurance Plan**"), basic long-term and short-term disability insurance (the "**Disability Plan**"), and basic AD&D insurance (the "**AD&D Insurance Plan**") to all Employees, who are automatically enrolled in each such insurance plan.  Symetra's administrative fees are built into the premium rates offered to the Debtors for the Life Insurance Plan, Disability Plan, and AD&D Insurance Plan, which equate to, in the aggregate, a monthly average of approximately $320,000.  In addition to the foregoing, the Debtors provide an employee assistance program (the "**Employee Assistance Program**") to all Employees which includes professional counseling services through ComPsych for a variety of personal and work-related issues.  The cost of the Employee Assistance Program is covered by the administrative fees paid to Symetra.

50.    As of the Petition Date, the Debtors estimate that there are approximately $630,000 in accrued but unpaid amounts owing on account of the Benefits Provided by Debtors.  By this Motion, the Debtors request authority to continue offering the Benefits Provided by Debtors and to pay any amounts that may be owing with respect to such benefits as they come due in the ordinary course of business.

51.    ***Voluntary Benefit Plans***.  Eligible Employees may also participate in certain voluntary benefit plans provided by Symetra, including, among others, critical illness insurance, accident insurance, and supplemental life, AD&D, and disability insurance plans (collectively, the "**Voluntary Benefit Plans**").  Symetra's administrative fees are built into the premium rates offered to the Debtors for the Voluntary Benefit Plans.  In general, the Voluntary Benefit Plans cost, in the aggregate, approximately $60,000 per month and are partially funded through premiums the Debtors withhold from participating Employees as Deductions and transfer

to Symetra.  The Debtors seek authority to remit all such Voluntary Benefit Plan expenses as they come due in the ordinary course of business.

52.     As of the Petition Date, the Debtors estimate that they are required to remit approximately $120,000 on account of the Voluntary Benefit Plans.  By this Motion, the Debtors request authority to continue offering the Voluntary Benefit Plans and to pay any amounts that may be owing with respect to such benefits as they come due in the ordinary course of business.

## C.     Retirement Benefits

53.     ***401(k) Plans***.  The Debtors maintain a defined contribution plan meeting the requirements of section 401(k) of the Internal Revenue Code (the "**401(k) Savings Plan**"), which is managed by Empower Annuity Insurance Company of America ("**Empower**").[12]  There are approximately 22,000 participants, including former Employees, with account balances in the 401(k) Savings Plan.  As part of the 401(k) Savings Plan, the Debtors are required to match certain Union Employees' 401(k) contributions as governed by the applicable CBAs.  The Debtors also contribute $300 per year of service towards the 401(k) Savings Plans of a select group of Employees upon their retirement.   The Debtors collect Employees' contributions through Deductions from participating Employees' gross pay each weekly or biweekly payroll cycle, as applicable, throughout the year.  The Debtors make disbursements to the 401(k) Savings Plan in an amount equal to the Employee contributions plus the applicable matching obligation or other applicable Employer contributions, on a weekly or biweekly basis, as applicable, on the payroll date to a trust established under the 401(k) Savings Plan.

---

[12]    Debtor Walbro previously maintained a Safe Harbor 401(k) savings plan for its Employees, which merged with the 401(k) Savings Plan in January 2025.  For the avoidance of doubt, the Debtors have no further obligations in connection with the Safe Harbor 401(k) savings plan and do not seek any relief in connection therewith.

54.     As of the Petition Date, the Debtors estimate owing approximately $80,000 on account of matching contributions pursuant to the 401(k) Savings Plan.  The Debtors request authority to continue administering the 401(k) Savings Plan and to make disbursements to the 401(k) Savings Plan in the amount equal to the Employee contributions plus any employer matching obligation or other applicable employer contributions and pay any related fees, whether or not such amounts relate to the prepetition period, as they become due in the ordinary course of business.

