# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|                                   |   |                                      |
|-----------------------------------|---|--------------------------------------|
| In re:                            | § | Chapter 11                           |
|                                   | § |                                      |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | Case No. 25-90399 (CML)              |
|                                   | § |                                      |
|                                   | § | **(Joint Administration Requested)** |
| Debtors.[1]                       | § | **(Emergency Hearing Requested)**    |

## DECLARATION OF CHARLES M. MOORE
## IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS

I, Charles M. Moore, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am a Managing Director at Alvarez & Marsal North America, LLC ("**A&M**") and Chief Restructuring Officer of First Brands Group, LLC ("**FBG**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and together with the Debtors' non-debtor affiliates, "**First Brands**" or the "**Company**").

2.     A&M is a leading restructuring consulting firm with extensive experience providing high quality, specialized management and restructuring advisory services to debtors and distressed companies.  Specifically, A&M's core services include turnaround advisory services, interim and crisis management, revenue enhancement, claims management, and creditor and risk management advisory services.  A&M provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including developing or validating forecasts, business plans, and related assessments of strategic position; monitoring and managing

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**EXHIBIT**

**B**

cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages. In addition, A&M provides advice on specific aspects of the turnaround process and helps manage complex constituency relations and communications.

3. I have over thirty years of experience providing turnaround consulting and advisory services to organizations in a variety of industries. I received my bachelor's degree and MBA from Michigan State University. I am a Certified Public Accountant, a Certified Turnaround Professional, and am certified in Financial Forensics. Prior to joining A&M, I was a Senior Managing Director at Conway MacKenzie, Inc., served as Chief Financial Officer for Horizon Technology Group (an automotive supplier), and began my career in the Management Solutions & Services group at Deloitte & Touche LLP.

4. I have substantial experience serving either in senior management positions or as a restructuring advisor in large organizations and in assisting companies with stabilizing their financial condition, analyzing their operations, and developing a business plan to accomplish restructuring objectives. I am recognized for my work in the automotive industry and have advised more than seventy-five (75) companies in the industry across all parts segments. I regularly advise Tier I and Tier II automotive suppliers, as well as secured lenders and equity investors, on matters such as liquidity management, cost reductions, mergers and acquisitions, negotiations with customers and unions, and strategic planning. I have served as Chief Restructuring Officer for, among others, Accuride Corporation, FirstEnergy Solutions, The Budd Company, Cynergy Data, Inc., and National Real Estate Information Services, Inc.

5. On September 5, 2025, the Debtors retained A&M to, among other things, assist with liquidity management and forecasting, identify cost-reduction opportunities, and assist

with contingency preparations for a potential chapter 11 filing.  On September 24, 2025, certain of the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and on September 28, 2025 (as applicable, the "**Petition Date**"), the remaining Debtors each commenced with the Court a voluntary case under the Bankruptcy Code.  From the outset of A&M's retention, my team and I have worked with the Debtors' management team and other advisors on numerous activities to support the Debtors' turnaround and restructuring efforts.  As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become generally familiar with the Company's day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases, as described in this declaration (the "**Declaration**").  Except as otherwise indicated herein, the facts in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by my team, employees of the Company, the Company's advisors, or my experience, knowledge, and information concerning the Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.      I submit this Declaration to assist the Court and parties in interest in understanding the circumstances and events that led to the commencement of these chapter 11 cases.

7.      This Declaration is divided into five sections:

- Section I provides an overview of the Debtors and these chapter 11 cases;

- Section II describes the Debtors' business;

- Section III describes the Debtors' corporate and capital structure; and

- Section IV describes the circumstances that led to the commencement of these chapter 11 cases.

## I.      **Overview**

8.      First Brands is a leading supplier of aftermarket automotive parts with operations across the world.  The Company proudly employs an estimated approximately 26,000 individuals globally, including almost 6,000 employees in the United States.  The Debtors have commenced these chapter 11 cases with a new money $1.1 billion debtor-in-possession financing facility (the "**DIP**") (plus certain roll-up amounts) that will be provided by an ad hoc group of the Debtors' first and second lien creditors (the "**Ad Hoc Group**").  The DIP will provide the Debtors with a much-needed capital injection that will enable First Brands to resume normal operations, service their customers, and preserve jobs.  In parallel with stabilizing their businesses, the Debtors will work with their stakeholders to evaluate and pursue a value-maximizing transaction under the guidance and direction of the Debtors' recently appointed special committee consisting exclusively of independent directors (the "**Special Committee**").

9.      Headquartered in Cleveland, Ohio, First Brands is a leading supplier of aftermarket parts.  First Brands' key product categories include brakes, filters, wipers, lights, pumps, and towing solutions.  First Brands operates a global network of manufacturing and vertically-integrated distribution centers that spans five continents and is supported by key regional capabilities across the world.  Helming a diverse portfolio of over twenty-five iconic brands, including household names such as "FRAM" and "Raybestos," First Brands maintains a strong

4

market position in all aftermarket sales channels, including automotive retailers, aftermarket vehicle dealerships, retail, mass merchants, warehouse distributors, e-commerce, and direct sales to original equipment manufacturers ("**OEMs**") in the automotive industry.

10.     First Brands' strategy is to procure a portfolio of high-quality brands backed by global supply-chain capabilities, capitalizing on the advantages of regional operations supported by a unified global manufacturing network.  This strategy allows First Brands to maximize efficiency through its brand synergies.  By consolidating warehouses, streamlining distribution processes and supply chains, and offering complimentary products across key customer categories, First Brands can achieve significant cost savings across its businesses, reach a wide customer base, and grow revenue.  According to the Company's audited consolidated financial statements for the year ended 2024, total net sales were approximately $5 billion.

11.     In less than fifteen years, the Company has consummated over fifteen (15) acquisition transactions, growing its portfolio to a total of over twenty-five (25) iconic automotive brands and establishing a significant market share in the global aftermarket parts industry.  Some of First Brands' iconic brands are included in the graphic below.



12.     First Brands' business model requires careful consideration of the timing of acquisitions.  Each historically debt-funded acquisition has required capital investments up-front to realize savings and revenue over time.  Although the Company has implemented this acquisition

strategy to great effect over the past fifteen years, in recent months, geopolitical uncertainty and headwinds from newly imposed tariffs have pressurized global supply chains and layered additional complications on the Company's operations. These systemic factors forced unexpected costs on the Company not only due to the increased cost of landed goods, but in connection with new investments required to minimize tariff exposure in the future. At the same time, the Company faced mounting funded debt and lease obligations between May and August 2025, particularly with respect to its equipment and inventory lessor, Onset. These factors snowballed into a liquidity crisis, forcing the Company to seek out a solution that would not only address its long-term debt and lease obligations, but also capture an immediate injection of liquidity to stabilize operations.

13. To proactively respond to these challenges, in July 2025, the Company pursued a global refinancing process led by Jefferies Finance LLC ("**Jefferies**"). In August 2025, however, it became clear that potential lenders would require further diligence, including a quality of earnings report. The Company paused the refinancing process while it prepared additional diligence required by prospective lenders, retaining Weil, Gotshal & Manges LLP ("**Weil**") and Lazard Frères & Co. ("**Lazard**") to assist the Company in developing and exploring strategic alternatives.

14. Together, the Company and its advisors explored various potential courses of action to improve the Company's liquidity profile and restructure its debt obligations without disrupting day-to-day operations. Given the Company's substantial operations, vertically integrated supply chain capabilities, and portfolio of iconic brands, the Company determined that the most effective course of action would be to perform a marketing process for a stake in the Company's equity, which is owned 100% by the Company's founder and sole equity holder (the "**Founder**"). Lazard performed initial diligence as the Company and its advisors continued

to evaluate potential transaction structures to maximize value and improve the Company's liquidity profile, including an effort to obtain bridge financing or potential equity capital raise.

