**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRST BRANDS GROUP, *et al.*, | Case No. 25-90399 (CML) |
| Debtors.[1] | (Jointly Administered) |

| | |
|---|---|
| FIRST BRANDS GROUP, *et al.*, <br> Plaintiffs | |
| v. | Adv. Pro. No. 25-03803 (CML) |
| PATRICK JAMES, THE PATRICK JAMES TRUST, ALBION REALTY, LLC, ALESTER TECHNOLOGIES LLC, BATTERY PARK HOLDINGS LLC, BOND STREET ASSET MANAGEMENT LLC, IGNITE ACQUISITION HOLDINGS LLC, LARCHMONT LLC, PEGASUS AVIATION, LLC, JOHN DOE(S) 1-100, AND ABC CORPORATION(S) 1-100, <br> Defendants | |

**OPPOSITION TO DEBTORS' APPLICATION FOR PRELIMINARY INJUNCTION**
(Relates to Docket Nos. 5 and 18)

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

## <u>TABLE OF CONTENTS</u>

Page

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND .................................................................................................. 5

III.    ARGUMENT ....................................................................................................... 6

        A.      The Application for a Preliminary Injunction Must Be Denied Because
                Debtors Made None of the Required Showings for Extraordinary Relief............. 6

                1.      The Debtors Did Not and Cannot Show a Substantial Likelihood of
                        Success On the Merits................................................................................. 6

                        a)      The Debtors' Claims Are Factually Unsupported. ......................... 6

                        b)      The Debtors' Claims Are Legally Deficient............................... 11

                2.      The Debtors Did Not and Cannot Show a Substantial Threat of
                        Imminent Irreparable Injury..................................................................... 17

                3.      The Balance of the Equities Favors the Enjoined Parties. ....................... 20

                4.      The Preliminary Injunction Would Substantially Harm Members of
                        the Public. ............................................................................................... 23

        B.      The Proposed Preliminary Injunction Does Not Comply with Law..................... 24

IV.     RELIEF REQUESTED........................................................................................ 26

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE LOPEZ:

Patrick James, The Patrick James Trust, Albion Realty, LLC, Alester Technologies LLC, Battery Park Holding LLC, Bond Street Asset Management LLC, Ignite Acquisition Holdings LLC, Larchmont LLC, Pegasus Aviation, LLC (collectively "Defendants"), by and through their attorneys, Debevoise & Plimpton LLP and Quinn Emanuel Urquhart & Sullivan LLP, hereby file this Opposition to the Debtors' Emergency *Ex Parte* Application for Preliminary Injunction Relief, Including an Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Request for Hearing (the "Application"), Adv. ECF No. 18, and respectfully state as follows in support of this opposition (the "Opposition"):

## I.      INTRODUCTION

1.      The Application is deficient on both the facts and the law.  As a factual matter, Debtors' outrageous allegations find little support in the threadbare and conclusory Application, resting instead on suspicion packaged as "information and belief."  As a legal matter, the Debtors have made none of the showings that the law requires to secure the relief they seek, much less on an *ex parte* basis, and instead appear focused on creating sensationalist headlines regarding one-sided monetary transfers.

2.      Recklessness abounds in the Application.  Notably, to the Application's detriment, its only factual support, the underlying affidavit ("Moore Affidavit"), contains no detail to support its claims of fraud and abscondment.  *First*, by the Debtors' own admission, the investigation is in its early stages.  But this work should have been completed ***before*** the Debtors decided to smear Mr. James and obtain an injunction freezing his assets.  *See* Moore Aff. ¶ 15, Adv. ECF No. 19 ("more work needs to be done"); *id.* ¶ 27 (review of off-balance-sheet practices is "subject to ongoing investigation"); *id.* ¶ 32 ("The Company's advisors are currently reviewing to determine which transactions and proceeds related to the Onset Facility benefitted

1

either the applicable SPV Debtors or FBG or if fair consideration was never received by the FBG subsidiaries for inventory and PP&E transferred"); *id.* ¶ 35 ("While the Debtors' investigation remains ongoing . . ."). *Second*, because the work has not been done, the Debtors are left to allege something as significant as a fraudulent scheme "upon information and belief." This empty phrase runs rife through the Moore Affidavit. *See, e.g., id.* ¶¶ 16, 26, 28, 29, 30, 31, 34, 35, 37, 39, 40, 45, 46, 47, 51, 52, 53, 55, 56, 58. *Third*, the Debtors tacitly concede that crucial facts must be vetted before they provide the basis for claims, including fraud claims. This includes cornerstone allegations made "upon information and belief"—like whether or not "the Company's vendors, customers and creditors, were largely unaware of the practices described [therein]," *id.* ¶ 16; whether or not Mr. James "fabricated and sold non-existent receivables," *id.* ¶ 26; whether inventory purchases were for less than reasonably equivalent value, *id.* ¶ 28; "whether Mr. James personally directed distributions from the Company to his trust," *id.* ¶ 37; whether "there was no legitimate business reason for Mr. James to transfer hundreds of millions of dollars from First Brands to Patrick James Trusts," *id.* ¶ 39; and whether "Mr. James also intentionally comingled First Brands' business accounts with personal funds and used First Brands' funds for his and his family's personal expenses and personal business," *id.* ¶ 45. These are severe accusations. Mr. James and the bankruptcy process generally deserve significantly more than the short shrift the Debtors have given them. *Finally*, "exigency"—a requirement under Fed. R. Civ. P. 65(b)(1)—is purportedly made out in a single paragraph in an attorney declaration that contains no specifics about historical transfers, amounts, and transferors. The *ex parte* emergency relief requested in the Order Granting Temporary Restraining Order ("TRO"), Adv. ECF No. 14, and now sought here in the form of a preliminary injunction, required much

2

more substance in the Application.[2]  *See* Moore Aff. ¶ 61 ("My counsel has advised me that all the requirements for emergency injunctive relief have been met."); Att'y Certification, Adv. ECF No. 20 (alleging without any support that "the significant and immediate risk that Defendants, if given notice of this motion, will seek to dissipate property of the estates beyond the reach of the Debtors or this Court.  A freeze of Defendants' assets . . . is necessary to protect the value of the bankruptcy estate from the risk of further, and potentially permanent, diminishment").