55.     ***401(h) Plan***.  Debtor Dalton Corporation ("**Dalton**") maintains a retirement healthcare plan (the "**401(h) Plan**") for the benefit of certain retirees at the Dalton manufacturing facility in Warsaw, Indiana.  Under the 401(h) Plan, retirees are entitled to withdraw saved funds that were deducted from their past paychecks to pay for their healthcare expenses.  Until September 23, 2025, the assets of the 401(h) Plan were held in the same trust as the assets of the Dalton Pension Plan.  On September 21, 2025, the assets of the 401(h) Plan, which total approximately $1.6 million were transferred to a separate trust, administered by TIAA, pursuant to an administrative services agreement dated as of July 8, 2025.  As administrator of the 401(h) Plan, TIAA is entitled to annual fees based on the number of claims against the trust as well as certain fixed annual fees related to trust services and tax filing obligations.  As of the Petition Date the Debtors do not believe that they owe any amounts related to the 401(h) Plan, however, for the avoidance of doubt, the Debtors seek authority, but not direction, to pay and remit all prepetition obligations on account of the 401(h) Plan, and to continue to pay amounts due related to the 401(h) Plan in the ordinary course of business.

56. ***Pension Plans***. Certain Debtors[13] contribute to four (4) local single-employer defined benefit pension plans and one multiemployer pension plan (the "**Pension Plans**") pursuant to their CBAs with certain bargaining units which are administered jointly by the applicable Debtors and union representatives. The Debtors currently make quarterly contributions to the Cardone Pension Plan and monthly contributions to the Carter Fuel Systems Pension Plan. The Debtors also anticipate that they will be required to make a contribution to the Walbro Pension Plan in April 2026. No contributions are currently contemplated on account of the Dalton and Fram Pension Plans. In addition, in connection with the Pension Plans, the Debtors are obligated, pursuant to ERISA, to make certain statutory insurance premium payments to the Pension Benefit Guaranty Corporation of approximately $580,000 per year (the "**PBGC Premiums**"). The Debtors paid the PBGC Premiums in September for calendar year 2025 and believe they are current on obligations related to the PBGC Premiums.

57. As of the Petition Date, the Debtors believe they owe, in the aggregate, approximately $480,000 of unpaid contributions to the Pension Plans. By this Motion, the Debtors seek authority, but not direction, to pay and remit all prepetition obligations on account of the Pension Plans, and to continue to pay amounts due on account of the Pension Plans (including PBGC Premiums) in the ordinary course of business.

58. ***Non-Qualified Plans***. The Debtors also make contributions to two (2) non-qualified annuity payment plans for the benefit of retirees (collectively, the "**Non-Qualified Plans**"). As of the Petition Date, there are no active participants in the Non-Qualified Plans and the Non-Qualified Plans only provide benefits to a closed group of retirees and their spouses. AON

---

[13]   Such Debtors include (i) Cardone Industries, Inc. ("**Cardone**"); (ii) Carter Fuel Systems, LLC ("**Carter Fuel Systems**"); (iii) Dalton; (iv) Fram Group Operations LLC ("**Fram**"); and (v) Walbro.

provides the Debtors with actuarial services related to the Non-Qualified Plans. The Debtors estimate that annual payments on account of the Non-Qualified Plans are approximately $117,000.

59. As of the Petition Date, the Debtors believe that they owe, in the aggregate, approximately $90,000 of unpaid contributions and approximately $230,000 for actuarial services related to the Non-Qualified Plans. By this Motion, the Debtors seek authority to pay and remit any accrued, unpaid obligations with respect to the Non-Qualified Plans, and to continue to pay amounts due with respect to the Non-Qualified Plans in the ordinary course of business.

60. ***OPEB Plans***. The Debtors also make contributions to post-retirement medical and life insurance plans (the "**OPEB Plans**"), including pursuant to their CBAs with certain unions. As of the Petition Date, there are approximately 1,600 former Employees currently participating in the OPEB Plans. The number of participating Employees could increase if additional eligible Employees experience a qualifying termination of employment postpetition. AON provides the Debtors with actuarial services related to the OPEB Plans. The Debtors estimate that annual payments on account of the OPEB Plans are approximately $940,000.