15.     However, upcoming maturity events, pressure from counterparties, and unrelenting systemic factors catalyzed a mounting liquidity crisis.  Operational pressures rose as counterparties alleged that the Company was in default on certain financial obligations, threatened to exercise remedies, and/or demanded unconscionable late fees, forcing the Company to make short-term concessions to preserve stability.  This onslaught of factors gave the Company little time to design, evaluate, and execute a complex restructuring solution.  As a result, the Company's out-of-court refinancing efforts did not yield an actionable transaction on the timeline required.

16.     On September 5, 2025, the Company engaged A&M (together with Weil and Lazard, the "**Company's Advisors**") to support the Company in its liquidity management efforts.  Soon thereafter, on September 14, 2025, the legal and financial advisors to the Ad Hoc Group entered into nondisclosure agreements and the Company commenced discussions with the Ad Hoc Group (who entered into nondisclosure agreements on a rolling basis but not earlier than September 17, 2025) regarding potential transactions to stabilize the Company's liquidity and operations and implement a value-maximizing transaction.  Simultaneously, the Company and its advisors continued to negotiate forbearance agreements with countless counterparties.  However, it was immediately clear that the Company required an immediate infusion of capital in order to have sufficient runway to implement any value-maximizing transaction.

17.     As a result of such discussions, the Ad Hoc Group provided a bridge loan to ensure the Company could make its payroll obligations while the Company and the Ad Hoc Group continued and ultimately finalized negotiations regarding a debtor-in-possession financing facility, allowing the Debtors to file concurrently herewith a motion seeking approval of a

proposed $1.1 billion DIP. The DIP will provide the Debtors with immediate access to an initial draw of $500 million shortly after the Petition Date and will allow the Debtors, with the support of their major stakeholders, to stabilize their operations, pursue and implement a value-maximizing transaction, and provide the runway needed to position the Company for long-term growth and success. Not only will the significant size of the DIP allow the Company to optimize operations, fill customer orders, and operate in the ordinary course, but it reinforces the potential go-forward value of the Company.

18. Accordingly, the Debtors are hopeful that the DIP facility will be promptly approved and significant capital can be injected into the business and operations can be stabilized.

## II. Debtors' Business

### A. History

19. First Brands was formed in 2013 under the name Crowne Industrial Group by the Founder. Between 2013 and 2014, the Company expanded its product offerings by acquiring brands such as Carter Fuel Pumps and Trico, a premium producer and distributor of windshield wiper blades. Beginning in 2019, the Company underwent further expansion by acquiring multiple reputable and, in some cases, decades- or century-old brands, to expand its portfolio of product offerings, with the goal of becoming a leading supplier of a wide variety of products across the aftermarket parts industry.

20. First Brands' diverse product lines have enabled the Company to maintain strong sales channels not only in the aftermarket, but with OEMs. Over the past 12 months, based on the Company's estimates, approximately 82% of the Company's revenue has been derived from sales of aftermarket parts, 13% from sales to OEMs, and approximately 5% from sales to specialty and industrial customers. In the aftermarket, the Company's customer base includes several large automotive retailers (including Advance Auto Parts, Autozone, O'Reilly's, and Napa Auto Parts),

wholesale distributors (including United Auto Supply, Federated Auto Parts, and Fischer Auto Parts), and national commercial retailers (including Walmart, Costco, and Amazon). The Company maintains strong relationships with this diverse customer base, with the top ten customers making up less than half of total net sales over the past three years.

21. The Company also has a large international presence. The Company's estimates indicate approximately 75% of the Company's revenue is generated by the sale of products sourced from North America, while the remaining 25% is generated by the sale of products sourced from outside North America. As of the Petition Date, the Company employs an estimated approximately 26,000 people across five (5) continents, with approximately 6,000 people employed by the Debtors in the U.S., and owns distribution centers, factories, and warehouses around the world, as reflected below.



## B. Debtors' Operations

22. The Company's brands generally can be categorized into four product categories: (i) braking products; (ii) filtration products; (iii) vision products; and (iv) repairs. The

Company also maintains research, development, and testing capabilities for the purpose of designing new products.

### 1. Key Products

23. ***Braking Products.*** The Company owns and/or licenses brands, including Raybestos, Centric Parts, StopTech, and Cardone that are market leaders in braking components such as rotors, brake pads, and calipers. The Company's other brands in the braking category include IBI, Carlson, Bendix, Prima, Break Pro and Aimco. These products are sold in both the aftermarket and to OEMs. The Company's estimates indicate that over the last twelve months, braking products accounted for approximately 33% of the Company's revenue.

24. ***Filtration.*** The Company owns several brands, including Luber Finer, PetroClear, Jasper Rubber Products, and FRAM, that manufacture and distribute air filters, cabin filters, fuel filters, and oil filters. These products are sold to car dealerships, OEMs, heavy duty/industrial purchasers, and individual consumers. Over the last twelve months, the Company's estimates indicate that filtration products accounted for approximately 14% of the Company's revenue.

25. ***Vision and Lighting.*** The Company also owns and/or licenses several brands that manufacture windshield wipers and lighting and related accessories, including ANCO, Trico, Narva, Philips, and Michelin, among others. These vision and lighting products are offered both domestically and internationally. The Company's estimates indicate that over the last twelve months, vision and lighting products accounted for approximately 29% of the Company's revenue.

26. ***Repairs and Towing.*** Finally, the Company offers products for under-the-hood repairs and towing. The Company's brands in the repairs space include Airtex, AutoLite, Carter Fuel Pumps, Reese, and StrongArm. These products include under-the-hood repair products such as spark plugs, gas springs, and wire sets, as well as towing and trailering solutions.

The Company's estimates indicate that over the last twelve months, sales of repair and towing products and services accounted for approximately 24% of the Company's revenue.

27. **_Product Research and Development_**. First Brands also has a robust new product development program geared towards developing innovative new products to complement its existing diverse product offerings. The Company has over 2,900 patents and operates twelve (12) laboratories and testing facilities across ten (10) countries to facilitate development of new products that complement First Brands' existing products. Drawing on consumer and category insights, field sales, and original research, the Company maintains a continuous evolution of new product offerings to keep up with changing customer needs and evolving vehicle technology, releasing 5,000 stock keeping units with respect to new products each year. Recent product offerings from the Company include a 25,000 mile oil filter and innovative windshield wipers with color indicators that inform drivers when it is time to change their wiper blades.

### 2. Global Supply Chain

28. The Company's international resources have allowed it to establish vertically-integrated global manufacturing capabilities, including casting/forging, welding/machining, fabricating metals, plastics, and rubbers, electronic assembly, surface treatments, packaging, and more. Regional capabilities across the world allow the Company to distribute products efficiently and develop new products based on customer preferences. As a result, as of the Petition Date, more than 90% of North American sales and 100% of European sales are from products produced in-region.

29. **_Mexico Operations_**. The Company also maintains significant operations in Mexico that are critical to their global manufacturing capabilities. The Company operates two distribution centers and thirty-six (36) factories in Mexico, including in Juarez, Mexico City, Nuevo Laredo, Los Reyes, Monterrey, Matamoros, Celaya, Silao, Santa Ana, Chihuahua, Puebla,

Mexicali, Los Mochis, and Reynosa. The Company's facilities in Mexico produce brake parts, spark plugs, fuel and water pumps, engine management systems, towing, and vision products, among other products. As of the Petition Date, approximately 14,000 of the Company's employees are based in Mexico, and 57% of the Company's sale volume in the United States is sourced from Mexico. Importantly, the Company estimates that the Company's operations in Mexico help to insulate the Company from additional tariff exposure. As of the Petition Date, approximately 92% of the Company's total annual imports from Mexico qualify for the United States-Mexico-Canada Agreement exemption, reducing the Company's total exposure to tariffs by approximately $285 million annually, according to the Company's estimates.