3.      The Debtors' Application also seeks to violate 100-years of Supreme Court precedent establishing that a party cannot obtain an injunction before it obtains a judgment unless it carries its extraordinary burden of showing its claims are equitable not legal; its claims are likely to succeed; it identifies specific assets; it traces those assets to the enjoined party; it connects them to alleged claims; and it shows imminent irreparable harm.  The Debtors have not come close on this record to making that showing.  Instead, they bluntly and indiscriminately ask for a blanket injunction on any and all funds—not identifying a single asset or individual account—on a record that rests entirely on "belief," does not identify a specific asset, and admits the investigation is incomplete.[3]  As the Debtors would have it, they can seize any and all funds

---

[2]      Federal Rule of Civil Procedure 65(b)(1), incorporated herein by Federal Rule of Bankruptcy Procedure 7065, states "[t]he court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:  (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  That showing was not made. *See* Att'y Certification, Adv. ECF No. 20.

[3]      *See. e.g.*, *Grupo Mexicano v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) ("a creditor's bill [can] be brought only by a creditor who has already obtained a judgment establishing the debt" (citing *Pusey & Jones Co. v. Hansen*, 261 U.S. 491, 497 (1923))); *Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 696 (S.D. Tex. 2002) ("[W]here a plaintiff creditor has no lien or equitable interest in the assets of a defendant debtor, the creditor may not interfere with the debtor's use of his property before obtaining judgment …. On the other hand, when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested …. If plaintiffs are seeking cognizable relief in equity, they must show a sufficient nexus between the assets sought to be frozen and the relief plaintiffs request.").

on the first day of the lawsuit that they commenced against Mr. James. The law does not give them that power.

4.      The Debtors are seeking—and received in the TRO—sweeping relief denying the Defendants the ability to access any and all bank accounts—and making the banks police the order. This promises value destruction for the Mr. James' companies (for example, preventing their ability to pay taxes or employ legal counsel to mount a defense) and threatens to shut down the business of several operating entities' employees, customers, vendors and other counterparties, by preventing them from engaging in even the most basic business operations. *See* TRO ¶ 4. Even the Stipulation (as defined herein) that the parties entered into urgently after the TRO was entered unreasonably constrains the operations of active businesses, putting their operations at the behest of the Debtors notwithstanding that those operating businesses are neither part of First Brands Group nor named as defendants in this action.

5.      Belying the Debtors' claim that immediate irreparable damages would occur if a preliminary injunction were not granted, the Application and accompanying papers do not identify a single element of recent conduct by the Defendants or any other enjoined party that warrants such a drastic measure, instead relying on speculation and accusations about past conduct that are contradicted by the allegations in the complaint (the "Complaint") as well as other evidence submitted herewith. Among other facts that are missing include the date of any challenged transfer; the Debtor-entity whose property was transferred—indeed, the terms "Company" and "First Brands," which encompass all Debtors and is used throughout without specifying which particular entity is relevant; and the immediate and subsequent transferees. That lack of precision precludes injunctive relief. Applicable bankruptcy and non-bankruptcy law requires much more. Even basic fraudulent transfer claims require a date-by-date, payment-

by-payment, and transaction-by-transaction recitation.[4]  Constructive trust requires a specific

tracing.[5]  The Application makes no effort to do this for any of the wild allegations it makes

concerning third-party factoring, inventory-financing, and alleged comingling.

6.      The requested preliminary injunction should be denied because: (1) longstanding

case-law prohibits the very type of pre-judgment seizure the Debtors are angling for here; (2) the

Debtors have not shown a likelihood of success on the merits; (3) the Debtors have not shown

any imminent irreparable injury and the harm allegedly suffered by the Debtors is compensable

by money damages; (4) the balance of hardships does not tip decidedly toward the Debtors; to

the contrary, the hardship falls overwhelmingly on Defendants and other enjoined parties; and

(5) the public interest favors denial of the requested preliminary injunction.

7.      Defendants respectfully request that the Court certify as final any order granting a

preliminary injunction.

## II.      BACKGROUND

8.      On September 28, 2025 (the "Petition Date"), the Debtors commenced the above-

captioned chapter 11 cases in this Court.

9.      On November 3, 2025, the Debtors initiated this adversary proceeding by filing

the Complaint and the Application seeking, among other things, a temporary restraining order

and preliminary injunction "freezing the assets of Patrick James and any and all companies he

---

[4]     *See, e.g.*, *Zazzali v.Wavetronix LLC (In re DBSI, Inc.)*, 445 B.R. 351, 354–55 (Bankr. D. Del. 2011) ("To plead
a fraudulent transfer action, Trustees must set forth the facts with sufficient particularity to apprise the
Individual Defendants fairly of the charges made against them so that they can prepare an adequate answer . . .
identifying one of the following four factors: the date of the transfer, the amount of the transfer, the name of
the transferor, and the name of the transferee" (cleaned up)).

[5]     *Newby*, 188 F. Supp. 2d at 703, 705 (plaintiff "must be able to identify a specific asset or fund of money;"
noting "tracing requirement" for constructive trust).

owns and controls in connection with the misappropriation and potential dissipation of funds belonging to the Debtors' estates." Application at 5.

10.     On November 3, 2025, the Bankruptcy Court granted the Application insofar as it requested a TRO, issued the TRO, and set the hearing on the Debtors' request for a preliminary injunction for November 10, 2025.

11.     On November 6, 2025, the Bankruptcy Court entered a stipulation by and among the Debtors and the Defendants modifying certain terms of the TRO. *See* Stipulation and Order (the "Stipulation"), Adv. ECF No. 28.

### III.     ARGUMENT

**A.     The Application for a Preliminary Injunction Must Be Denied Because Debtors Made None of the Required Showings for Extraordinary Relief.**

12.     "[A] preliminary injunction is an extraordinary remedy[,] which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion on' on all four requirements" with "specific facts," namely, "(1) a substantial likelihood that [the movant] will prevail on the merits, (2) a substantial threat that [the movant] will suffer [imminent] irreparable injury if the injunction is not granted, (3) [the movant's] threatened injury outweighs the threatened harm to the party whom [the movant] seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 252–53 (5th Cir. 2009) (citations omitted).