61. As of the Petition Date, the Debtors believe that they owe, in the aggregate, approximately $80,000 of unpaid policy premiums and approximately $100,000 for actuarial services related to the OPEB Plans. By this Motion, the Debtors seek authority to pay and remit any accrued, unpaid obligations with respect to the OPEB Plans, and to continue to pay amounts due with respect to the OPEB Plans in the ordinary course of business.

**D.     Non-Insider Severance**

62. Under the terms of certain CBAs, the Debtors are obligated to pay severance, in certain circumstances, to certain eligible Union Employees (the "**CBA Severance Obligations**"). From time to time, the Debtors are also obligated to pay severance, in certain circumstances, pursuant to the terms of certain employment contracts (the "**Employment**

Contract **Severance Obligations**" and together with the CBA Severance Obligations,
the "**Contractual Severance Obligations**").  Additionally, the Debtors maintain an informal
practice of paying severance to certain salaried Employees as determined in the Debtors' sole
discretion.  This practice is fully discretionary and typically provides eight and a half (8.5) weeks'
pay to hourly Employees upon a reduction in force of more than fifty (50) such Employees within
a six (6) month period (the "**Informal Discretionary Severance Obligations**" and together with
the Contractual Severance Obligations, the "**Severance Obligations**").

63.     As of the Petition Date, the Debtors not believe they owe any outstanding
amounts on account of the CBA Severance Obligations and estimate owing approximately
$790,000 on account of the Employment Contract Severance Obligations and Informal
Discretionary Severance Obligations.  By this Motion, the Debtors seek authority, but not
direction, to pay any accrued and unpaid Severance Obligations in the ordinary course of business,
and to continue to honor such awards, in their discretion where applicable, in the ordinary course
of business, on a postpetition basis.  For the avoidance of doubt, the Debtors are not seeking
authority to pay or honor any severance payments to Insider Employees absent further order of the
Court.

### Relief Requested Should Be Granted

## I.     Payment of Workforce Obligations Is Warranted Under Sections 363(b) and 105(a) of Bankruptcy Code

64.     The Court may grant the relief requested herein pursuant to section 363(b)
of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a
hearing, may use, sell, or lease, other than in the ordinary course of business, property of the
estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use
property of the estate outside of the ordinary course of business pursuant to section 363(b) of the

25

Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 434–35 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation and citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted).

65.     In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)). Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 491–93 & n.6 (holding that

sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *In re CEI Roofing*, 315 B.R. at 56.  Moreover, Bankruptcy Rule 6003 implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "needed to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Accordingly, the Bankruptcy Code authorizes the payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of the debtor's estate.

66.     The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 363(b) and 105(a) of the Bankruptcy Code.  Authorizing the Debtors to pay the prepetition amounts related to the Workforce Obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Indeed, without the relief requested herein being granted, the Debtors are at risk of significant Employee attrition, as the Debtors' Employees may seek alternative opportunities, perhaps with the Debtors' competitors.  Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.  Additionally, the loss of valuable Employees would deplete the Debtors' workforce, thereby hindering the Debtors' ability to maintain continuity of operations, likely diminishing the Debtors' ability to implement their chapter 11 objectives of maximizing value to the detriment of the Debtors' estates and stakeholders.

67.     Moreover, failure to satisfy the prepetition Workforce Obligations will likely jeopardize Employee morale and loyalty at a time of perceived uncertainty in light of the

commencement of these chapter 11 cases, a time when the Debtors need the Employees to perform at peak efficiency. The majority of the Debtors' Employees rely exclusively or primarily on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses and support their families. These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid Workforce Compensation Obligations. Additionally, if the Court does not authorize the Debtors to honor their various obligations under the Employee Benefits Programs, many Employees may lose access to vital health and insurance coverage.