### III.     <u>Debtors' Corporate and Capital Structure</u>

**A.     Corporate Structure, Governance, and Management**

30.     A chart summarizing the Debtors' corporate organizational structure, as of the Petition Date, is attached hereto as **<u>Exhibit A</u>**. As set forth therein, the Debtors consist of 112 entities, each of which is 100% indirectly owned by the Company's Founder.

31.     ***Boards***. The Company has Boards of Managers (each, a "**Board**" and, collectively, the "**Boards**") at each of (i) First Brands Group Holdings, LLC ("**FBG Holdings**"); (ii) First Brands Group Intermediate, LLC ("**FBGI**"); (iii) First Brands Group, LLC, and (iv) Viceroy Private Capital, LLC (collectively, the "**Parent Entities**"). Each of the Parent Entities' Boards is comprised of the following individuals:

| Name | Position |
|------|----------|
| Patrick James | Manager |
| Stephen Graham | Manager |
| Shekhar Kumar | Manager |
| Neal Goldman | Independent Manager |
| William Transier | Independent Manager |

32. **_Special Committee_**.  In September 2025, the Boards established the Special Committee comprised of independent managers William Transier and Neal Goldman.  The Special Committee has the exclusive power and authority to, among other things, (i) consider and evaluate all potential transactions, including any proposal made in respect thereof; (ii) approve and authorize (or reject) the Company's entry into and consummation of any agreement, contract, or other arrangement with respect to a potential transaction and cause and direct the Company's subsidiaries to approve, authorize, execute, and consummate a Potential Transaction; (iii) oversee the implementation and execution of a potential transaction; and (iv) conduct and oversee an investigation into potential claims and causes of action that may exist in favor of one or more of the Debtors, including with respect to current and former members of the governing bodies of the Debtors as well as current and former affiliates, equity holders, officers, and other insiders of the Debtors (the "**Investigation**").  The scope of the Investigation includes matters relating to the Company's prepetition factoring and other off-balance sheet financing processes discussed herein.  The Special Committee, working with Weil, as counsel, and A&M, launched the independent Investigation of potential claims held by the Company, among other things, before the Petition Date, and the Investigation is ongoing.

33. **_Management_**.  In September 2025, prior to the Petition Date, I was appointed as Chief Restructuring Officer by each of the Debtors.  As Chief Restructuring Officer,

I have been delegated the full authority to (i) approve all cash expenditures of each Debtor; (ii) approve the incurrence of any indebtedness by each Debtor; (iii) oversee the cash management system of each Debtor; and (iv) oversee the Debtors' public relations firm, among other duties. In my capacity as Chief Restructuring Officer, I report directly to, and take direction from, the Special Committee working in coordination with the management of the Company. The following table sets forth the names and positions of the rest of the Company's executive management team:

| Name | Position |
|---|---|
| Patrick James | Chief Executive Officer |
| Stephen Graham | Chief Financial Officer |
| Shekhar Kumar | Senior Vice President – Mergers & Acquisitions |

### B. Capital Structure

#### 1. Prepetition Debt Capitalization[2]

34.     As of the Petition Date, the Debtors had approximately $6.1 billion in aggregate principal amount of on-balance sheet outstanding funded debt obligations, $2.3 billion in aggregate "off balance sheet" financings incurred through special purpose vehicles, and approximately $800 million in unsecured supply chain financing liabilities. The Company, additionally, has approximately $2.3 billion in factoring liabilities. Debtor First Brands Group Holdings, LLC and its Debtor subsidiaries (the "**FBG Debtors**") hold the approximately $6.1 billion in aggregate principal amount of funded debt obligations outstanding, and Debtor Viceroy Private Capital, LLC ("**Viceroy**") and its Debtor subsidiaries hold the approximately $2.3 billion in off-balance sheet debt obligations outstanding.

---

[2]     The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

35.     The table below summarizes the Debtors' total prepetition debt capitalization.

| Prepetition Indebtedness | Principal Amount Outstanding |
|---|---|
| **ABL Obligations** | |
| ABL Loans/Letters of Credit Obligations | $226.9mm[3] |
| ABL Supply Chain Financing/Cash Management | $369.4mm |
| **Total ABL Obligations** | $596.3mm |
| **Term Loan Obligations[4]** | |
| First Lien L/C Facility | $100mm |
| First Lien Term Loans (USD) | $3,886.9mm |
| First Lien Term Loans (EUR) | $763mm[5] |
| Side Car Term Loans | $250mm[6] |
| Second Lien Term Loans | $540mm |
| **Total Term Loan Obligations** | $5,539.9mm |
| **Off-Balance Sheet Obligations (SPV Debtors' Obligations)[7]** | |
| Aequum Facilities | $77.8mm |
| CarVal Facilities | $159.0mm |
| Evolution Facilities | $230mm |
| Onset Lease | $1,880mm |
| **Total Off-Balance Sheet Obligations** | $2,346.8mm |
| **Select Unsecured Obligations** | |
| Supply Chain Financing Obligations | $812.4mm |
| **TOTAL DEBT OBLIGATIONS OF DEBTORS** | $9,295.4mm |

---

[3]     Includes approximately $133 million in borrowings and approximately $93 million of undrawn letters of credit.

[4]     Outstanding balances listed as of June 30, 2025 (other than $24.5 million bridge loan). First Lien Term Loans (USD) include a bridge loan of $24.5 million provided by the Ad Hoc Group on September 25, 2025.

[5]     Assuming EUR:USD conversion rate of 1.19:1.00.

[6]     Excludes make whole amount of approximately $26 million.

[7]     Each of the Aequum Facilities, CarVal Facilities, and Evolution Facilities' outstanding balances are listed as of July 31, 2025.

36.     Upon information and belief, the priority of security interests against the

FBG Debtors' assets is summarized below:[8]

| Collateral | ABL Priority Collateral | Term Priority Collateral | Previously Unencumbered Assets[9] |
|---|---|---|---|
| **Priority** | 1. ABL Secured Parties<br>2. ***Proposed DIP Facility***<br>3. First Lien Secured Parties / Side-Car Secured Parties<br>4. Second Lien Secured Parties | 1. ***Proposed DIP Facility***<br>2. First Lien Secured Parties / Side-Car Secured Parties<br>3. Second Lien Secured Parties<br>4. ABL Secured Parties | 1. ***Proposed DIP Facility*** |
| **Description** | • All Accounts (other than Accounts from sale of Term Priority Collateral)<br>• Inventory<br>• Payment Intangibles (other than Payment Intangibles from sale of Term Priority Collateral)<br>• Deposit Accounts, Securities Accounts, Commodity Accounts and all Money therein<br>• 50% of business interruption insurance and all rights to credit insurance with respect to Accounts<br>• General Intangibles evidencing the above<br>• Relevant collateral, guarantees and Supporting Obligations<br>• Relevant books and records<br>• Products and Proceeds of the above | • Equipment and real property interests therein and fixtures<br>• Intellectual Property<br>• Equity Interests and other Investment Property (other than Payment Intangibles being ABL Priority Collateral)<br>• Instruments, Documents and General Intangibles that are not ABL Priority Collateral<br>• Term Priority Accounts<br>• Insurance policies relating to Term Priority Collateral<br>• Commercial Tort Claims<br>• Other collateral not constituting ABL Priority Collateral<br>• Relevant collateral, guarantees and Supporting Obligations<br>• Relevant books and records<br>• Products and Proceeds of the above | • Substantially all previously unencumbered assets (including proceeds of avoidance actions and commercial tort claims)<br>• Pledges of equity in certain non-Debtor subsidiaries |

---

[8]     The ABL Secured Parties maintain a higher priority interest in the ABL Priority Collateral, while the First Lien Secured Parties and the Second Lien Secured Parties maintain a higher priority interest in the Term Priority Collateral. The ABL Priority Collateral explicitly excludes equipment and real property interests therein, intellectual property rights, and equity interests, among other things, which are, in each case, Term Priority Collateral. The rights of the ABL Secured Parties, and the First Lien Secured Parties, the Side-Car Secured Parties and the Second Lien Secured Parties are set forth in that certain *Amended and Restated Intercreditor Agreement*, dated as of February 26, 2019.