**1.     The Debtors Did Not and Cannot Show a Substantial Likelihood of Success On the Merits.**

a)     The Debtors' Claims Are Factually Unsupported.

13.     The Debtors' purported "showing" in support of their claims is riddled with speculation and innuendo—far from the required "prima facie" showing of a substantial likelihood of success on the merits. *In re Ozcelebi*, 2022 WL 1529359, at *3–4 (Bankr. S.D.

Tex. May 13, 2022); *see also Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572–73 (5th Cir. 1974) (the movant must "clearly carr[y] the burden of persuasion" to show a substantial likelihood of success on the merits).

14.      *First*, the Debtors' Application itself acknowledges that the Debtors' investigation into their potential claims is incomplete, yet tries to justify the relief it seeks based on the Debtors' failure, to date, to uncover "documentation" relating to the transfers at issue.  *See, e.g.*, Application ¶ 21 ("The transaction documents that the Debtors have uncovered to date fail to show that Mr. James' transfers were made for any legitimate business purpose."); Compl. ¶ 9, Adv. ECF No. 17 ("It is unclear if fair value was ever received by First Brands for the funds transferred to Archive Health.").  A proponent of a preliminary injunction bears the burden to investigate and come forward with specific, well-supported facts demonstrating that its claims are likely to succeed on the merits *before* securing injunctive relief.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (proponent of temporary injunctive relief must carry burden of persuasion by "a clear showing" (emphasis omitted) (citation omitted)).  An injunction cannot be based on the fact that the Debtors, to date, have not uncovered evidence refuting their assumptions and speculation.  *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.").

15.      *Second*, the Debtors' own pleadings acknowledge that their claims of fraudulent transfers only examine cash that flowed one way:  to Mr. James and his affiliated entities.  This underscores that their investigation is incomplete and one-sided.  They create the specter of "misappropriation" and fraudulent transfers by making blanket assertions that hundreds of millions of dollars were moved out of the Debtors to Defendants—while only obliquely

acknowledging that substantial reinvestments may have been made, *e.g.*, "[t]he Debtors also understand that during this period, funds may have been transferred into the Company from Mr. James or his affiliated entities," but faulting Mr. James because he "never provided a comprehensive accounting of the amounts or purposes of all of the transfers made between and among First Brands and Mr. James and his affiliated entities."  Compl. ¶ 8; *see also id.* ¶ 63 ("While Mr. James or his affiliated entities may have transferred some funds back to First Brands, Mr. James has never provided a comprehensive accounting of the amounts or purposes of all of the transfers made between and among First Brands and Mr. James and his affiliated entities."); *id.* ¶ 65 ("On information and belief, funds may have been transferred into the Company from Mr. James or his affiliated entities during this period.").  This flips the burden onto Mr. James to *disprove* a fraudulent transfer to avoid injunctive relief.  That is not and cannot be the standard.

16.    Indeed, the Debtors' recent communications to Mr. James' counsel have taken the explicit position that money transferred through non-debtor entities owned by Mr. James were transferred to and/or for the benefit of First Brands Group.  *See, e.g.*, Ex. A, Letter from Weil, Gotshal & Manges LLP to Debevoise & Plimpton LLP (Oct. 24, 2025) (asserting that "FBG paid €27.5M through Butterworth Capital Management, LLC for the sale of the Novares Subsidiaries and assumed certain liabilities").  Other documentation supports that sizeable monetary transfers can and did occur from non-debtor entities owned by Mr. James to First Brands Group.  *See* Ex. B (identifying a series of transfers totaling approximately $40 million from Global Technologies to the First Brands Group in the summer of 2025).

17.    Similarly, the Complaint alleges that a "Bowery Finance II" account was used in connection with alleged misappropriation of funds as a "slush fund"—yet acknowledges in the

same breath that nearly $12 billion flowed through the account from 2022 through 2025.  Compl.
¶ 60.  That is far more than any amount the Defendants are accused of "misappropriating" from
the Company.  To this end, the Complaint admits that the purported "slush fund" account was in
fact used to "meet repayments due to Onset and the factoring companies."  *Id.*  Notably, Bowery
Finance II is not named as a defendant in this action, suggesting that the record reflects that
Bowery Finance II was not in fact used to "misappropriate" funds from the Debtors.  In light of
the large amounts that, the Debtors admit, were reinvested into the Company, the Complaint's
unsupported assertions that Mr. James misappropriated substantial sums from the Company on a
net basis are neither credible nor a sufficient evidentiary basis on which to predicate
extraordinary *ex parte* relief.

18.     *Third*, the Debtors present precious little detail, and absolutely no actual evidence,
to support their bold accusation that $700 million was transferred out of First Brands Group to
Mr. James and affiliated entities.  The Debtors present no accounting or other specifics with
respect to the bare accusation that "[o]ver $700 million was funneled from First Brands directly
to Mr. James and his affiliated entities from 2018 to 2025." *Id.* ¶ 70.  Nor do they identify which
purported transfers actually fell within any applicable lookback period to their claims,[6] instead
opting to allege amounts purportedly transferred over a much longer time period, perhaps to
present the Court with an eye-catching headline number in service of their desired narrative.  Nor
do Debtors even attempt to recognize or account for the substantial inflows into First Brands
Group from Mr. James and/or related entities.