68.     Similarly, the Supplemental Workforce is an integral component of the Debtors' operations, ensuring that key services critical to the Debtors' business continue while the Debtors pursue a value-maximizing transaction. The Supplemental Workforce provides fundamental services in key areas, such as warehouse and inventory management and various back office functions. Failure to timely pay the Temporary Employee Obligations would endanger the Debtors' prospects of successful chapter 11 cases and cause widespread negative effects throughout the Debtors' business.

69.     Accordingly, the relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 363(b) and 105(a) of the Bankruptcy Code. Authorizing the Debtors to pay or honor the Workforce Obligations will benefit the Debtors' estates and their stakeholders by providing the greatest likelihood of retention of the Debtors' Employees and allowing the Debtors' business operations to continue without interruption.

## II.     Payment of Workforce Obligations Would Not Prejudice Parties in Interest

70.     The Debtors believe that the majority of the prepetition Workforce Obligations are entitled to priority treatment under sections 507(a)(4) and 507(a)(5) of the

Bankruptcy Code. Specifically, under section 507(a)(4)(A) of the Bankruptcy Code, claims of employees for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status up to $17,150 per individual. 11 U.S.C. § 507(a)(4)(A). Similarly, under section 507(a)(5) of the Bankruptcy Code, claims related to "contributions to an employee benefit plan . . . arising from services rendered within 180 days" prior to the Petition Date are also afforded priority unsecured status up to the statutory limits described therein. 11 U.S.C. § 507(a)(5). As priority claims, the Workforce Obligations are entitled to payment in full before any non-priority general unsecured claims asserted against the Debtors can be satisfied. Thus, the relief requested affects only the timing of the payment of the priority prepetition Workforce Obligations and should not prejudice the rights of general unsecured creditors or other parties in interest.

III.     **Payment of Certain Workforce Obligations Is Required by Law**

71.     The Debtors also seek authority to remit certain Withholding Obligations to the appropriate third parties. These amounts principally represent Employee earnings that governments, judicial authorities, and Employees themselves have designated for deduction from Employees' paychecks. Indeed, certain Deductions, including contributions to Employee Benefits, child support, and alimony payments, are not property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold"); *Begier v. IRS*, 496 U.S. 53, 66–67 (1990) (concluding that withholding taxes are property held by a debtor in trust for another and are therefore not property of debtor's estate).

72.     Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks.  *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring corporate debtor to withhold city income tax from its employees' wages created trust relationship between debtor and city for payment of withheld income taxes); *DuCharmes & Co. v. Michigan (In re DuCharmes & Co.)*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Failure to timely pay Workforce Obligations may place the Debtors in violation of applicable law in a number of jurisdictions.  Because Withholding Obligations are not property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations to the proper third parties in the ordinary course of business.

73.     For the foregoing reasons, payment of the prepetition Workforce Obligations and continuation of Employee compensation and benefits programs are necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases.  Accordingly, the Court should authorize the relief requested herein.

### Applicable Financial Institutions
### Should Be Authorized to Receive, Process, Honor, and Pay
### Checks Issued and Transfers Requested to Pay Workforce Obligations

74.     The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by or on behalf of the Debtors relating to the Workforce Obligations, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payment.  The Debtors represent that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to the authorized payment of Workforce Obligations.  Accordingly,

the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently. Any such financial institution may rely on the representations of such Debtors as to which checks are issued or wire transfers are made (or, as applicable, requested to be issued or made) and authorized to be paid in accordance with this Motion without any duty of further inquiry. The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or funds transfer requests on account of Workforce Obligations that are dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

### Debtors Have Satisfied Bankruptcy Rule 6003(a)

75. Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003. Bankruptcy Rule 6003(a) provides that, to the extent relief is needed to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting a motion to "use, sell, or lease property of the estate, including a motion to pay all or a part of a claim that arose before the petition was filed" or a motion to "incur any other obligation regarding the property of the estate" prior to 21 days after the Petition Date. Fed. R. Bankr. P. 6003(a). As explained above and in the First Day Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted. Accordingly, the Debtors submit that the relief requested herein is needed to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Debtors' Compliance with Bankruptcy Rule 6004(a) and 6004(h)