[9]     The Proposed DIP facility priorities in the above chart include any adequate protection obligations under the DIP. Collateral negotiations between the Debtors and the Ad Hoc Group are ongoing and are subject to change. Notwithstanding anything herein to the contrary, the terms of any entered final order approving the DIP shall control.

37.     In addition to the FBG Debtors' funded indebtedness, the SPV Debtors (defined below) participate in several lease, inventory, and equipment financing arrangements (the "**Off-Balance Sheet Obligations**").   The obligors on Off-Balance Sheet Obligations are subsidiaries of Viceroy and Debtor Carnaby Capital Holdings, LLC (Viceroy and its Debtor subsidiaries, the "**SPV Debtors**"), and are not subsidiaries of FBG, as set forth in the structural chart below and attached hereto as **Exhibit A**.   The SPV Debtors are not obligors under the prepetition term loan or ABL facilities.



*(i)*     ***FBG Debtors' Obligations***

38.     ***ABL Facility***.   On February 2, 2018, FBG entered into that certain *ABL Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**ABL Credit Agreement**") by and among FBG, as lead borrower, Trico Limited, a limited company incorporated under the laws of England and Wales, as a borrower ("**Trico Limited**"), Trico Belgium SA, a Belgian limited liability company incorporated

under the laws of Belgium, as another borrower, First Brands Group Intermediate, LLC (f/k/a Trico Group Holdings, LLC), as parent, Bank of America, N.A. ("**BOA**") (as successor to Goldman Sachs Bank USA), as administrative agent and collateral agent (in such capacities, the "**ABL Agent**") and the lenders parties thereto from time to time (the "**ABL Lenders**" and, together with the ABL Agent and any other "Secured Parties" (as defined in the ABL Credit Agreement), collectively, the "**ABL Secured Parties**"), providing for an asset-based senior secured revolving credit facility (the "**ABL Facility**") with an original aggregate principal amount of up to $80 million. The total commitments under the ABL Facility are up to $250 million.

39. FBG's obligations under the ABL Facility are guaranteed by certain Debtor affiliates of FBG (collectively, the "**ABL/Term Loan Obligors**"), and the obligations of the ABL/Term Loan Obligors under the ABL Facility are secured by (i) a **first** priority lien on the ABL Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement (as defined below)) of the ABL/Term Loan Obligors and (ii) a **third** priority lien on the Term Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement).

40. As of the Petition Date approximately $227 million of principal obligations under the ABL Facility are outstanding, consisting of approximately $133 million in borrowings and approximately $93 million of undrawn letters of credit.

41. *First Lien Facility*. On February 2, 2018, FBG entered into that certain *First Lien Term Loan Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**First Lien Term Loan Agreement**") by and among FBG, as borrower, FBGI, as parent, Jefferies (as successor to Credit Suisse AG, Cayman Island Branch, which was successor to Goldman Sachs Bank USA), as administrative agent and collateral agent (in such capacities, the "**First Lien Agent**") and the lenders from time to time party thereto

18

(the "**First Lien Lenders**" and, together with the First Lien Agent and any other "Secured Parties" (as defined in the First Lien Term Loan Agreement), including any L/C Issuer (as defined in the First Lien Term Loan Agreement) collectively, the "**First Lien Secured Parties**"). Under the First Lien Term Loan Agreement, term loans in an aggregate principal amount of $3,886.9 million and $763 million are outstanding. These amounts include a bridge loan with a principal amount of $24.5 million that was provided to the Debtors on September 25, 2025 by certain First Lien Lenders pursuant to the Bridge Amendment (as defined below) in the lead up to the Debtors' chapter 11 filing so that the Debtors had sufficient funds to make payroll and other critical payments.

42. FBG's obligations under the First Lien Term Loan Agreement are guaranteed by the ABL/Term Loan Obligors, and the obligations of the ABL/Term Loan Obligors under the First Lien Term Loan Agreement are secured by (i) a **second** priority lien on the ABL Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement) and (i) a **first** priority lien on the Term Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement).

43. *Second Lien Facility*. On February 26, 2019, FBG entered into that certain *Second Lien Term Loan Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Second Lien Term Loan Agreement**") by and among FBG, as borrower, FBGI, as parent, Jefferies Finance LLC (as successor to Credit Suisse AG, Cayman Island Branch), as administrative agent and collateral agent (in such capacities, the "**Second Lien Agent**") and the lenders from time to time party thereto (the "**Second Lien Lenders**" and, together with the Second Lien Agent and any other "Secured Parties" (as defined in the Second Lien Term Loan Agreement), collectively, the "**Second Lien Secured Parties**").

19

Under the Second Lien Term Loan Agreement, term loans in an aggregate principal amount $540 million are outstanding.

44.    FBG's obligations under the Second Lien Term Loan Agreement are guaranteed by the other ABL/Term Loan Obligors, and the obligations of the ABL/Term Loan Obligors under the Second Lien Term Loan Agreement are secured by (i) a **third** priority lien on the ABL Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement) and (ii) a **second** priority lien on the Term Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement).

45.    *Side-Car Facility*. On June 16, 2025, FBG entered into that certain *First Lien Term Loan Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Side-Car Term Loan Agreement**") by and among FBG, as borrower, FBGI, as parent, Sagard Holdings Manager (US) LLC, as Sagard administrative agent (in such capacity, the "**Side-Car Sagard Agent**"), GLAS USA LLC, as GLAS administrative agent (in such capacity, the "**Side-Car GLAS Agent**") and collateral agent (in such capacity, the "**Side-Car GLAS Collateral Agent**") and the lenders from time to time party thereto (the "**Side-Car Lenders**" and, together with the Side-Car Sagard Agent, the Side-Car GLAS Agent, the Side-Car Collateral Agent and any other "Secured Parties" (as defined in the Side-Car Term Loan Agreement), collectively, the "**Side-Car Secured Parties**").  Under the Side-Car Term Loan, term loans in an aggregate principal amount of $250 million were extended to the Company on June 16, 2025.  On September 24, 2025, as a result of the Company's failure to make an interest payment that was due on September 16, 2025, the Side Car Lenders accelerated the Side Car Loan, including a make-whole premium of approximately $26 million.  As a result, the total amount

outstanding on account of the Side-Car Term Loan as of the Petition Date on account of principal and the make-whole premium is approximately $276 million.

46.     FBG's obligations under the Side-Car Term Loan Agreement are guaranteed by the other ABL/Term Loan Obligors, and the obligations of the ABL/Term Loan Obligors under the Side-Car Term Loan Agreement are secured by (i) a **first** priority lien on the Term Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement) and (ii) a **second** priority lien on the ABL Priority Collateral (as defined in the ABL/Term Loan Intercreditor Agreement) and, in each case, subject to the terms of the ABL/Term Loan Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement.

47.     Additionally, contemporaneously with the execution of the Side-Car Term Loan Agreement, FBGI and the Side Car Secured Parties also entered into that certain *Side Letter* (the "**Side Letter**").  Under the terms of the Side Letter, FBG agreed to certain restrictions and negative covenants, including with respect to FBG's ability to incur new money indebtedness other than as contemplated by the Side Letter, absent the consent of the Side Car Secured Parties.