19.     Numerous of the Debtors' allegations that Mr. James deployed funds obtained
from First Brands for "personal uses" likewise appear unsupported by an evidentiary record or

---

[6]     *See* 11 U.S.C. § 548(a)(1) (two-year lookback period); Ohio Rev. Code. Ann. § 1336.04(A) (four-year
lookback period); 6 Del. Code. §§ 1304(a), 1309 (same).

well-founded asset tracing; instead, many such allegations appear to be based entirely on the
unsupported mental leap that, if funds were transferred within time frames roughly close to
personal expenditures by Mr. James, such funds must have been used for that personal
expenditure.  *See, e.g.*, Application ¶ 20 ("Money transferred from First Brands to Mr. James
also occurred in close proximity to his acquisition of various real estate properties and cars."); *id.*
("[I]n the two months prior to purchasing a home in the Hamptons on August 31, 2021, Mr.
James received over $1 million from First Brands.").  The Debtors' conclusory speculations and
pleadings "on information and belief" in this regard cannot form the basis for a sweeping
preliminary injunction freezing all of Defendants' assets and bank accounts for nearly all
purposes.  *See Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc*., 446 F.2d 353, 357 (5th
Cir. 1971) ("[D]istrict courts have shown appropriate reluctance to issue [injunctive] orders
where the moving party substantiates his side of a factual dispute on information and belief.");
*Bush v. Monroe*, 2017 WL 9989140, at *2 (E.D. Tex. Dec. 4, 2017) ("[Plaintiff] has failed to
demonstrate the entitlement to a preliminary injunction, particularly because his claims are
conclusory, generalized, and speculative."), *report and recommendation adopted*, 2018 WL
3729765 (E.D. Tex. Aug. 5, 2018); *Garza v. Barker*, 2021 WL 3730056, at *2 (E.D. Tex. Aug. 3,
2021) ("Given [plaintiff's] conclusory allegations, he has failed to clearly carry the burden of
persuasion as to all elements necessary for a preliminary injunction/temporary restraining
order."), *report and recommendation adopted*, 2021 WL 3722795 (E.D. Tex. Aug. 23, 2021).

20.    The Debtors' other scattershot attempts to impute nefarious intent and impropriety
to routine transactions follow a similar pattern.  For example, the Application and the Moore
Affidavit contend that "from 2021 through 2025, First Brands transferred approximately $8
million from First Brands to [Mr. James'] son-in-law's 'wellness' company, Archive Health LLC

[and] [a]t least one transfer to Archive Health was requested by Mr. James' son-in-law to help 'cover payroll.'" Moore Aff. ¶ 49. The Affidavit further contends—without support or any apparent attempt to investigate: "It is unclear if fair value was ever received by First Brands for the funds transferred to Archive Health." *Id.* The truth is that there is nothing "unclear" about these payments at all: such payments were legitimate expenses associated with the company's role in providing health clinic services to approximately 7,000 families of First Brands factory employees in both the U.S. and Mexico.

21.     Most gallingly, all of these accusations were first made in a sealed court pleading, without the Debtors ever taking the time to ask the Defendants or their counsel about them. Given the Debtors' own admission that they have little documentary record to support their conclusions, it would seem that they should have at least made inquiries as to the purpose of certain transfers and other activity before filing pleadings and seeking emergency preliminary relief from this Court.

b)     <u>The Debtors' Claims Are Legally Deficient</u>.

22.     The claims in the Debtors' Complaint are also legally deficient.

23.     *First*, at core, the Complaint seeks to assert fraudulent transfer claims against Defendants relating to the purportedly purloined funds. But there are fundamental flaws with the fraudulent transfer claims such that the Complaint would not even withstand a motion to dismiss, let alone form the evidentiary basis for injunctive relief. These deficiencies include:

- Failure to plead, as required under the applicable federal and state laws, for each purportedly challenged transfer: the date of such challenged transfer; the amount of such transfer; the Debtor-entity that made such transfer and whose property was transferred; and the immediate and subsequent transferees of such transfer. Indeed, for most of Defendants, there are absolutely no allegations that such Defendants received any allegedly fraudulently

11

transferred funds (Alester Technologies LLC; Bond Street Asset Management LLC; Ignite Acquisition Holdings LLC; and Pegasus Aviation, LLC), or just a vague generalized reference to receipt of transfers with no other detail.  Compl.¶ 85 ("From 2018 to 2025, approximately $35 million was transferred to Larchmont LLC, another entity owned and controlled by Mr. James that is unrelated to First Brands and appears to bear no legitimate business relationship to First Brands. Significant additional transfers totaling in the millions of dollars were also made from First Brands to Mr. James' real estate holding company (Albion Realty LLC) over the same period.").

- Failure to plead any non-conclusory allegation of insolvency as to any of the purported Debtor transferors at the time of each transfer, *see id.* ¶ 117.

- Failure to specify whether alleged "distributions" were tax distributions and thus were presumptively for fair value, *see id.* ¶ 69.[7]

- Wholly conclusory assertions of fraud and lack of good faith; *see id.* ¶ 105 ("Mr. James directed First Brands to pay Defendants with the actual intent of hindering, delaying, and/or defrauding First Brands' creditors and investors."); *id.* ¶ 108 ("Mr. James did not direct any of the transfers in good faith.").

- The Complaint attempts to assert that "[e]ach transfer was concealed," but this conclusory allegation is contradicted by the Debtors' own allegation that such transfers appeared in the audited general ledger of First Brands Group.  *Id.* ¶ 102; *see id.* ¶ 69 ("Aside from entries in the Company's general ledger, the Company's advisors are unaware of any formal

---

[7]    Such failure is particularly noteworthy because First Brands is a pass-through entity for tax purposes and Mr. James as its 100% owner pays the company's tax obligations.  *See In re Northlake Foods, Inc.*, 715 F.3d 1251, 1255 (11th Cir. 2013).

documentation indicating that these payments constituted dividends or distributions in the ordinary course.").

24.    *Second*, the equitable causes of action alleged in the Complaint carry the potential for monetary relief only insofar as the funds at issue can be traced to the alleged violation. *Whitney Nat'l Bank v. Air Ambulance by B&C Flight Mgmt. Inc.*, 2006 WL 8459812, at *2 (S.D. Tex. Apr. 13, 2006) ("The cases are clear that a court may not reach a defendant's assets unrelated to equitable relief sought in litigation and 'freeze' them so that they may be preserved to satisfy a potential money judgment."); *see also In re Primera Energy, LLC*, 2015 WL 6556887, at *4 (Bankr. W.D. Tex. Oct. 28, 2015) (denying motion for preliminary injunction to freeze defendants' assets where "[p]laintiffs [did] not demonstrate[] their entitlement to freeze any of [d]efendants' assets because there [w]as [] no showing of which assets [we]re subject to disgorgement, recovery or a constructive trust").  The Debtors have not even attempted such tracing here, fundamentally undermining any plausible claim that they have shown a likelihood of success on the merits of these claims.