76. To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm

to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **Reservation of Rights**

77.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Motion, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code. The Debtors expressly reserve all rights with respect to the foregoing matters. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## **Notice**

78.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## **No Previous Request**

79.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  September 29, 2025
        Houston, Texas

                                           */s/  Clifford W. Carlson*
                                           WEIL, GOTSHAL & MANGES LLP
                                           Gabriel A. Morgan (24125891)
                                           Clifford W. Carlson (24090024)
                                           700 Louisiana Street, Suite 3700
                                           Houston, Texas 77002
                                           Telephone:  (713) 546-5000
                                           Facsimile:  (713) 224-9511
                                           Email:  gabriel.morgan@weil.com
                                                   clifford.carlson@weil.com

                                           -and-

                                           WEIL, GOTSHAL & MANGES LLP
                                           Matthew S. Barr (*pro hac vice* pending)
                                           Sunny Singh (*pro hac vice* pending)
                                           Andriana Georgallas (*pro hac vice* pending)
                                           Kevin Bostel (*pro hac vice* pending)
                                           Jason H. George (*pro hac vice* pending)
                                           767 Fifth Avenue
                                           New York, New York 10153
                                           Telephone:  (212) 310-8000
                                           Facsimile:  (212) 310-8007
                                           Email:  matt.barr@weil.com
                                                   sunny.singh@weil.com
                                                   andriana.georgallas@weil.com
                                                   kevin.bostel@weil.com
                                                   jason.george@weil.com

                                           *Proposed Attorneys for Debtors*
                                           *and Debtors in Possession*

## Certificate of Service

I hereby certify that on September 29, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


       */s/ Clifford W. Carlson*
       Clifford W. Carlson

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | Case No. 25-90399 (CML) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |

ORDER (I) AUTHORIZING DEBTORS TO (A) PAY
PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, AND
OTHER OBLIGATIONS AND (B) CONTINUE COMPENSATION AND BENEFITS
PROGRAMS IN ORDINARY COURSE, AND (II) GRANTING RELATED RELIEF

Upon the motion, dated September 29, 2025 (the "**Motion**"),[2] of First Brands

Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**"), for entry of an order, pursuant to sections 105(a),

363(b), and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing

the Debtors to (a) pay Workforce Compensation Obligations and Employee Benefit Obligations

and related expenses, fees, and costs attendant to the foregoing, and (b) maintain, and continue to

honor and pay amounts with respect to the Debtors' business practices, programs, and policies for

their employees as such were in effect as of the Petition Date and as such may be modified or

supplemented in the ordinary course of business; and (ii) granting related relief, all as more fully

set forth in the Motion; and this Court having jurisdiction and authority to consider the Motion and

the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b); and consideration of

the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon consideration of the First Day Declaration; and upon any hearing held on the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003 and is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT

1.      The Debtors are authorized, subject to the limitations herein, but not directed, pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code, to (a) pay the Workforce Obligations, and (b) maintain, and continue to honor and pay amounts with respect to the Debtors' business practices, programs, and policies for their employees as such were in effect as of the Petition Date and as such may be modified or supplemented in the ordinary course of business, in the Debtors' discretion, and without the need for further Court approval; *provided that* the Debtors may not materially modify, alter, amend, terminate or implement the Workforce Compensation Obligations without the consent of the Required Lenders (as defined in the DIP Orders (as defined below)).

2.      The Debtors are authorized, but not directed, to make any payments on account of the 2024 Discretionary Bonuses and to continue the Bonus Program postpetition;

*provided, however*, that this Order does not authorize the Debtors to satisfy obligations on account of the Bonus Program owed to Insiders.

3.      Before honoring any prepetition Workforce Compensation Obligations that exceed the priority amounts set forth in sections 507(a)(4) and (a)(5) of the Bankruptcy Code for any Employee, the Debtors shall provide five (5) business days' advance notice to the U.S. Trustee, the Ad Hoc Group, and any statutory committee appointed in these chapter 11 cases that identifies (a) the title of the claimant, (b) the amount of the payment to such claimant, and (c) the proposed payment date; *provided*, that if the U.S. Trustee, the Required Lenders, or any statutory committee objects to such payment, the Debtors shall not make such payment in excess of the priority caps set forth in sections 507(a)(4) and 507(a)(5) without further order of the Court or written consent from the U.S. Trustee, the Required Consenting Lenders, or any statutory committee, as applicable.