*(ii)*     ***Off-Balance Sheet Obligations***

48.     The SPV Debtors' Off-Balance Sheet Obligations generally consist of inventory financing programs, pursuant to which a Debtor borrower will agree to purchase or exchange in-kind inventory and/or raw materials from other Debtor subsidiaries.  The borrower may then utilize the purchased or exchanged inventory as borrowing base assets to obtain loans from the financier and may sell the completed inventory to other Debtor entities or third parties in the ordinary course.

49.     ***Aequum Facilities***.  On March 28, 2024, Debtor Broad Street Financial, LLC, as borrower (the "**Aequum Borrower**"), entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to

time, the "**Aequum Facility**") with, among others, Aequum Capital Financial II, LLC, as administrative agent and collateral agent, and the lenders from time to time party thereto (the "**Aequum Lenders**").  Under the Aequum Facility, the Aequum Lenders provided an asset-based revolving credit facility in an aggregate principal amount of $45 million to the Aequum Borrower.

50.     The Aequum Facility allows the Aequum Borrower to purchase inventory directly from FBG and its subsidiaries, including brake parts, electronics, steering components, calipers, pumps, and motors, and utilize that inventory as a borrowing base to obtain credit from the Aequum Lenders.  Subsequently, the Aequum Borrower may sell the inventory back to the Debtors, which must be purchased by Viceroy if not by another Debtor entity.  As of the Petition Date, on information and belief, the Aequum Borrower holds approximately $66 million in inventory as of July 31, 2025.  The Aequum Borrower's obligations under the Aequum Facility are guaranteed by Debtor Broad Street Financial Holdings, LLC and are secured by a lien on all assets of the Aequum Borrower and Broad Street Financial Holdings, LLC.

51.     On December 2, 2024, Debtors Global Assets LLC, as US borrower, Global Assets GmbH, a German limited liability company and an affiliate of the Debtors, as German borrower (together with Global Assets LLC, the "**UMB Borrowers**"), entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Global Assets Facility**," and together with the Aequum Facility, the "**Aequum Facilities**") with, among others, UMB Bank, N.A., as administrative agent and collateral agent, and the lenders party thereto from time to time (the "**UMB Lenders**").  Under the Global Assets Facility, the UMB Lenders provided an asset-based revolving credit facility in an aggregate principal amount of $45 million to the UMB Borrowers.

52. The Global Assets Facility enables the UMB Borrowers to use finished parts, raw materials, and semi-finished products purchased directly from certain of the Debtors as a borrowing base to draw down credit from the UMB Lenders. The UMB Borrowers may then sell the inventory back to the Debtors, which, similarly to the U.S.-based Aequum facility, must be purchased by Viceroy if not by another Debtor entity. As of the Petition Date, on information and belief, the UMB Borrowers hold approximately $68 million in inventory as of July 31, 2025. The UMB Borrowers' obligations under the Global Assets Facility are guaranteed by Debtor Carnaby Capital Holdings, LLC and secured by a lien on all assets of the UMB Borrowers and Carnaby Capital Holdings, LLC.

53. As of the Petition Date, approximately $77.8 million in principal of obligations under the Aequum Facilities are outstanding.

54. The Company Advisors' current understanding of the Aequum Facilities are summarized in the graphic below:



55.     ***CarVal II Facility***.  On May 31, 2022, Debtor Carnaby Inventory II, LLC (the "**CarVal II Borrower**") entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**CarVal II Facility**") with, among others, GLAS Trust Company LLC, as administrative agent, and the lenders party thereto from time to time (the "**CarVal II Lenders**").  Under the CarVal II Facility, the CarVal II Lenders provided an asset-based revolving credit facility in an aggregate principal amount of $60 million to the CarVal II Borrower.  The CarVal II Borrower may also engage certain subsidiaries of the Debtors to manufacture inventory on its behalf, which have contractual relationships with certain *maquiladora* entities that import materials from domestic Debtor subsidiaries and export finished goods.  Such finished goods may be entitled to United States-Mexico-Canada exemptions for certain tariffs.  The CarVal II Borrower may purchase manufactured inventory such as brake parts or raw materials from the Debtors and may utilize that inventory as a borrowing base to obtain credit from the CarVal II Lenders.  As of the Petition Date, on information and belief, the CarVal II Borrower holds approximately $116 million in inventory as of August 2, 2025.  The CarVal II Borrower's obligations under the CarVal II Facility are guaranteed by Debtors First Brand Group Holdings, LLC and Carnaby Inventory Holdings II, LLC and secured by a lien on all assets of the CarVal II Borrower and Carnaby Inventory Holdings II, LLC.

56.     ***CarVal III Facility***.  On July 6, 2022, Debtor Carnaby Inventory III, LLC (the "**CarVal III Borrower**") entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**CarVal III Facility**," and together with the CarVal II Facility, the "**CarVal Facilities**") with, among others, GLAS Trust Company LLC, as administrative agent, and the lenders party thereto

from time to time (the "**CarVal III Lenders**").  Under the CarVal III Facility, the CarVal III Lenders provided an asset-based revolving credit facility in an aggregate principal amount of $100 million to the CarVal III Borrower.  Similar to the CarVal II Facility, the CarVal III Borrower may engage certain subsidiaries of the Debtors with manufacturing contracts with certain *maquiladora* entities to manufacture inventory on its behalf.   The CarVal III Borrower may purchase manufactured inventory and raw materials from the Debtors, and may utilize that inventory as a borrowing base to obtain credit from the CarVal II Lenders.  As of the Petition Date, on information and belief, the CarVal III Borrower holds approximately $133 million in inventory as of August 2, 2025.  The CarVal III Borrower's obligations under the CarVal III Facility are guaranteed by Debtors First Brand Group Holdings, LLC and Carnaby Inventory Holdings III, LLC and secured by a lien on all assets of the CarVal III Borrower and Carnaby Inventory Holdings III, LLC.

57.     As of the Petition Date, approximately $159.0 million of principal obligations under the CarVal Facilities are outstanding.

58.     The Company Advisors' current understanding of the CarVal Facilities are summarized in the graphic below:



59.     ***Evolution Facilities***.  On November 9, 2023, Debtor Patterson Inventory, LLC (the "**Patterson Borrower**") entered into that certain *Uncommitted Inventory Finance Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Patterson Facility**") with Evolution Credit Opportunity Master Fund II-B, L.P., as lender ("**Evolution**").  Under the Patterson Facility, Evolution provided an uncommitted asset-based revolving credit facility with maximum aggregate amount of advances of $150 million to the Patterson Borrower. The Patterson Borrower's obligations under the Patterson Facility are (i) guaranteed by Debtor Patterson Inventory Holdings, LLC, (ii) secured by a pledge of 100% equity of the Patterson Borrower that the Patterson Parent owns, and (iii) secured by a lien on all assets of the Patterson Borrower.

60.     On March 28, 2024, Starlight Inventory I, LLC (the "**Starlight Borrower**," and together with the Patterson Borrower, the "**Evolution Borrowers**") entered into that certain *Uncommitted Inventory Finance Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Starlight Facility**" and, together with the Patterson Facility, collectively, the "**Evolution Facilities,**" and the Evolution Facilities together with the CarVal Facilities, and the Aequum Facilities, the "**Inventory Financing Facilities**").  Under the Starlight Facility, Evolution provided an uncommitted asset-based revolving credit facility with maximum aggregate amount of advances of $150 million to the Starlight Borrower. The Starlight Borrower's obligations under the Starlight Facility are (i) guaranteed by Starlight Inventory Holdings I, LLC, (ii) secured by a pledge of 100% equity of the Starlight Borrower that the Starlight Parent owns, and (iii) secured by a lien on all assets of the Starlight Borrower.