25.    Rather than carry their burden to show particular funds against which they are likely to recover, Debtors have sought an injunction that broadly restrains the Defendants' disposition of *any* of their of assets without any effort to link those assets to the alleged fraud.  This is a strong indication that the preliminary relief that the Debtors are seeking is not in fact in service of their equitable claims but an eventual claim for money damages.  The law does not permit this.  *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (preliminary injunction unavailable to prevent the defendant from transferring assets in which no lien or equitable interest is claimed); *see also Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 701 (S.D. Tex. 2002) (In order "to avoid the limits of *Grupo Mexicano*[,] . . .

plaintiffs seeking asset-freezing injunctions [must] meet the 'substantive requirements for obtaining [equitable] relief[.]'" (quoting *United States ex rel. Rahman v. Oncology Assocs. P.C.*, 198 F.3d 489, 499 (4th Cir.1999))); *Turnkey Offshore Project Servs., LLC v. JAB Energy Sols., LLC*, 2021 WL 3509677, at *6 (E.D. La. Aug. 10, 2021) ("A federal court's general equitable power does not reach a defendant's assets unrelated to the underlying litigation or entail the power to freeze such assets so that they may be preserved to satisfy a potential money judgment." (internal quotations and citations omitted)); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc*., 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003) ("A preliminary injunction in this case would be issued in aid of the collection of a money judgment, not final equitable relief, an outcome barred by *Grupo Mexicano*.").

26.     The Debtors need to specifically identify the assets, including specific property traceable to the alleged violations, that they wish to subject to the injunction.  The failure to do so precludes equitable relief.  Where "the injunctive relief requests freezing of assets generally, rather than those connected to a particular property or fund that is the object of the ultimate equitable relief sought, courts have found that they lack the authority to issue injunctions to effectuate the collection of money in satisfaction of . . . alleged legal liability."  *Coley v. Vannguard Urb. Improvement Ass'n, Inc.*, 2016 WL 7217641, at *3 (E.D.N.Y. Dec. 13, 2016) (internal quotation marks omitted) (collecting cases).  Instead, the movant must demonstrate "a sufficient nexus between the assets sought to be frozen and the equitable relief request[ed]." *Newby*, 188 F. Supp. 2d at 696–97; *see also United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 497 (4th Cir. 1999) (holding a nexus is required "to determine whether the interim relief sought—in this case the preliminary injunction freezing assets—is a reasonable measure to preserve the *status quo* in aid of the ultimate equitable relief claimed").

27.     Moreover, the claims the Debtors bring sound in law, not equity.  *See, e.g.*, *In re BYJU's Alphia, Inc.*, 661 B.R. 109, 119 (Bankr. D. Del. 2024) (remedy sought in fraudulent transfer claims is "purely monetary" (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 46–47 (1989))).  Additionally, even if some claims might sound in equity, courts look to the substance of the requested relief—which here confirms the Debtors seek monetary damages.  *See Matrix Partners VIII, LLP v. Nat. Res. Recovery, Inc.*, 2009 WL 175132, at *5 (E.D. Tex. Jan. 23, 2009) (courts "engage in a more penetrating analysis" to determine if the "action, considered in context, is truly equitable in nature or whether it is fundamentally an action at law with ancillary claims that merely sprinkle a bit of equity on a suit for money damages.").

28.     *Third*, the TRO and proposed preliminary injunction expansively restrain and enjoin **numerous non-Defendant entities that are not even alleged to have received any alleged fraudulent transfers or otherwise participated in any of the alleged conduct at issue.**  None of the Debtors' cited case law supports their extraordinary request for *ex parte* preliminary relief against such entities based on speculations drawn of an admittedly incomplete and inconclusive investigation.  For example, in *Sommers v. Harvie*, a court did not impose a blanket asset freeze like that requested here; instead, the court applied the well-settled asset tracing rule and merely enjoined defendants from transferring specific proceeds from the sale of a particular parcel of property. Case No. 22-31327, Adv. No. 22-03259 (Bankr. S.D. Tex. 2022), ECF No. 12.  Here, there has been no effort to trace actual funds and instead the TRO and proposed preliminary injunction seek to freeze all assets of Mr. James and related entities without any showing that those entities hold any allegedly tainted assets.  This is not permitted.  In *In re Fredeman Litig.*, 843 F.2d 821, 824–28 (5th Cir. 1988), the Fifth Circuit vacated a preliminary injunction freezing assets to ensure satisfaction of a potential judgment because the order was over-inclusive and

there was no connection between the property frozen and the underlying lawsuit.  The Fifth Circuit explained that, rather than seeking to preserve specific assets, the district court "froze essentially all of the defendants' assets, effectively putting the defendants into involuntary receivership, based on unproven claims for unliquidated damages."  *Id.*

29.     *Fourth*, given that the Complaint sounds in fraud, Debtors have failed to satisfy their obligations under Rule 9(b) to plead with particularity the particular statements that they allege are fraudulent and a plausible basis to believe any such statements were made with scienter.  *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019) ("When the Rule 9(b) pleading standard applies, the complaint must contain factual allegations stating the 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994))).  Like their failure to engage in tracing, the Debtors' cavalier assertion of fraud without any specificity as to which particular statements they allege are fraudulent, who made them, and why, are fatal to their claim that they have demonstrated a reasonable likelihood of success on the merits.

30.     Instead, the Complaint paints with broad brush strokes to make conclusory allegations that attribute every alleged action of First Brands Group to Mr. James personally— with absolutely no supporting detail to suggest that he took any of the actions alleged.  *See, e.g.*, Compl. ¶ 5 ("Mr. James caused First Brands to incur at least $2.3 billion in accounts receivable factoring liabilities"); *id.* ¶ 6 ("Mr. James engaged in financing transactions involving special purpose vehicles");  *id.* ¶ 7 ("Mr. James . . . secretly pilfered some of the Company's assets to fund his and his family's lavish lifestyle"); *id.* ¶ 42 ("Debtors believe Mr. James improperly

secured funding for First Brands from third parties"); *id.* ¶ 46 ("Mr. James induced third-party

lenders to lend to First Brands irrespective of its true financial condition….").