4.      The Debtors are further authorized, but not directed, to pay prepetition amounts due and owing in connection with the Supplemental Workforce Obligations and to continue to pay the Supplemental Workforce and Staffing Agencies for such services postpetition, as needed.

5.      The Debtors are authorized, but not directed, to continue the Non-Insider Severance programs on a postpetition basis in the ordinary course of business and consistent with historical practice; *provided*, that nothing in this Order shall be deemed to authorize the payment of any amounts to Insiders under the Non-Insider Severance program.

6.      The Debtors shall maintain a matrix of amounts paid related to the prepetition Non-Insider Severance made subject to the terms and conditions of this Order (the "**Employee Matrix**"), including the following information: (i) the title of the payee; (ii) the date and amount of the payment; (iii) the category of payment; and (iv) the Debtor or Debtors that

made the payment. The Debtors shall provide a copy of the Employee Matrix on a confidential basis to the U.S. Trustee and on a professionals' eyes only basis to any statutory committee appointed in these chapter 11 cases and the Ad Hoc Group by the last day of each month beginning on the last day of the first full month following the Petition Date. The Debtors shall not be required to file or publish the Employee Matrix.

       7.     The Debtors shall not make any payments to any Insider that would violate or permit the violation of 503(c) of the Bankruptcy Code, including, for the avoidance of doubt, payment of any bonus or severance obligations to or on behalf of any Insider without further order of this Court. Notwithstanding the foregoing, nothing in this Order shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time or shall constitute a determination by the Court as to whether any individual entitled to payment pursuant to this Order is an Insider.

       8.     Neither this Order, nor any payments made by the Debtors pursuant to the Motion or this Order, shall be deemed to change the classification of any claim or to in any way change the rights or create new rights of any member of the Workforce or any other person, including, without limitation, the creation of any right to payment entitled to administrative expense priority pursuant to sections 503 and 507 of the Bankruptcy Code.

       9.     Each of the Banks at which the Debtors maintain their accounts relating to the payment of the Workforce Obligations are authorized to (i) receive, process, honor, and pay all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by or on behalf of the Debtors, to the extent that sufficient funds are on deposit in those accounts and (ii) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or electronic funds or automated clearing house transfers should be honored or dishonored

in accordance with this or any other order of this Court, whether such checks, drafts, wires, or electronic funds or automated clearing house transfers are dated prior to, on, or subsequent to the Petition Date, without any duty to inquire otherwise.

10.     The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds or automated clearing house transfers, and to replace any prepetition checks or electronic fund or automated clearing house transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Order.

11.     Nothing in the Motion or this Order or any payment made pursuant to the authority granted by this Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Order, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code.

12.     Notwithstanding anything to the contrary contained in the Motion or this Order, any payment made or to be made pursuant to the authority granted herein, and any authorization contained herein, shall be subject to and in accordance with any interim and final orders, as applicable, entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or the Debtors' use of cash collateral (such orders,

the "**DIP Orders**") and any budget in connection with any use of cash collateral and/or postpetition debtor-in-possession financing authorized therein (subject to any permitted variances). To the extent there is any inconsistency between the terms of the DIP Orders and any action taken or proposed to be taken under this Order, the terms of the DIP Orders shall control. Nothing in the Motion or this Interim Order shall constitute a waiver or substitution of any consent right required under the DIP Orders.

13.    The requirements of Bankruptcy Rule 6003(a) have been satisfied.

14.    Notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules.

15.    Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

16.    The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Order.

17.    This Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2025
      Houston, Texas

                                           _____
                                           CHRISTOPHER LOPEZ
                                           UNITED STATES BANKRUPTCY JUDGE