61.     Under each of the Evolution facilities, the applicable Evolution Borrower may purchase eligible inventory pursuant to purchase orders from FBG and its subsidiaries, which they may use as a borrowing base to obtain loans from Evolution.  The Evolution Borrowers collectively held approximately $376 million in inventory as of August 2, 2025.  As described in paragraph 95 below, Evolution inventory may have been commingled with the inventory of the FBG Debtors prior to the Petition Date.  The Special Committee will review these issues.

62.     As of the Petition Date, approximately $230 million in principal obligations under the Evolution Facilities are outstanding.

63.     The Company Advisors' current understanding of the Evolution Facilities are summarized in the graphic below:



64.     ***Onset Obligations***.[10]   On June 28, 2022, Carnaby Inventory IV, LLC ("**Carnaby IV**") entered into that certain *Master Lease Agreement No. OFI1445416* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time,

---

[10]     Notwithstanding the description of the Onset Master Leases herein, the Debtors believe the Onset Master Leases may not be true leases, and the Debtors reserve all rights and remedies, and waive none, in connection therewith, including their rights to seek to recharacterize the Onset Master Leases as financings.

the "**Onset Master Lease IV**") with Onset Financial, Inc. ("**Onset**"). Specific leases of property under the Onset Master Lease IV are documented under separate schedules that are entered into and delivered by Carnaby IV to Onset from time to time. Obligations of Carnaby IV under the Onset Master Lease IV are guaranteed by each of First Brands Group Holdings, LLC, Viceroy Private Capital, LLC, Carnaby Capital Holdings, LLC, Carnaby Capital, LLC and Carnaby Inventory Holdings IV, LLC.

      65.     On October 24, 2023, Carnaby FA, LLC ("**Carnaby FA**" and, together with Carnaby IV, the "**Carnaby Lessees**" or the "**Carnaby Debtors**") entered into that certain *Master Lease Agreement No. OFI1545465* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Onset Master Lease FA**" and, together with the Onset Master Lease IV, collectively, the "**Onset Master Leases**") with Onset. Specific leases of property under the Onset Master Lease FA are documented under separate schedules that are entered into and delivered by Carnaby FA to Onset from time to time. Obligations of Carnaby FA under the Onset Master Lease FA are guaranteed by each of Carnaby Capital Holdings, LLC, Viceroy Private Capital, LLC, First Brands Group Holdings, LLC, Carnaby Capital, LLC, Carnaby FA Holdings, LLC, Eagle Casting Holdings, LLC and Eagle Casting, LLC.

      66.     Under the Onset Master Leases, Onset will initially lend funds to Carnaby IV to acquire inventory or equipment from FBG on Onset's behalf. Subsequently, the inventory will be leased back to Carnaby IV and may ultimately be repurchased by FBG. The Company Advisors' current understanding of the Onset Master Leases is reflected in the graphic below:



67.     As set forth in more detail below, the Debtors entered into three forbearances with respect to the Onset Master Leases.

68.     As of the Petition Date, including all outstanding and accrued interest, fees, forbearance fees, approximately $1.9 billion of obligations under the Onset Master Leases and related forbearances are outstanding.

### 1.     Other Financing Arrangements

69.     ***Accounts Receivable Factoring***.  Prior to the Petition Date, the Company utilized various factoring arrangements to support liquidity.   Under these arrangements, the Company would sell accounts receivables generated from the sale of goods in exchange for near-term payment on invoices with extended payment terms.   The Company historically entered into two types of factoring arrangements, including (i) factoring arrangements with customers and their financial institution partners ("**Customer Factoring**") and (ii) factoring arrangements with unaffiliated third parties ("**Third-Party Factoring**").

70.     Under the Customer Factoring arrangements, the Company entered into factoring arrangements with their large retail customers that had lengthy payment terms (up to 365 days).  Under these arrangements, the Company would sell receivables to financial institutions that partner with their customers in exchange for near-term payment, often within 30 days.  When the

receivables later become due, the customer may pay the receivable to the financial institution directly, instead of payment coming from the Company.

71.     Under the Third-Party Factoring arrangements, the Company would sell a receivable to an unaffiliated third-party factor (i.e., a factor that had not partnered with a customer of the Company).  The factor would pay the Company for the receivable in the near-term, sometimes within seven (7) days, in exchange for a payment approximately 105 days later.  Unlike the Customer Factoring arrangements, when a payment is often made by the customer directly to the customer's financial institution partner, the payment is required to be made directly by the Company to the Third-Party Factor, rather than the customer that owes the receivable.

72.     Following diligence performed by the Company's Advisors, the Debtors believe that an unpaid prepetition balance of approximately $2.3 billion has accrued with respect to the Third-Party Factoring arrangements as of the Petition Date.  The Debtors' factoring practices are subject to the Special Committee's ongoing Investigation including (i) whether receivables had been turned over to third party factors upon receipt, and (ii) whether receivables may have been factored more than once.  Pending the results of the Investigation, the Debtors will segregate funds received on account of receivables that were factored prior to the Petition Date by the Company.

## IV.     Key Events Leading to Chapter 11

### A.     Challenges Facing Debtors' Business

73.     I understand several factors have contributed to the commencement of these chapter 11 cases, including significant liabilities related to (i) tariffs, (ii) capital expenditures related to both the Company's acquisitions and integration costs, and (iii) leverage.   These compounding factors have strained operations and the Company's liquidity.

74.     *Tariffs*.   Recent fluctuations in United States policies for foreign commercial partners have led to increased capital expenditures and significant costs for the

Company. Specifically, in April 2025, the United States government imposed new tariffs that increased the cost of landed inventory across the entire aftermarket parts industry, with certain products being tariffed at rates as high as 73%. In response, I understand the Company incurred various costs, not only as a direct result of the increased price of goods, but as a means to hedge against the potential consequences of supply chain disruption in the event certain parts or materials became cost prohibitive or unavailable. Specifically, in 2024 and 2025 the Company:

(i) expended approximately $60 million to pre-buy inventory ahead of tariff effectiveness;

(ii) incurred landed inventory cost increases of approximately $99 million between April and August 2025;

(iii) suffered an approximately $25 million gross margin reduction before product prices could be increased to counteract the effects of tariffs; and

(iv) paid an additional $35 million in capital investments to cover costs of a new "Made-In-USA Rotor Project" in the twelve months leading up to August 2025.[11]

75. Moreover, the price increases of necessary materials for the Company's manufacturing processes and industry-level confusion regarding these policies—particularly due to shutdowns in foreign supply chains amid tariff negotiations—caused operational inefficiencies throughout the Company's enterprise and diminished cost savings that historically have been central to First Brand's competitive advantage.

76. ***Capital Expenditure Requirements.*** The Company's strategy of pursuing synergistic brand acquisitions requires significant capital before an acquisition is integrated and cost savings are realized. It is common practice for the Company to make capital expenditures up-

---

[11] Although the project has significant demand and is intended to minimize the Company's tariff exposure by bringing manufacturing of rotors from facilities in China to the United States, domestic foundry and machining costs have required an additional $35 million capital investment to realize the project and created inefficiencies in the ramp-up process.

front to integrate brands into their enterprise and attempt to recoup those payments over time through savings. Similarly, winning new business necessitates up-front expenditures to build inventory, stock retailers, and meet demand.

77. Over the past twelve months, I understand the Company has incurred a total of nearly $160 million of up-front costs in the twelve months leading up to June 2025 related to plant consolidation, cash severance, purchasing, insourcing, and other integration-related investments to position itself to realize cost savings from recent acquisitions. At the same time, new business has required the Company to expend approximately $200 million for the launch of new programs between June and September 2025. Altogether, these costs in conjunction with increased costs related to the Company's tariff exposure, which totaled approximately $220 million as of the end of August 2025, have strained the Company's liquidity.