31.    Far from showing a substantial likelihood of success on the merits, the Complaint

is replete with unsupported, speculative allegations that are destined to fail when put to the

scrutiny of adversarial litigation.

> **2.    The Debtors Did Not and Cannot Show a Substantial Threat of
> Imminent Irreparable Injury.**

32.    To succeed on an application for a preliminary injunction, an applicant must

demonstrate substantial threat of harm that is imminent and irreparable.  *ADT, LLC v. Cap.*

*Connect, Inc.*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015); *see also Nevada v. United States*

*Dep't of Lab.*, 218 F. Supp. 3d 520, 532 (E.D. Tex. 2016) ("An injunction is appropriate only if

the anticipated injury is imminent and not speculative.").  For an injury to qualify as "imminent"

there must be a substantial, concrete, and not speculative, risk that it is likely to occur in the

absence of preliminary relief.  *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227

(S.D. Tex. 2011).  Further, it is black-letter law that an injury is not irreparable if the movant can

be made whole by an award of damages or other relief at the conclusion of the proceeding.  *Heil*

*Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013) ("An irreparable injury is one

that cannot be undone by monetary damages or one for which monetary damages would be

'especially difficult to calculate.'" (quoting *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir.

1991)); *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848 (5th Cir. 2004) ("For

purposes of injunctive relief, an adequate remedy at law exists when the situation sought to be

enjoined is capable of being remedied by legally measurable damages."); *Matter of Read*, 183

B.R. 107, 113 (Bankr. E.D. La. 1995) ("The general rule is that injunctive relief is not

appropriate when money damages are an adequate remedy at law."); *Danden Petroleum, Inc. v.*

*Northern Nat. Gas Co.*, 615 F. Supp. 1093, 1099 (N.D. Tex 1985) ("Injuries which can be compensated by money damages at a later time are not irreparable and do not warrant the extraordinary remedy of an injunction."); *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (quoting *Va. Petroleum Jobbers Ass'n v. fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

33.     Where, as here, a proponent of the preliminary injunction is seeking to restrain another party's funds on the basis of an asset dissipation theory, the Debtors must show with reference to specific transactions, *e.g.*, by date, amount, transferor, that the Defendants, Mr. James, as well as "all other persons or entities acting in concert with any of them," (together, the "Enjoined Parties"), *see* TRO ¶ 1, are actively transferring assets in a manner that would render Defendants judgment proof or have engaged in such conduct in the recent past.  *See In re Fredeman Litig.*, 843 F.2d at 827–28 (explaining that the scope of an injunction freezing assets should be limited "to protect[ing] assets that are the subject of the dispute" and the "direct, traceable proceeds" of those assets, as well as to circumstances where "the defendant was about to become insolvent").  The Debtors come nowhere close to showing imminent and irreparable harm on such a theory.

34.     There is no evidence whatsoever that Mr. James or any of the other Defendants are or have been actively transferring their own assets so as to render themselves judgment proof; nor is there evidence that they have done so in the recent past.  Indeed, the Application does not even point to any recent transfers made from First Brands to Mr. James or the other

18

Defendants, nor any meaningful dissipation of assets by Mr. James or the other Defendants.  But this is required for the relief that the Debtors seek.  *Cajun Servs. Unlimited, LLC v. Benton Energy Serv. Co.*, 2020 WL 3000361, at *6 (E.D. La. Jan. 23, 2020) (denying preliminary injunction because plaintiffs did not show "a strong indication that the defendant may dissipate or conceal assets" and therefore did not demonstrate that irreparable harm is likely in the absence of an injunction; instead, plaintiffs "provided only conclusory assertions regarding the allegedly unsavory character of [defendant] and its agents, and they have provided no evidence showing that [defendant] has been or is planning on dissipating its assets").  There must be clear, concrete indications of planned or ongoing dissipation, such as evidence that the defendant is actively moving assets to prevent recovery or evidence of concealment or obfuscation. *See U.S. Philips Corp. v. KXD Tech., Inc.*, 2007 WL 9657637, at *1 (C.D. Cal. Sept. 17, 2007) ("Plaintiff provides evidence that Defendants have: closed bank accounts; transferred over $8 million dollars in assets to bank accounts in China over the past year; and failed to comply with this Court's order to disclose documents indicating Defendants' assets and titles to real property.  Therefore, Plaintiff has demonstrated the possibility of irreparable injury by presenting sufficient evidence to show a strong indication that Defendants are dissipating and concealing its assets to prevent Plaintiff any recovery." (internal citations omitted)).  Nothing of the sort is even alleged here.

35.     Instead, the Application seeks a preliminary injunction based not on recent conduct suggesting imminent harm, but rather based on complaints about purported past actions by Defendants (primarily with the active participation of the Debtors themselves) dating as far back as 2018.  But complaints about past conduct are insufficient to justify the extraordinary injunctive relief requested.  *Gouldd v. Accetta*, 2009 WL 10678304, at *1 (N.D. Tex. Feb. 24,

2009) ("There is no irreparable harm based only on an alleged past wrongdoing." (citing *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir. 1997))); *ShiftKey, LLC v. NurseIO, LLC*, 2025 WL 2107687, at *3 (E.D. Tex. July 28, 2025) ("Allegations of past misconduct—without more—are insufficient to warrant equitable relief and do not establish that irreparable harm is imminent or ongoing.").