78. *Leverage*. As of the Petition Date, according to the Company's financial statements, the Company was levered approximately 5 times based on total on-balance sheet funded debt of $6.1 billion and reported EBITDA of $1.133 billion. A significant portion of the Company's funded debt was raised in connection with the acquisitions between 2019 and 2024, which were primarily debt-financed. The Company's leveraged balance sheet has compounded liquidity issues both prior to and as a result of tariff costs and capital expenditure requirements. Due to the floating-rate interest obligations in conjunction with the elevated cost of capital, the Company has over $900 million in annual debt service costs[12] on top of its numerous Off-Balance Sheet Obligations.

---

[12] The Company's over $900 million in annual debt service costs has been calculated without taking into account any of the Debtors' obligations under the Onset Master Leases.

**B.     Prepetition Restructuring Efforts**

79.     As stated, in response to the challenges described above, the Company proactively sought to address its capital structure and liquidity challenges in the months leading up to the Debtors' chapter 11 filing. These efforts included (i) seeking to raise approximately €1.3 to 1.5 billion in debt financing by separating its European and other non-U.S. operations to form a new entity (the "**ROW Financing Process**"); (ii) pursuing a $6.2 billion global refinancing of the Company's capital structure (the "**Global Refinancing Process**"); and (iii) pursuing bridge financing to fund a potential out-of-court sale process (the "**Bridge Financing Process**").  Once those efforts did not materialize and as a result the Company Advisors' discovery of the Third-Party Factoring irregularities, following which the Company's liquidity became even more constrained, the Debtors immediately pivoted to a chapter 11 strategy.  Each of the Debtors' initiatives ahead of these chapter 11 cases are described in more detail below.

**1.   ROW Financing Process**

80.     Beginning in mid- to late-2024, the Company sought to raise new debt financing by separating the Company's operations outside North America, including Europe, Asia, Africa, and Latin America, into an independent entity with its own capital structure separate and apart from First Brands.  The newly created enterprise would have included a number of First Brands' non-North American portfolio brands, including Trico and ANCO, as well as several other recently acquired businesses.  Through this process, the Company sought to raise new term loans of approximately €1.3 to 1.5 billion.  The marketing process was led by Banco Santander, S.A. ("**Santander**").  However, after not receiving sufficient interest from potential lenders, including as a result of external factors and a changing geopolitical environment, the Company ended its efforts to pursue a potential transaction centered around its non-U.S. assets.

### 2. Global Refinancing Process

81.     In July 2025, the Company launched a refinancing process led by Jefferies seeking to raise approximately $6.2 billion that would be used to comprehensively refinance its capital structure by paying down its existing funded debt obligations.  The Company sought to raise the following new debt facilities as part of the Global Refinancing Process:

- 5-year $500 million ABL Revolving Credit Facility;

- 5-year $2,700 million First Lien Term Loan;

- 5-year $1,000 million Fixed-Rate First Lien Term Loan;

- 5-year €850 million ($995 million equivalent) First Lien Term Loan; and

- 5.5-year $1,500 million Second Lien Term Loan.

82.     The Global Refinancing Process was designed to enhance the Company's liquidity profile and hedge against increasing interest rates.  However, the process was paused in August 2025 for the Company to complete a quality of earnings report requested by certain potential lenders.

### 3. Forbearances

83.     ***Onset Forbearance***.  Beginning in May 2025, while the Company was pursuing the various processes described above, Debtors Carnaby Inventory IV, LLC and Carnaby FA, LLC (together, the "**Carnaby Debtors**") entered into three forbearance agreements with Onset.  The first forbearance agreement (the "**First Onset Forbearance**") was entered into on May 1, 2025 after the Carnaby Debtors failed to make monthly payments totaling approximately $208 million due on May 1, 2025 (the "**May Monthly Payment**").  Under the First Onset Forbearance, the deadline for the Carnaby Debtors to make the May Monthly Payment was extended by twenty-nine (29) days to May 30, 2025 in exchange for late fees and forbearance fees totaling approximately $35 million.

84. On June 1, 2025, after the Carnaby Debtors were unable to make the May Monthly Payment as well as monthly payments totaling $198.5 million due under the Onset Master Leases on June 1, 2025 (the "**June Monthly Payment**"), the Carnaby Debtors and Onset entered into a second forbearance agreement (the "**Second Onset Forbearance**"). Under the Second Onset Forbearance, the deadlines for the Carnaby Debtors to make the May Monthly Payment and the June Payment were extended to June 27, 2025 and July 27, 2025, respectively, in exchange for late and forbearance fees totaling approximately $73.5 million. In addition, the Carnaby Debtors agreed to make one additional monthly payment to Onset totaling approximately $223 million to Onset.

85. Finally, on June 30, 2025, after the Carnaby Debtors failed to timely pay the May Monthly Payment under the Second Onset Forbearance, the Carnaby Debtors and Onset entered into a third forbearance agreement (the "**Third Onset Forbearance**"), layering on late fees in excess of the Debtors' original obligations once again. For example, the monthly payment schedules under the Onset Master Leases were restructured under the Third Onset Forbearance to provide for total payments to Onset of $1.9 billion, an increase of approximately $380 million due to Onset under the Onset Master Leases before the First Onset Forbearance. Under the Third Forbearance, the Carnaby Debtors agreed to make a $20 million payment to Onset on or before July 3, 2025 (which they made), a $570 million payment to Onset on August 29, 2025, various monthly payments to Onset through August 20, 2026, followed by a balloon payment of $645 million to Onset on August 31, 2026. In connection with the Third Onset Forbearance, Viceroy entered into a pledge agreement pursuant to which it pledged 15% of its membership interests in Debtor FBG Holdings to Onset.

86. On September 9, 2025, after the Carnaby Debtors failed to make the $570 million payment due on August 29, 2025, Onset delivered a notice of event of default and acceleration of the amounts due under the Third Onset Forbearance. The Special Committee is reviewing the facts and circumstances related to the Onset transactions and forbearances.

87. ***ABL Forbearance.*** On September 15, 2025, the Company attempted to draw down the remaining approximately $23 million available under the ABL Facility in light of increased liquidity pressure. The same day, the Company received a letter from BOA, the administrative and collateral agent under ABL Credit Agreement, informing the Company that the ABL Lenders would be establishing reserves under the ABL Credit Agreement. BOA further asserted that once reserves had been established, an overadvance of credit may occur, at which point the ABL Lenders would have no obligation to make any further extensions of credit under the ABL Credit Agreement because the maximum aggregate principal of the facility would be exceeded. BOA, further, refused to fund the Debtors' request to draw down the remainder of the ABL Facility pending implementation of the reserves.

88. On September 18, 2025, the Company received a second letter from BOA alleging that an event of default had occurred and was continuing under the terms of the ABL Credit Agreement due to an inability of the Company to pay its debts as they become due. The same day, the Company received a third letter from BOA stating that it had established a $200 million reserve under the ABL Credit Agreement, resulting in an overadvance of approximately $168 million. Accordingly, BOA informed the Debtors that it would promptly implement cash dominion remedies.

89. The following day, on September 19, 2025, the Company received a fourth letter from BOA stating that the purchase price paid for certain of the Debtors' inventory that was

factored constituted the ABL Lenders' collateral, and therefore, must be deposited into an account subject to a control agreement in favor of the collateral agent under the ABL Facility.

90.     In light of the risk of BOA attempting to exercise remedies against the Company, the parties began discussions regarding a potential forbearance.  On September 25, 2025 the Company, BOA, and the ABL Lenders executed a forbearance agreement under which the lenders agreed to temporarily refrain from exercising any remedies under the ABL Credit Agreement until October 5, 2025.  In return, the Company agreed to provide reporting data, such as a daily budget, cash flow forecast, a bank account schematic, and all material information provided to other stakeholders to BOA, as well as certain restrictions on the movement of collateral.  The Company also agreed to immediately discontinue certain factoring practices and implement already in process governance changes, such as appointing myself as Chief Restructuring Officer.