36.     Nor is there any evidence that Mr. James will abscond to, or has sought to conceal assets in, a foreign jurisdiction, as the Application misleadingly implies. While Mr. Moore tries to create this impression by asserting in his affirmation that Mr. James is a "Malaysian national," Mr. James has not been a Malaysian citizen since 1988. The fact of the matter is that Mr. James is a U.S. citizen who has lived and worked in the U.S. for more than 40 years, has extensive family ties here, and has invested substantial sums of money in U.S. companies, including the Debtors themselves. Any suggestion otherwise is irresponsible and not well taken. Moreover, the Application cites no facts suggesting that Mr. James has transferred or will transfer any assets to foreign jurisdictions or otherwise beyond the reach of the bankruptcy court. At bottom, the mere fact that a person was born abroad is not, and cannot be, a substitute for a substantial evidentiary showing that such person is likely to dissipate his assets, as required to secure injunctive relief.[8]

### 3.     The Balance of the Equities Favors the Enjoined Parties.

37.     "A preliminary injunction is to be issued only when the balance of hardships favors the party seeking the injunction. This calculation requires a court to consider 'the

---

[8]     As to the Application's attempts to cast aspersions over Mr. James's personal life—asserting that he and his family lead a "lavish lifestyle"—the Debtors' second-guessing of Mr. James's past personal financial decisions is not grounds for entry of a restraining order in the absence of evidence that such expenditures are likely to continue and are of such a magnitude that they would render the Defendants judgment-proof. *See Gouldd*, 2009 WL 10678304, at *1; *ShiftKey, LLC*, 2025 WL 2107687, at *3; *Amegy Bank Nat'l Ass'n v. Monarch Flight II, LLC*, 2011 WL 4948986, at *5–6 (S.D. Tex. Oct. 18, 2011). The Debtors presented no such evidence in the Application or its supporting materials.

competing claims of injury and . . . the effect on each party of the granting or withholding of the requested relief.'  A district court therefore can only perform this task after identifying 'the most serious possible injury' that can be claimed by either party."  *Heil Trailer Int'l*, 542 F. App'x at 336–37 (citations omitted).

38.     Here, the Enjoined Parties will suffer a litany of catastrophic harms if the preliminary injunction in granted, whereas the Debtors have not made any showing that they will be harmed in its absence.

39.     *First*, the TRO and proposed preliminary injunction prohibits the Enjoined Parties from "disposing of any and all assets that are owned or controlled by the Defendants or any entities owned or controlled by the Defendants," including "[a]ny and all funds in any and all bank accounts of any other entities in Defendants' control."  TRO ¶ 3.  This breathtakingly broad restriction arguably applies not only to Mr. James and the other Defendants, but also to numerous non-debtor operating businesses owned by Mr. James (the "Operating Businesses"), notwithstanding that there is not a shred of evidence (or even conclusory allegations) that any of them are involved in alleged wrongdoing or otherwise received funds from the Debtors.  Such businesses include:

- The Eitek Business[9]:  a business offering automotive interior technologies and products based in Austria. FIDELIUM, https://www.fidelium-partners.com/en/portfolio/eitek-gmbh/ (last visited Nov. 4, 2025)

- The Peterson Business[10]:   the largest privately held spring manufacturer in North America that designs, manufactures and supplies springs, snap-rings, wire forms, clips, clamps, stampings, and a variety of sub-assemblies.  PETERSON SPRINGS, https://www.pspring.com/products/stampings/ (last visited Nov. 4, 2025).

---

[9]     Eitek GmbH.
[10]    Peterson American Corporation d/b/a Peterson Spring.

- The Meteor Business[11]:  a business that develops and manufactures automotive sealing systems, such as weatherstrips and other rubber components.  Meteor, https://meteor-group.com/working-at-meteor/ (last visited Nov. 4, 2025)

If the Operating Businesses are unable to access their bank accounts or other assets, they will be unable to pay their employees, fulfill customer orders, satisfy tax, pension, or other regulatory obligations or pay rent or other amounts necessary to maintain day-to-day operations and would have to cease doing business altogether.  *Cf. Snelling Emp. L.L.C. v. MB Indus., LLC*, 2011 WL 13130075, at *2 (N.D. Tex. Sept. 28, 2011) (finding that the balance of the harms militated in favor of denying a temporary restraining order and preliminary injunction to freeze assets where the defendant would be "prevent[ed] . . . from engaging in its normal business operations," while "[t]he only harm to [the movant] would be a further delay in receiving the payments owed to it").

40.     The court could not possibly have intended the TRO or any injunctive relief to force the Operating Businesses to cease operations in this matter, even on an interim basis. Indeed, Defendants approached the Debtors for confirmation that the TRO did not prohibit the Operating Businesses from making ordinary course business expenditures, but the Debtors did not agree, opting instead to treat this issue as an opportunity to seek even more onerous restrictions on the ability of the Operating Businesses to operate, notwithstanding that there is no evidence that they have been used to facilitate any allegedly wrongful conduct by Defendants. Instead, the Debtors forced counsel to negotiate limits on the operating budgets of those entities. *See* Stipulation ¶ 1.

41.     Subjecting these entities to the TRO and proposed preliminary injunction—even with "allowances" for operating budgets—is incredibly burdensome, unworkable, and without any basis whatsoever.  The businesses are already being damaged: since the TRO was issued,

---

[11]     Meteor Holdings, S.a.r.L. and Meteor Acquisitions S.a.r.L.

there have been multiple resignations at entities that the Debtors assert are covered by the TRO, *see, e.g.*, Ex. C, Frédéric Özgur Resignation from Neptune Industrial I S.à.r.l (Nov. 5, 2025); Ex. D, Frédéric Özgur Resignation from Neptune Industries Holdings LLC (Nov. 5, 2025); Ex. E, Saad Madani Resignation from Neptune Industrial I S.à.r.l (Nov. 5, 2025); Ex. F, Saad Madani Resignation from Neptune Industries Holdings LLC (Nov. 5, 2025).  These resignations— including a resignation by a manager and director of two Operating Businesses—have compounded the effects of the TRO on the Operating Businesses.

42.    *Second*, because the only expenditures permitted by the TRO and proposed preliminary injunctions are for "Living Expenses," *see* TRO ¶ 5, Mr. James and the other Defendants are also prohibited from making payments on account of tax or other legal obligations, or paying legal, accounting, or other professional advisors, rendering them effectively unable to defend themselves in this and other proceedings and delivering victory to the Debtors by default.  Such result is contrary to well-settled law.  *See Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 328 (1938) (courts may "not enjoin acts" that are "lawful").