91.     ***Forbearances with Non-Debtor Affiliates.***  Simultaneously with the Debtors' restructuring efforts leading up to the Petition Date, the Company also worked closely with stakeholders and creditors of non-Debtor affiliated entities in light of upcoming maturity dates and, once it became clear that the Company would be pursuing a chapter 11 strategy, to forbear against any defaults that might occur under non-U.S. credit facilities as a result of the Debtors' filing.  As a result, various non-Debtor affiliates executed forbearance agreements with lenders in the months leading up to September 2025, in which the Company's lenders agreed to forbear from exercising remedies for a limited period in exchange for certain concessions, such as monetary consideration, information reporting requirements, and satisfaction of limited advisors' fees.

### 4.  Out of Court Bridge Financing and Sale Process

92.     In early August 2025, following the pause of the Global Refinancing Process, the Company retained Weil and Lazard to assist with addressing the Company's capital

structure and liquidity situation.  Lazard immediately began outreach to raise bridge financing to provide the Debtors with additional runway to explore potential solutions to its capital structure.

93.     Contemporaneously with their efforts to market a bridge loan, Lazard began outreach to third parties regarding a potential sale or other investment in the Company.   In connection therewith, in early August 2025, Lazard contacted four (4) third parties, in addition to certain of the Debtors' prepetition secured lenders, to gauge their interest in providing a proposal to the Debtors for bridge financing or to purchase an equity stake in the Company.   The Debtors only received one (1) financing proposal despite these efforts, which contained insufficient financing to meet the Company's liquidity needs and was subject to significant diligence, among other things.  Due to the Company's rapidly declining liquidity and the time needed for potential investors to complete further diligence, it became clear that any potential transaction would need to be implemented in court.  Accordingly, the Company and the Company's Advisors turned their focus to raising a debtor-in-possession financing facility.

### 5. Other Prepetition Actions Taken by and Notices Received from Stakeholders

94.     ***Evolution Default and Termination Notice.***  On September 22, 2025, the Debtors received a notice from Evolution claiming that a default had occurred under the Starlight Facility because the Debtors had failed to make a payment of approximately $110 million in principal and $7.8 million in accrued interest thereunder.  Evolution indicated that it would be imposing a default interest rate as a result of the alleged breach.  The same day, Evolution also sent the Debtors a notice indicating that the Debtors had failed to make an additional payment of approximately $4.7 million on account of purchased receivables, and reserved rights to enforce all remedies.

95.     ***Evolution Collateral.***  Recently, the Company Advisors became aware that certain inventory subject to a security interest in favor of Evolution pursuant to the Evolution

Facilities may have been commingled with collateral securing the ABL Facility. Subsequently, the Debtors and their advisors reached out to the applicable stakeholders to make them aware of the foregoing and begin work to understand the facts (the "**Evolution Collateral Dispute**"). The Evolution Collateral Dispute is subject to the Investigation by the Special Committee, which is ongoing.

96. ***Southstate Dispute.*** On September 23, 2025, the Company was made aware that Southstate Bank had set off debts allegedly owed by the Company against an account held by the Company with Southstate, which contained approximately $27 million in working capital funds, the last remaining liquidity of the U.S. entities. Southstate alleged that the Company had failed to pay Southstate approximately $30 million, and therefore, Southstate could assert a right of setoff to remove the total amount of funds owed from any account held by the Company with Southstate. As a result of Southstate setting off the funds, the Company was left with only $14 million in cash as of September 22, 2025, which was insufficient to fund its operating expenses through the remainder of the week, including the funding of payroll. Accordingly, the Company engaged in discussions with the Ad Hoc Group regarding incremental financing to bridge the Company to a chapter 11 filing, as discussed in more detail below.

**6. Bridge Amendment**

97. At the time Southstate setoff the funds, the Company was in discussions with the Ad Hoc Group regarding potential transactions to stabilize the Debtors' business, as well as preparing for a chapter 11 filing in the near-term. Southstate's actions, however, left the Company with little working capital to operate, and absent a short-term liquidity infusion, would have forced the Company to file for chapter 11 haphazardly and without a financing commitment or the ability to continue to operate. Accordingly, the Company quickly pivoted discussions with the Ad Hoc Group Lenders to discussions of the potential willingness of the Ad Hoc Group lenders

to provide a prepetition bridge facility that would provide additional runway for the Debtors to finalize their chapter 11 preparations and ensure a smooth transition into chapter 11. On September 25, 2025, the Debtors and the First Lien Lenders entered into an amendment to the First Lien Term Loan Agreement pursuant to which the First Lien Lenders extended an additional $24.5 million in incremental loans to the Company.

### 7. Filing of Petitions of SPV Debtors

98. As the Debtors continued to approach the Petition Date, it became clear that the Debtors would be unable to secure forbearances in time with certain lenders associated with the Debtors' Inventory Financing Facilities before the Debtors would be at risk of default or exercise of remedies under such facilities. Certain of the Debtors' Inventory Financing Facility lenders could exercise remedies against Debtor entities including, in some cases, proxy rights or foreclosure. Recognizing that the exercising of any of such remedies by the Debtors' Inventory Financing Facility lenders could be prejudicial to the Debtors' ability to smoothly transition into chapter 11 and pursue a value-maximizing transaction, on September 24, 2025, the SPV Debtors filed voluntary petitions for chapter 11 as a protective measure. These Debtors' chapter 11 cases are proposed to be jointly administered with the remaining Debtors' chapter 11 cases pursuant to the *Emergency Motion of Debtors for Order Directing Joint Administration of Chapter 11 Cases*, filed contemporaneously herewith.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 29th day of September 2025.

Respectfully submitted,

By: _/s/ Charles M. Moore_
Charles M. Moore, Managing Director
Alvarez & Marsal

**Exhibit A**
**Organizational Chart**



Legend:
- Senior Facilities Borrower
- Senior Facilities Guarantor
- Debtor Entity
- CarVal Facilities Guarantor
- Onset Guarantor

**Equity Owner** — 100%

Aztec Corporation — ~1%

Brake Parts Holdings, Inc. — ~33%

Viceroy Private Capital, LLC — ~66%

**Carnaby SPV Silo**

Eagle Casting Holdings, LLC

Carnaby Capital Holdings, LLC

Carnaby Capital, LLC

Global Assets LLC

First Brands Group Holdings, LLC

**Senior Credit Facilities**
Aggregate Principal Amount

ABL Loans and L/C Obligations: $226.9mm
1L Term Loans: $4,749.9mm
   1L L/C Facility: $100mm
   1L Term Loans (USD): $3,886.9mm
   1L Term Loans (EUR): $763mm
Side-Car Term Loans: $250mm
2L Term Loans: $540mm

First Brands Group Intermediate, LLC

First Brands Group, LLC

*SPV Holding Entities*

Global Assets GmbH

Carnaby FA, LLC

Carnaby Inventory IV, LLC

Carnaby Inventory II, LLC

Carnaby Inventory III, LLC

Starlight Inventory I, LLC

Patterson Inventory, LLC

Broad Street Financial, LLC

$1,880 million Onset Leases

$159 million CarVal Facilities

$230 million Evolution Facilities

$77.8 million Aequum Facility

*Senior Facilities U.S. Guarantors***

*Foreign Borrowers (ABL Loans)*

*Domestic Non-Loan Party Subsidiaries*

*Foreign Non-Loan Party Subsidiaries*

$226.9 million (ABL Loans and L/Cs)
2 non-U.S. borrowers

*This simplified organizational chart is included for ease of reference only and should not be relied upon. First Brands' full organizational chart is attached to each chapter 11 petition filed in these cases.

**One senior facilities guarantor, Eagle Casting, LLC, is also an Onset Guarantor.