### 4.    The Preliminary Injunction Would Substantially Harm Members of the Public.

43.    The preliminary injunction must also be denied because it will substantially harm members of the public.  Even as modified by the parties' subsequent stopgap stipulation, the TRO's restraints on the Operating Businesses are massively disruptive—subjecting them to draconian spending caps that, if continued for any meaningful duration, could force them out of business by denying them the ability to operate in the ordinary course.  If these businesses are forced to shut down, employees will lose their jobs, customers' orders will go undelivered, and the Debtors will have effectively destroyed a portion of the value that they purport to seek to recover on behalf of their creditors, notwithstanding that none of these harmed individuals and

23

groups had anything to do with the purported wrongdoing at issue in this adversary proceeding

Such result is irreconcilable with the requirement that injunctive relief be tailored to minimize

harm to the public good.  *Cf. Ramirez v. Collier*, 595 U.S. 411, 433–34 (2022) (explaining that

injunctive relief should be "tailored" to balance the "respective [public] interests" at stake);

*VanDerStok v. Garland*, 625 F. Supp. 3d 570, 586 (N.D. Tex. 2022) (explaining that the court

"tailored the scope of the preliminary injunction with careful attention to avoid further upsetting

the balance of . . . competing public interests").

### B.    The Proposed Preliminary Injunction Does Not Comply with Law.

44.    The TRO and proposed preliminary injunction does not comply with well-settled

law.  It is well-settled that injunctive relief must be (i) narrowly tailored, so as not to be

overbroad and (ii) specific, so as to provide the enjoined party adequate notice of exactly the acts

it is forbidden from taking.  *See, e.g.*, *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d

1236, 1246 (5th Cir. 1975); Fed. R. Civ. P. 65(d)(1) ("Every order granting an injunction" must

"state its terms specifically" and "describe in reasonable detail . . . the acts or acts restrained.").

"The rule embodies the elementary due process requirement of notice."  *U.S. Steel Corp.*, 519

F.2d at 1246.  "[T]he broadness of an injunction refers to the range of proscribed activity, while

vagueness refers [to] the particularity with which the proscribed activity is described."  *Id.* at

1246 n.19.

45.    Here, multiple aspects of the TRO and proposed preliminary injunction are

unduly vague and overly broad.  For example, the TRO and proposed preliminary injunction are

hopelessly vague as to who, specifically, is enjoined by the order.  This is because the TRO's

definition of "Enjoined Parties" encompasses not only the nine listed Defendants, but also "*all

other persons and entities acting in concert with any of them*."  TRO ¶ 1 (emphasis added).  The

TRO does not identify which persons or entities are encompassed by this language nor does it

specify what it means to "act in concert" with the Defendants, much less whether it applies to persons or entities acting in concert with such Defendants only with respect to certain acts or with respect to any and all acts of Defendants.  *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("As we have emphasized in the past, the specificity provisions of Rule 65(d) are no mere technical requirements.  The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.  Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." (internal citations omitted)).  Combined with the overbreadth of the prohibitions listed in paragraph 3 of the TRO against disposition of any and all assets of entities owned or controlled by the Defendants, a rank-and-file employee of the Operating Businesses, for example, could become an "Enjoined Party" and violate the TRO simply by virtue of cashing their paycheck.  Protecting against this sort of contempt by hindsight is exactly why injunctions must be specific and narrowly tailored.  *See id.* at 476 n.2 ("The judicial contempt power is a potent weapon.  When it is founded upon a decree too vague to be understood, it can be a deadly one.  Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." (quoting *Int'l Longshoremen's Ass'n. v. Phlia. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967))).

46.     For similar reasons, the TRO and requested preliminary injunction is overbroad to the extent it purports to enjoin persons or entities for whom there is no evidence (or even allegations) that they participated in or were in any way involved in any wrongdoing, such as the Operating Businesses.  *See John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004) ("[T]he

scope of injunctive relief is dictated by the extent of the violation established.  The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." (citations omitted)).

47.    The same can be said of the scope of the restrictions placed on the Defendants' use of their own assets, bank accounts, or other funds.  For example, other than the exceedingly narrow carveout for Mr. James's "Living Expenses" (which is not clearly described, leaving more questions than answers), Defendants are prohibited from transferring any assets whatsoever, meaning they are prohibited from making tax payments, payroll payments, rent payments, or other payments or transfers required by law.  *See* TRO ¶¶ 3, 5.

48.    Mr. James and the other Defendants are also prohibited from using their own funds to pay counsel, accounting, or other professional fees to assist in their defense of this adversary proceeding and related litigations, effectively barring them their right to counsel and to defend the claims against them in this Court and other venues.  There is no basis for the Debtors to exercise that kind of control over Mr. James or his companies simply because they brought a lawsuit.  Unless and until they secure a judgment against Mr. James and his companies, they have no claim to their assets.

## IV.    RELIEF REQUESTED

49.    For all the reasons stated herein, the Court should deny the Application.

Respectfully submitted this 7th day of November, 2025.

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice*)
Erica S. Weisgerber (admitted *pro hac vice*)
Matthew J. Sorensen (admitted *pro hac vice*)
Chris R. Ceresa (admitted *pro hac vice*)
66 Hudson Boulevard
New York, NY  10001
Telephone: (212) 909-6000
nlabovitz@debevoise.com
eweisgerber@debevoise.com
mjsorensen@debevoise.com
crceresa@debevoise.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Cameron Kelly*
Cameron Kelley
(TX SBN: 24120936)
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: (713) 221-7000
Email: cameronkelly@quinnemanuel.com

Michael B. Carlinsky (admitted *pro hac vice*)
James C. Tecce (admitted *pro hac vice*)
Scott Hartman (admitted *pro hac vice*)
Eric S. Kay (admitted *pro hac vice*)
Reece Pelley (admitted *pro hac vice*)
Grace Sullivan (admitted *pro hac vice*)
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000

*Attorneys for Defendants Patrick James, The Patrick James Trust, Albion Realty, LLC, Alester Technologies LLC, Battery Park Holding LLC, Bond Street Asset Management LLC, Ignite Acquisition Holdings LLC, Larchmont LLC, Pegasus Aviation, LLC*

27

## <u>CERTIFICATE OF SERVICE</u>

I, Cameron Kelly, hereby certify that on the 7th day of November, 2025, a copy of the foregoing Objection was served via the Clerk of the Court to the parties who are registered to receive service via CM/ECF.

*/s/ Cameron Kelly*
Cameron Kelly
