IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | X : | |
| In re | : | **Chapter 11** |
| **FIRST BRANDS GROUP, LLC,** *et al.*, [1] | : : | **Case No. 25-90399 (CML)** |
| | : | **(Jointly Administered)** |
| Debtors. | : X | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | : : | |
| Plaintiffs, | : : | |
| v. | : : | **Adversary Pro. No. 25-03803 (CML)** |
| **PATRICK JAMES, THE PATRICK JAMES TRUST, ALBION REALTY, LLC, ALESTER TECHNOLOGIES LLC, BATTERY PARK HOLDINGS LLC, BOND STREET ASSET MANAGEMENT LLC, IGNITE ACQUISITION HOLDINGS LLC, LARCHMONT LLC, PEGASUS AVIATION, LLC, JOHN AND JANE DOE(S) 1-100, and ABC CORPORATION(S) 1-100,** | : : : : : : : : : : : : : : | |
| Defendants. | : : | |

REPLY IN SUPPORT OF DEBTORS' APPLICATION
FOR PRELIMINARY INJUNCTIVE RELIEF
(Relates to Docket Nos. 25 and 37)

---

[1] A complete list of the debtors in these chapter 11 cases may be obtained on the website of the debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ............................................................................................................. 1

II.   ARGUMENT .................................................................................................................... 4

    A.    The Debtors are Likely to Succeed on the Merits.................................................. 4

    B.    The Debtors Will Suffer Irreparable Harm Absent an Injunction ....................... 15

    C.    The Balance of Equities and the Public Interest Favor the Debtors .................... 17

    D.    In the Alternative, the Debtors Do Not Object to Reasonable
          Modifications to the Injunction............................................................................. 19

III.  CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.T.N. Industries, Inc. v. Gross*,
632 F. App'x 185 (5th Cir. 2015) ............................................15

*Amegy Bank Nat'l Ass'n v. Monarch Flight II, LLC*,
No. H-11-3218, 2011 WL 6091807 (S.D. Tex. Dec. 7, 2011) ...............15

*Animale Grp. Inc. v. Sunny's Perfume Inc.*,
256 F. App'x 707 (5th Cir. 2007) ............................................12

*Ball v. Soundview Composite LTD (In re Soundview Elite LTD)*,
543 B.R. 78 (Bankr. S.D.N.Y. 2016) ........................................13

*In re Fredeman Litig.*,
843 F.2d 821 (5th Cir. 1988) ................................................15

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) ..........................................................13

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) .....................................................12, 13

*Johnson v. Johnson*,
385 F.3d 503 (5th Cir. 2004) .................................................7

*Kalsi Eng'g, Inc. v. Davidson*,
No. H-14-1405, 2014 WL 12540550 (S.D. Tex. Sept. 2, 2014)............11

*In re NE 40 Partners, Ltd. P'ship*,
440 B.R. 124 (Bankr. S.D. Tex. 2010) ......................................19

*Newby v. Enron Corp.*,
188 F. Supp. 2d 684 (S.D. Tex. 2002) ......................................15

*Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*,
117 F.4th 628 (5th Cir. 2024) ................................................7

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005)..................................................14

*Schmidt v. Platinum Partners Value Arbitrage Fund LP (In re Black Elk)*,
No. 16-03237, Dkt. 7 (Bankr. S.D. Tex. 2016)..............................11

*Sommer v. Harvie (In re 338 L.T.D.)*,
    No. 22-03259, Dkt. 12 (Bankr. S.D. Tex. 2022)....................................................................11

*In re Team Sys. Int'l, LLC*
    2023 WL 1428572 (Bankr. D. Del. Jan. 31, 2023) ...............................................................13

*Winter v. Nat'l Res. Def. Council*,
    555 U.S. 7 (2008)......................................................................................................................4

**Statutes**

11 U.S.C. § 542(a) ..........................................................................................................................9

11 U.S.C. § 548 ...............................................................................................................................9

8 Del. C. § 174(a) ...........................................................................................................................9

Ohio Rev. Code Ann. §§ 1336.04(A)(1), 1336.04(A)(2), 1336.07, 1336.09 ...............................9

Ohio Rev. Code Ann. § 2305.07 .....................................................................................................9

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
    § 2949 (3d ed.) ...........................................................................................................................6

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE LOPEZ:

First Brands Group, LLC and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "**Plaintiffs**" or the "**Debtors**," together with non-debtor affiliates, "**First Brands**" or the "**Company**"), by their attorneys, Weil, Gotshal & Manges LLP, respectfully submit this response to the Opposition to Debtors' Application for Preliminary Injunction, ECF No. 37 ("**Opposition**"), and the Emergency Motion to Vacate or Amend Order Granting Temporary Restraining Order, ECF No. 25 ("**Defendants' Emergency Motion**"), filed by Defendants Patrick James, The Patrick James Trust, Albion Realty, LLC, Alester Technologies LLC, Battery Park Holdings LLC, Bond Street Asset Management LLC, Ignite Acquisition Holdings LLC, Larchmont LLC, and Pegasus Aviation, LLC (collectively, "**Defendants**"), and in further support of Debtors' Emergency Ex Parte Application for Preliminary Injunctive Relief, Including an Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Request for Hearing, ECF No. 18 ("**Motion**").

## I.      INTRODUCTION

1.      As the Court already concluded in awarding a Temporary Restraining Order, ECF No. 14 ("**TRO**"), the Debtors have carried their burden to show they are entitled to injunctive relief. Defendants' meritless and completely fact-free Opposition changes nothing.

2.      The Debtors offer a detailed showing—supported by the sworn Affidavit of Charles Moore, First Brands' interim Chief Executive Officer, and to be further supported by Mr. Moore's testimony and documentary evidence at the hearing on the Motion—that Mr. James secured billions of dollars of funding for First Brands only to turn around and misappropriate hundreds of millions (if not billions) of dollars for Mr. James' and his family's personal use. The Debtors further showed that Mr. James controls a web of interconnected entities and accounts in the United States and abroad, transfers funds among them with abandon and without regard for corporate

formalities, and has spent many millions of dollars (some belonging to the estate) on luxury goods and services. The Debtors bring this action to recover misappropriated funds for the benefit of the estates and their creditors. And the Debtors seek immediate injunctive relief to prevent Defendants from dissipating those funds in the interim, to ensure that the Debtors can enforce the judgment they will receive in this action.

3.      Defendants' Opposition is notable more for what it omits than what it includes. The Debtors set forth detailed allegations of grave misconduct by Mr. James. If Defendants disputed those allegations, it should have been straightforward to offer a sworn affidavit from Mr. James (or another percipient witness) rebutting them. But Defendants offer no facts—none—in opposition to the Debtors' allegations. Defendants offer no documents justifying Mr. James' actions. Defendants refused to make Mr. James available for a deposition. And Defendants have chosen not to present Mr. James (or any other witness) at the preliminary injunction hearing. Defendants' silence leaves the Debtors' factual support for their Motion entirely unrebutted.

4.      Unable or unwilling to dispute the facts, Defendants' Opposition instead engages in a campaign of nitpicking and distraction. Defendants argue that the Debtors should have offered even more evidence of misconduct, while largely ignoring the damning evidence the Debtors did present. While the Debtors' investigation remains ongoing, and the Debtors will return to the Court with still more evidence of Defendants' wrongdoing as this action proceeds, the Debtors' investigation to date has been thorough and the record currently before the Court is more than sufficient to justify preliminary relief. Defendants further suggest (without any factual support) that Mr. James also "reinvested" all of the misappropriated funds into the Company. Opposition ¶ 17. But this is no defense to improper transfers of hundreds of millions of dollars out of First Brands in the first place. Moreover, it appears that Mr. James' transfers to First Brands were not

2

"investments" at all, but rather an effort to perpetuate his fraud by maintaining the illusion that First Brands could repay the debts he inappropriately secured. Mr. James was engaged in a loop of transferring money in to mislead his lenders and secure additional funding, only to then take more money out. Defendants' efforts to distinguish the Debtors' legal authority are weaker still. In case after case, courts in this district and elsewhere have awarded exactly the relief ordered here on similar facts. And Supreme Court precedent is clear—as many courts have recognized—that a party seeking equitable relief may secure an asset freeze while the litigation is pending.

5.      Defendants also challenge the scope of the Court's remedy, arguing that the TRO sweeps too broadly and unduly harms Defendants and third parties. But if Defendants are displeased with the Court's remedy, they have only themselves to blame. And not just because it is the Defendants' rampant (and apparently unrepentant) fraud and misappropriation that necessitated this action in the first place. The Debtors sought a freeze of all assets under Defendants' control because Defendants' history of commingling funds and fraudulent transfers creates an imminent risk that the misappropriated property of the estates could be dissipated through any entity or account under Defendants' control (as they have been doing for years). Were Defendants willing to ensure that the misappropriated property of the estates would not be dissipated and that funds would be available to satisfy a judgment in this action, a freeze would not be needed.

6.      To that end, the Debtors have acted with urgency and good faith to modify the injunction to respond to Defendants' concerns. The parties have agreed to, and the Court entered, a stipulation allowing for what Defendants claimed were legitimate business expenses for operating entities allegedly imperiled by the TRO. ECF No. 28 (the "**Stipulation**"). As the Debtors' counsel wrote to Defendants' counsel: "Our sole and stated purpose in securing an

3

injunction is to protect the estates by preventing Mr. James and Defendants from dissipating estate property beyond the reach of the Debtors and their creditors and the Court … We urge you to propose any additional stipulation that you believe is necessary and appropriate to avoid the concerns you raise regarding Defendants' unwillingness to live under the injunction. We will continue to consider any proposal you make in good faith in an effort to reach agreement on a reasonable ongoing construct that addresses your concerns while ensuring that Defendants cannot dissipate the property of the estates." Ex. A. Defendants have not proposed a thing.

7.      The Debtors will not oppose any reasonable and appropriate modifications to the structure of the injunction, so long as it continues to prevent dissipation of property of the estate and ensures that the Debtors can collect on a judgment in this action. The only reason for Defendants to oppose the Debtors' reasonable proposal is if Defendants actively seek to dissipate property of the estates beyond the Debtors' reach. The Court should not allow them to get away with it.

## II.      ARGUMENT

### A.      The Debtors are Likely to Succeed on the Merits.[2]

(i)      *The Debtors' Evidence is More Than Sufficient to Justify Relief*

8.      To support the Motion, the Debtors offered detailed examples of: doctored invoices factored for many times their actual value, ECF No. 17 ("**Compl.**") ¶¶ 5, 52–54; ECF No. 19 ("**Moore Aff.**") ¶¶ 19–25; improper SPV funding transactions, Compl. ¶¶ 72–76; Moore Aff. ¶¶ 27–32, 41–42; and improper transfers to Mr. James, his trust, and the other Defendants totaling in the hundreds of millions of dollars for no legitimate purpose, Compl. ¶¶ 66–70; Moore Aff.

---

[2] Both parties agree that the standard four-factor test for injunctive relief applies. Motion ¶ 27, 34–56; Opposition ¶ 12; *see Winter v. Nat'l Res. Def. Council*, 555 U.S. 7 (2008).

¶¶ 34–39. At the preliminary injunction hearing, the Debtors will introduce documents supporting these claims, including First Brands' general ledger, which shows the date, amount, and recipient of transfers from First Brands to Defendants, as well as messages, showing in real time, the process by which the Company created "dummy invoices." *See* ECF No. 34 (Debtors' Exhibit List).

9.      The Debtors have shown, allegation by allegation, sworn statement by sworn statement, and—at the upcoming hearing—document by document and transfer by transfer, that Defendants engaged in the unlawful conduct the Debtors allege. This showing more than satisfies the Debtors' prima facie burden at this stage to show that the Debtors are likely to succeed on the merits of any one of their eight claims, including for turnover of estate property and fraudulent transfer. *See* Motion ¶ 34. Indeed, the Debtors showed that they are likely to succeed on everything.

10.      Tellingly, Defendants do not specifically identify any particular element of any particular claim that they believe the Debtors cannot prove. And Defendants do not offer any facts of their own to dispute the Debtors' proof: no sworn statement from Mr. James (or anybody else), no documents, no witnesses, nothing.[3] Defendants had ample opportunity to provide the Court and the Debtors with exculpatory facts to justify Mr. James' actions. Defendants failed to do so. Defendants do not even deny many of the Debtors' most troubling allegations, including that (i) Mr. James orchestrated billions of dollars in financing through the factoring and SPV-related conduct the Debtors alleged; (ii) hundreds of millions of dollars were transferred from First Brands to Mr. James, the Patrick James Trust (which received approximately $600 million), and his affiliated entities; (iii) many of these transfers were not documented or were poorly documented and made without an appropriate business purpose or reasonably equivalent value provided to First

---

[3] Defendants offer just six exhibits with their Opposition. None of these call into question (or even address) any of the facts of Mr. James' conduct. The documents instead relate either to Mr. James' purported transfers *into* First Brands, or to events at other entities controlled by Mr. James since the TRO was entered.

Brands; (iv) substantial insider distributions and personal expenditures occurred in close proximity to financing transactions, including while the Debtors approached insolvency; and (v) at the end of the day, after Defendants' actions, First Brands was left insolvent, with just $12 million in its bank accounts and this was after reducing payments to vendors and obtaining a $24.5 million emergency loan to make payroll in the lead-up to filing. All Defendants offer is attorney argument about whether the Debtors have carried their burden to secure an injunction, not a factual defense of Mr. James' actions.

11.     These unchallenged facts show that the Debtors are likely to succeed on each of their claims. *See* Motion ¶¶ 36–45. And Defendants' failure to contest these facts is fatal at the preliminary injunction stage. *See generally* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 (3d ed.) ("[I]f there is no conflict about the facts, the preliminary injunction will be granted or denied on the basis of the undisputed evidence without difficulty.").

12.     Defendants' persistent focus on the supposed inadequacy of the Debtors' investigation is a non sequitur. Opposition ¶¶ 2, 14. The Debtors have already engaged in thorough investigation to support their claims, including collecting millions of documents and conducting numerous interviews of current and former employees. *See* Motion ¶ 12, n.3; Compl. ¶ 41; Moore Aff. ¶ 44. That the investigation is ongoing is irrelevant, as the Debtors have already uncovered more than enough evidence to justify the urgent relief they seek. While the Debtors will likely uncover still more evidence of Defendants' misconduct—especially as this action proceeds into discovery—there is no good reason for the Debtors to wait, given what the Debtors have already found and the significant risk of further immediate harm. There is certainly no good reason to give Mr. James notice and opportunity to secrete the proceeds of his conduct by "ask[ing] the Defendants or their counsel" about the investigation's findings before seeking relief (as

Defendants suggest, apparently with a straight face, as if Mr. James would under any circumstance do anything but deny the claims). Opposition ¶ 21. The Debtors owe a duty to their creditors to preserve the estates and refuse to sit idly by while Defendants squander the estates' property.

13.     Defendants' related refrain that allegations made "upon information and belief" are disqualifying is simply incorrect. Opposition ¶¶ 2, 19. The Debtors have marshaled sworn statements and documentary evidence more than sufficient to satisfy the standard for interim relief. *See, e.g.*, ECF No. 34 (Debtors' Exhibit List). Supplementing evidence with "information and belief" allegations is commonplace and appropriate where, as here, knowledge of key facts—like the current status of pilfered property of the estates—lies solely with a defendant. *See Johnson v. Johnson*, 385 F.3d 503, n.19 (5th Cir. 2004) ("'Information and belief' pleadings are generally deemed permissible under the Federal Rules, especially in cases in which the information is more accessible to the defendant." (citation omitted)). Indeed, this is exactly why the Debtors seek an equitable accounting, so that Defendants will tell the Court and the Debtors where the misappropriated funds are located so that the Debtors can eventually recover them.

(ii)     *Defendants Cannot Avoid the Debtors' Facts and Offer None of Their Own*

14.     To the extent Defendants do attempt to challenge the Debtors' allegations, they offer nothing more than superficial critiques that ignore the robust factual record that the Debtors have presented and that Defendants have not opposed with any evidence of their own.

15.     *First*, Defendants suggest that inbound transfers of funds from Mr. James to First Brands cure Defendants' fraud and misappropriation. Opposition ¶ 15. But Defendants' "net basis" argument does not aid them. Opposition ¶ 17. Even had Defendants returned all of the money they took it would not undo their misconduct. Defendants cite no law whatsoever to support this argument, and nowhere explain how inbound transfers disprove all of the Debtors' claims. Perhaps Defendants are gesturing at an affirmative defense (though they never say as much). If so, they fail

to carry their own burden to offer evidence supporting that defense. *See Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.,* 117 F.4th 628, 643 (5th Cir. 2024) ("[A]n affirmative defense places the burden of proof on the party pleading it." (citation omitted)).

16.     In any event, Defendants offer no evidence or sworn statement to show that Mr. James returned all of the funds he misappropriated.[4] Again, if this were the case, Defendants should be willing to provide an accounting proving as much. The Debtors' detailed proof of millions of dollars of lavish expenses incurred by Mr. James and his family, especially when coupled with the Debtors' lack of cash at the filing of these cases, instead confirms that everything taken was not returned.

17.     Worse still, the very inbound transfers Defendants claim are exculpatory appear to be part and parcel of Defendants' cycle of misconduct. Mr. James moved funds into various First Brands entities in an apparent effort to conceal from the victims—the lenders—of his misrepresentations that First Brands could not pay back the debts Mr. James had obtained. And, once this purpose was achieved, funds thereafter made their way back to Mr. James. Of course, First Brands ultimately could not meet its obligations, and filed these bankruptcy cases with its cash reserves nearly depleted and unable to pay even the most basic of its obligations, including payroll. The $12 billion total flow of funds into and out of (again and again) Bowery Finance II without sufficient record-keeping or respect for ownership or corporate formalities confirms the impropriety of Mr. James' transfers. Compl. ¶ 60; Moore Aff. ¶ 30.

---

[4] At most, Defendants cite to two exhibits—A and B—which show, respectively, transfers of just €27.5 million and $40 million when the Debtors have alleged hundreds of millions of transfers from the Debtors' accounts to Mr. James and the other Defendants over the course of six years. Two purported transfers back to the Debtors' accounts does not even begin to challenge the Debtors' supported claims.

18.     *Second,* Defendants question the amount of detail the Debtors have offered to support their claims, including the Debtors' allegation that $700 million was transferred from First Brands to Defendants. Opposition ¶¶ 14, 18; *see id.* ¶ 29 (arguing that the Debtors' allegations lack particularity). Notably, Defendants do not deny that $700 million was transferred from First Brands to Defendants. Defendants merely fault the Debtors for "present[ing] no accounting or other specifics" with respect to the transfers to Defendants and argue that the Debtors do not "identify which purported transfers actually fell within any applicable lookback period." *Id.* ¶ 18. The Debtors, however, have provided Defendants with exhibits (to be admitted in connection with the preliminary injunction hearing) detailing the transfers from First Brands to Defendants on a transaction-by-transaction basis, showing the date, amount, origin, and destination of each transfer. *See* ECF No. 34 (Debtors' Exhibit List). These records show hundreds of millions of dollars flowing from First Brands to bank accounts in Mr. James' control, including transfers made well into 2025. *Id.* This evidence leaves no doubt that there are hundreds of millions of dollars in transfers that fall within the lookback periods for the Debtors' claims.[5]

19.     *Third*, Defendants attempt to recast certain improper payments as "legitimate expenses," arguing that questioning the propriety of these payments calls for an "unsupported mental leap." Opposition ¶¶ 19–20. Importantly, Defendants challenge only a minuscule fraction of the more than $700 million in transfers from First Brands to Mr. James and his affiliated entities alleged in the Complaint. So even were Defendants correct with respect to the few transfers they address (they are not), Defendants have left the vast majority of the transfers unchallenged.

---

[5] Turnover under 11 U.S.C. § 542(a) carries no lookback period and requires return of the property of the estate regardless of when that property was first taken. Debtors' remaining claims have lookback periods of at least two years, and in many cases longer, and the Debtors have shown Mr. James' fraud and misappropriation well within these windows. *See, e.g.*, 11 U.S.C. § 548 (two years); Ohio Rev. Code Ann. § 2305.07 (six years for unjust enrichment); Ohio Rev. Code Ann. §§ 1336.04(A)(1), 1336.04(A)(2), 1336.07, 1336.09 (four years for fraudulent transfer); 8 Del. C. § 174(a) (four years for illegal dividend claim).

20.     As for the few transfers they address, Defendants' arguments ring hollow. Defendants first nitpick the Debtors' description of Mr. James' purchase of property and cars in close proximity to transfers from First Brands, arguing that the Debtors fail to support any claim that Mr. James was using First Brands' funds for personal use. Opposition ¶¶ 19–20. But money is fungible. Mr. James was misappropriating millions of dollars from First Brands (which the Debtors have shown) and, around the same time, was spending millions of dollars on real estate and luxury cars (which the Debtors have also shown). It requires no mental leap to conclude that Mr. James' misappropriation of First Brands' funds facilitated his purchases. In suggesting that more evidence is required, Defendants are trying to blame the Debtors for the Defendants' own obfuscation: It is the complexity and opacity of Mr. James' business and financial arrangements— made worse by Defendants' refusal to provide any discovery, *see* Ex. A—that make it impossible for Debtors to trace the flow of funds once they have left First Brands.

21.     With respect to Archive Health, Defendants claim that all payments made "were legitimate expenses associated with the company's role in providing health clinic services." Opposition ¶ 20. Defendants, as ever, fail to offer any evidence to support their claim. Even if Archive Health performed some services for First Brands, there is no documented legitimate reason why Mr. James was authorizing millions of dollars in transfers at his son-in-law's behest in amounts that would seem to vastly exceed the value of any services Defendants claim were rendered. Moore Aff. ¶ 49.[6] Defendants' focus on these examples, coupled with their refusal to provide any facts of their own, all but confirms that Defendants' strategy is more to distract at the margins than to refute the core of the Debtors' claims.

---

[6] First Brands transferred a total of roughly $8 million—of over $700 million in identified transfers from 2021-2025—into Archive Health LLC, Archive Health Medical, PLLC, and Archive Health Medical Kansas, P.A.

(iii)    *Defendants' Legal Arguments are Deficient*

22.    Thus unable to gain any ground on the facts, Defendants turn to arguing the law. But Defendants cannot distinguish this case from others in which this Court (and others) have granted similar relief in similar circumstances. *See* Opposition ¶¶ 23–30.

23.    The Debtors cited numerous decisions granting asset freezes under similar circumstances, including involving misappropriation by insiders, commingling, improper multi-entity transfers, and the need to prevent further dissipation of assets. *See* Motion ¶¶ 28–32; *see, e.g.*, *Sommer v. Harvie (In re 338 L.T.D.)*, No. 22-03259, Dkt. 12 (Bankr. S.D. Tex. 2022) (issuing an order freezing assets, or transfer of such assets, in the possession of the sole member and manager of the debtor and entities "owned or controlled by [him]" due to risk to the estate); *Schmidt v. Platinum Partners Value Arbitrage Fund LP (In re Black Elk)*, No. 16-03237, Dkt. 7 (Bankr. S.D. Tex. 2016) (freezing assets of defendants, the majority shareholders of the debtor, where plaintiffs alleged the existence of fraudulent transfers). Defendants do not meaningfully attempt to distinguish those cases.[7] Nor could they. Just as in those cases, the Debtors seek injunctive relief to prevent Defendants from further dissipating the estates' assets where Defendants have demonstrated the means, the motive, and the opportunity to do so.

24.    At bottom, Defendants do not—and cannot—contest that this Court is empowered to issue the relief the Debtors seek. When faced with "a substantial threat that [the defendant] will

---

[7] When Defendants filed their Emergency Motion on Tuesday, November 4, 2025, they attempted to distinguish the cases that the Debtors cite where courts, including this one, awarded similar relief under similar circumstances. Defendants' Emergency Motion ¶ 26. None of their superficial distinctions could overcome the overwhelming similarity between those cases and this one. *See* Motion ¶¶ 12–13. Now, with the benefit of additional time, Defendants seem to have realized as much, and their Opposition mentions only one of the half dozen cases the Debtors cited—a tacit admission that the Debtors' cases are squarely on point and that the Court has the authority to issue the relief the Debtors seek. The one case Defendants do mention, *Sommer v. Harvie*, No. 22-03259, Dkt. 12, confirms that the Court may enjoin entities "owned or controlled by [the defendant]" from transferring assets to maintain the status quo in cases alleging fraudulent transfer—like this one. *See* Motion ¶¶ 28, 30.

irretrievably dissipate [wrongfully acquired] funds and assets in the near future" and "no other remedy will fully and adequately preserve [the] property," an asset freeze is appropriate. *Kalsi Eng'g, Inc. v. Davidson*, No. H-14-1405, 2014 WL 12540550, at *2 (S.D. Tex. Sept. 2, 2014). And, as explained below, the Debtors do not oppose alternatively structured injunctions that fully and adequately satisfy the Debtors' core purpose of preserving the property of the estates and preventing Defendants from dissipating it. It is Defendants' own commingling, concealment, and complexity that necessitate the broad relief that the Debtors sought and are entitled to. The equities here favor safeguarding the estates for creditors, not rewarding insiders who orchestrated the misconduct by allowing them to continue to perpetuate it.

25.     Finally, Defendants' argument that the Debtors are prohibited from seeking an asset freeze under *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), has been repeatedly rejected. *See* Opposition ¶ 25. In *Grupo Mexicano*, the Supreme Court held that a federal district court may not freeze a defendant's assets where the plaintiff seeks only *legal* remedies. *See id.*   The Supreme Court was clear, however, that a district court may impose an asset-freeze injunction where—as here—the plaintiff seeks *equitable* relief. *See id.* at 325; *see also Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007) (holding, in accord with other circuits, that *Grupo Mexicano* "is limited to actions at law" and is thus inapplicable to cases in which the plaintiffs "seek equitable relief"); *In re Team Systems Int'l, LLC*, No.22-10066, 2023 WL 1428572, at *9 n.54 (Bankr. D. Del. Jan. 31, 2023) ("So long as one of the plaintiffs' viable claims sounds in equity, the case would fit within *Grupo Mexicano*'s equitable exception even if that equitable claim is joined with a legal claim.").

26.     The Debtors here seek equitable relief. The Debtors contend that Mr. James, his affiliated entities, and the other Defendants siphoned funds from First Brands and subsequently

hid those funds away from First Brands and its creditors. The Debtors bring equitable claims, including fraudulent transfer, to recover these misappropriated funds and seek immediate relief to prevent their dissipation in the interim.[8] That the Debtors seek to freeze all of Defendants' assets does not turn their claims from equitable to legal. Defendants' unwillingness to provide any information has made it impossible to trace what happened to the funds once they left the Debtors' accounts. The absence of clarity about downstream transfers, intermediaries, and ultimate recipients necessitates broader protective measures to safeguard the estates. If the Debtors had reliable visibility into the post-transfer path and could promptly marshal those assets back into the estates, narrower relief would suffice. The breadth of the requested relief is a function of the Defendants' own decision to conceal their actions behind a complex web of entities and accounts and their refusal to provide any information to aid the Court and the Debtors in tracing the property of the estates in their possession—they should not be rewarded for their obfuscation.

27.     In a recent decision in the Bankruptcy Court for the District of Delaware, the court wrote a thorough and well-reasoned opinion rejecting the argument Defendants raise here regarding whether claims sounding in fraud seek legal rather than equitable remedies. *See In re Team Sys. Int'l, LLC*, 2023 WL 1428572. The court held that this question was already resolved in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), where the Supreme Court held that a fraudulent transfer claim may sound in either law or equity. *Id.* ("The claim is equitable to the extent it seeks the return of a specific asset, but legal to the extent it seeks money damages for the value of the asset transferred."). Ultimately, the court determined that because the plaintiffs'

---

[8] To be clear, to the extent these funds are no longer recoverable as a result of Defendants' actions, the Debtors reserve the right to separately and additionally seek recovery from all available sources of funds belonging to Defendants.

fraudulent conveyance claim sought equitable relief in the form of an accounting in addition to monetary relief, an asset-freeze injunction was available as an equitable remedy. *Id.* So, too, here.[9]

28.     Moreover, Defendants' argument about *Grupo Mexicano* is a non-starter because "it has been repeatedly held … that *Grupo Mexicano* does not constrain the powers … [of] bankruptcy courts," only district courts. *Ball v. Soundview Composite LTD (In re Soundview Elite LTD)*, 543 B.R. 78, 120–21 (Bankr. S.D.N.Y. 2016). As Judge Ambro, writing for the Third Circuit, has explained: "[T]he Court's opinion in *Grupo Mexicano* acknowledged that bankruptcy courts *do* have the authority to deal with the problems presented by that case. … [H]ad the company in *Grupo Mexicano* been in bankruptcy, the bankruptcy court would have had the authority to implement the remedy the district court lacked authority to order under general equity power outside the bankruptcy context." *In re Owens Corning*, 419 F.3d 195, 209 n.14 (3d Cir. 2005).

29.     Defendants also try to manufacture a rule that to obtain equitable relief, "[t]he Debtors need to specifically identify the assets, including specific property traceable to the alleged violations, that they wish to subject to the injunction." Opposition ¶ 26. Defendants are unable to buttress this argument with any legal support from this Circuit. *See id.* (citing *Coley v. Vanguard Urb. Improvement Ass'n, Inc.*, No. 12-CV-5565 (PKC) (RER), 2016 WL 7217641, at *3 (E.D.N.Y. Dec. 13, 2016)). And Defendants later articulate the correct standard, namely, that a movant must show only "a sufficient nexus between the assets sought to be frozen and the equitable relief request[ed]." *Id.* (quoting *Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 696–97 (S.D. Tex. 2002)). The Debtors have done so here, requesting a freeze of misappropriated assets and to that end, a

---

[9] The Debtors' separate cause of action for an accounting is well established to be a claim sounding in equity. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 44 (1989).

freeze in every account controlled by the Defendants in which they may be located, and equitable remedies to recover them.

30.     Defendants' various arguments all fall short and fail to undermine the conclusion that the Debtors have demonstrated a clear showing that they are likely to succeed on the merits.

**B.      The Debtors Will Suffer Irreparable Harm Absent an Injunction.**

31.     The Debtors also stand to suffer irreparable harm absent injunctive relief, as the Court already concluded in awarding a Temporary Restraining Order. Without such relief, Mr. James could continue to dissipate the estates' assets, permanently harming the Debtors and their creditors.

32.     According to Defendants, the Debtors cannot be entitled to relief preventing Mr. James from permanently dissipating the estates' funds unless and until the Debtors can identify "specific transactions" in which Mr. James already permanently dissipated the estates' funds. Opposition ¶ 33 (citing *Newby*, 188 F. Supp. 2d 684). Even the case Defendants cite undermines their implausible argument that the Debtors can seek relief only after the horse has already left the barn. In *Newby*, the court denied an asset freeze because the evidence offered in that case did "not distinguish among the defendants on the basis of their involvement in the alleged [wrongdoing] … or on the basis of their current activities or present or future risk of asset concealment or dissipation." 188 F. Supp. 2d at 708. That is exactly what the Debtors have offered here: specific allegations and evidence distinctively relating to Mr. James and the other Defendants showing their prior spending habits and risk of future dissipation. *See, e.g.*, Moore Aff. ¶¶ 33–39. Mr. James cannot complain about the lack of specificity in the Debtors' claims when it is his own obfuscation

and misconduct that prevent the Debtors from tracing the proceeds of Defendants' misappropriation.[10]

33.     Defendants' claim that any harm can be remedied by money damages is contrary to both precedent and the record. Where a defendant has demonstrated the ability and proclivity to rapidly transfer and commingle assets across a network of controlled entities and accounts, the risk of irreparable harm is present given the likelihood that recovery may become impossible or impracticable. Courts routinely find irreparable harm in analogous circumstances, where there is evidence supporting the conclusion that funds can be concealed, moved abroad, or otherwise placed beyond reach before judgment can be enforced. *See Amegy Bank Nat'l Ass'n v. Monarch Flight II, LLC,* No. H-11-3218, 2011 WL 6091807, at *6 (S.D. Tex. Dec. 7, 2011) (finding that it "may give rise to the irreparable harm required for a  preliminary injunction" where a "defendant intends to dissipate his assets to make a judgment awarding damages uncollectible"); *A.T.N. Industries, Inc. v. Gross*, 632 F. App'x 185, 191 (5th Cir. 2015) (affirming finding of irreparable harm where defendant had practice of "transferring money internationally, suggesting high risk that funds allegedly to plaintiffs could disappear" without emergency relief to freeze assets).

34.     Here, the Moore Affidavit documents frequent, large, and undocumented transfers to insiders for personal use in proximity to financing events; use of SPVs and multiple bank accounts; and commingling of personal and business funds. Moore Aff. ¶¶ 17, 18, 23–31, 33–55, 57, 58. Those facts establish a substantial risk of further dissipation absent an asset freeze. Defendants' attempt to distract with assertions about Mr. James' citizenship or lifestyle does not

---

[10] Defendants also cite *In re Fredeman Litig.*, 843 F.2d 821, 824-28 (5th Cir. 1988), to argue that the TRO is overbroad. *See* Opposition ¶ 28. *Fredeman* undermines their position. There, the court rejected an asset freeze because "[t]he plaintiffs d[id] not ultimately seek return of any particular asset or fund that [an] interim injunction might secure or that has been used to violate the statute." *Id.* at 825. Here, the Debtors seek exactly that.

change anything. Opposition ¶ 36, n.8.[11] The risk arises from demonstrated control over numerous entities and accounts, and a track record of moving funds quickly and without legitimate purpose or documentation—which together create a significant risk that the property of the estates the Debtors are attempting to recover will no longer be recoverable by the time of a judgment in this action. That is precisely the risk interim relief exists to prevent.

35.     Defendants could have—but did not—represent under oath that Mr. James' and his family's spending will cease or is immaterial. Mr. James could have submitted a sworn statement disavowing recent or intended transfers—but he did not. To the contrary, the only inference that can be drawn from Mr. James' refusal to disavow dissipation and refusal to propose any stipulation to modify the structure of the injunction is that Mr. James may move property beyond the reach of the Debtors and the Court the instant any injunction is lifted.

**C.     The Balance of Equities and the Public Interest Favor the Debtors.**

36.     Finally, Defendants' Opposition does little to alter the Court's calculus at the Temporary Restraining Order stage that the balance of equities and public interest favor the Debtors.

37.     Defendants' arguments on these issues are virtually identical to Defendants' arguments about the injunction's overbreadth. As explained in greater detail below, and as the Debtors have made clear to Defendants, the Debtors will not object to reasonable modifications to avoid the purported "litany of catastrophic harms" Defendants claim, or the "substantial[] harms [to] members of the public" Defendants suggest—so long as such relief can be achieved while preserving the injunction's purpose of preventing improper dissipation of the property of the

---

[11] Defendants' clarification that Mr. James was once a Malaysian citizen but is no longer, Opposition ¶ 36, does little to reduce his risk of abscondment. The risk derives not from the country listed in his passport but rather his sophistication, resources, and connections to foreign jurisdictions.

Debtors. Opposition ¶¶ 38, 43.[12] Similarly, the Debtors do not object to allowing Mr. James to "mak[e] payments on account of tax or other legal obligations, or pay[] legal, accounting, or other professional advisors," Opposition ¶ 42, so long as such expenses are reasonable. Most notably, Defendants do not mention that the Stipulation already addressed and remedied the particular concerns the Defendants identified, and that the Debtors have repeatedly invited Defendants to propose other such modifications only to be met with abject refusals to engage. *See* Ex. A. In light of the Stipulation and potential for ongoing modifications to the structure of any potential relief, the Defendants can claim no harm to themselves or the public from maintaining the status quo pending this litigation.

38.     Maintaining the TRO and imposing a preliminary injunction with narrow modifications that continue to ensure Defendants cannot further dissipate the estates' property appropriately balances the equities and the public interest. The injunction protects creditors by preventing dissipation of estate assets, and any tailored modifications should address the specific concerns Defendants identify without undermining that protective function.

39.     The only reason Defendants, other entities under their control, or the public may suffer the harms Defendants' claim is Defendants' own malfeasance and intransigence. Indeed, the only reason they would be suffering any harm in the first place is because of Mr. James' misconduct. Defendants assert they should be free to use "their own assets, bank accounts, or other funds," notwithstanding the fact that they misappropriated hundreds of millions of dollars from the Debtors. Opposition ¶ 47. It is only because of Defendants' own pervasive commingling and

---

[12] Contrary to Defendants' statement that "the Debtors did not agree" to "a negotiated resolution of this issue," the parties have since agreed to carve out the listed Operating Businesses from the injunction's scope, and the Court approved a stipulation to this effect. *See* Opposition ¶ 35–36; Stipulation.

unaccountable and improper cash flows that the Debtors need the broad asset freeze that causes the harms Defendants complain of.

40.     Further, Defendants argue that they stand to suffer harm through the resignations of various board members of other entities under Mr. James' control. *See* Defendants' Exhibits, ECF Nos. 37-3–37-6. But these resignations are a direct and foreseeable consequence of Defendants' underlying misconduct and the uncertainty it created. Given Mr. James' conduct, and utter disregard for corporate formalities, there is a significant risk that other entities under his control may be used as vehicles for perpetuating his fraud, including by using those entities to dissipate property of the estate (or else engage in other, related fraudulent actions). It is inappropriate for Defendants to pin responsibility for these harms on the Debtors when it is Defendants' own actions that are to blame.

41.     At bottom, Defendants' argument offers no reason for the Court to depart from its conclusion in awarding the TRO that the Debtors have carried their burden to secure injunctive relief to preserve the Debtors' ability to recover estate property pending litigation on the merits.

**D.      In the Alternative, the Debtors Do Not Object to Reasonable Modifications to the Injunction.**

42.     For all of the reasons explained above, the Court's Temporary Restraining Order was and remains necessary, appropriate, and lawful—and the Court should extend that relief in the form of a preliminary injunction to ensure that Defendants cannot dissipate property of the estate pending this litigation. The record demonstrates that substantial sums of estate property were misappropriated and entered a black box of interconnected entities and accounts controlled by Defendants here and abroad, and that significant sums were expended by Mr. James and his family on personal luxuries and expenses with no appropriate business purpose. At this interim stage, it is reasonable and consistent to impose and maintain a broad injunction designed to prevent further

transfers of the Debtors' funds to preserve the status quo. *See* Motion ¶¶ 28–32 (collecting cases). Consider the alternative: if Defendants are able to maintain even one avenue through which they can spend or otherwise distribute any estate property, then it is within their power to dissipate all of the funds they misappropriated and ensure that the Debtors and the creditors will never be able to recover them.

43.     In the alternative, now that Defendants and their counsel are on notice of their misconduct and enjoined from continuing it on penalty of contempt, and in light of the Court's willingness to consider tailored modifications to the TRO, there may be alternative constructs that can achieve the same core objective while imposing fewer burdens on Defendants and, especially, innocent third parties who deal with Defendants. The Debtors' core objective is to discharge their duty to safeguard the proceeds of any fraud or misappropriation for the benefit of the estates and the creditors. *See In re NE 40 Partners, Ltd. P'ship*, 440 B.R. 124, 129 (Bankr. S.D. Tex. 2010) (a debtor-in-possession "has a fiduciary duty to . . . recover and preserve property of the estate" (citation omitted)). If the Court can be assured those proceeds are not being spent or dissipated and that Defendants will be in a position to satisfy any judgment against them, that assurance supplies the necessary security for interim relief while the parties litigate this action to judgment.

44.     By way of illustration, if Defendants are willing to fund an escrow with the entirety of the proceeds they received from First Brands pending the outcome of this litigation, the Debtors can comfortably know that all of those proceeds can be recovered if and when the Debtors secure a judgment. The Debtors presume, however, that the Defendants are unlikely to accept such a construct, which should raise questions for the Court.

45.     The Debtors have repeatedly expressed to Defendants the Debtors' willingness to accommodate the Defendants' legitimate concerns while ensuring that the Debtors are not

spending down or otherwise dissipating the estates' property. *See* Ex. A. The parties have already successfully achieved one such resolution with respect to four operating businesses, which are now carved out of the injunction's reach. The only reason the Debtors have not yet agreed to any further modifications is because Defendants have refused to propose any. *Compare* Ex. A (Debtors' counsel: "We urge you to propose any additional stipulation that you believe is necessary and appropriate to avoid the concerns you raise regarding Defendants' unwillingness to live under the injunction. We will continue to consider any proposal you make in good faith in an effort to reach agreement on a reasonable ongoing construct that addresses your concerns while ensuring that Defendants cannot dissipate the property of the estates."); *with id.* (Defendants' counsel not proposing anything).

46.     The Debtors' aim is urgent but narrow: to preserve and recover all property of the estates for the benefit of the Debtors and their creditors. To the extent Defendants seek to interfere with this aim, they are and should be enjoined. To the extent Defendants can show that their actions do not involve control of estate property and do not create a risk that they will spend or otherwise dissipate the estate's property or other misappropriated funds in a manner that will prevent the Debtors from collecting on a judgment in this action, they need not be enjoined.

47.     Defendants' refusal to even negotiate with the Debtors and their decision to fight the Court's injunction, rather than compromise, can be interpreted in only one way: Defendants ask this Court to lift its injunction so that they can dissipate estate property and ensure that the proceeds of Mr. James' conduct can never be recovered by the Debtors or their creditors.

### III.     CONCLUSION

48.     The Debtors have made the requisite clear showing for interim injunctive relief: a strong likelihood of success on equitable and avoidance claims; a substantial threat of immediate and irreparable harm; a balance of equities favoring preservation of estate assets; and a public

interest in maintaining the integrity of the bankruptcy process and preventing dissipation. Defendants' emergency motion should be denied.

WHEREFORE, the Debtors respectfully request that the Court grant the Debtors' Motion and enter a preliminary injunction, and deny Defendants' Emergency Motion.

Dated:   November 9, 2025
         Houston, Texas

_/s/  Clifford W. Carlson_

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   gabriel.morgan@weil.com
         clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted _pro hac vice_)
Sunny Singh (admitted _pro hac vice_)
David Lender (admitted _pro hac vice_)
Nili T. Moghaddam (admitted _pro hac vice_)
Robert Niles-Weed (admitted _pro hac vice_)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   matt.barr@weil.com
         sunny.singh@weil.com
         david.lender@weil.com
         nili.moghaddam@weil.com
         robert.niles-weed@weil.com

_Proposed Attorneys for Debtors_
_and Debtors in Possession_

## <u>CERTIFICATE OF SERVICE</u>

I, Clifford W. Carlson, certify that on November 9, 2025, I caused a true and correct copy of the foregoing document to be served by the Court's CM/ECF system on all parties entitled to notice, and was served by electronic mail on Defendants' counsel.

<u>/s/ *Clifford W. Carlson*</u>
Clifford W. Carlson

# EXHIBIT A

| | |
|---|---|
| **From:** | eweisgerber@debevoise.com |
| **Sent:** | Thursday, November 6, 2025 11:30 PM |
| **To:** | Niles-Weed, Robert |
| **Cc:** | michaelcarlinsky@quinnemanuel.com; jamestecce@quinnemanuel.com; scotthartman@quinnemanuel.com; erickay@quinnemanuel.com; reecepelley@quinnemanuel.com; gracesullivan@quinnemanuel.com; Project Overdrive Rx; Project Overdrive Litigation; OverdriveRx; Sorensen, Matthew J.; Labovitz, Natasha |
| **Subject:** | Re: 11.6.25 430pm ET meet and confer |

Robert,

We will not agree to delay the preliminary injunction hearing.  Defendants require — and deserve — to have their concerns with the TRO addressed in a fulsome manner by the Court immediately.   The Debtors ex parte and with no notice to us restrained business and personal bank accounts without proper legal or factual basis, and we have been waiting days already to address this with the Court.

Nor do we see anything inappropriate about demanding that the Debtors proceed on the date that the <u>Debtors themselves</u> proposed for the PI hearing, with full knowledge that Mr. Moore was a necessary witness.

In addition to the many issues we raise in our papers, as we have indicated multiple times, the Operating Businesses are not Defendants in the action and there's been no allegation, let alone showing, that those entities received any purportedly illicit funds. They should not be constrained by the TRO to begin with, so we should not be required to continue to negotiate for modifications to an order that should not apply to them.

If the Court is amenable, we are willing to start the hearing even earlier to ensure Mr. Moore is done well in advance of 10:30am Central.

Jamie and I will be on tomorrow morning's hearing to oppose your request.  We ask that you please raise this issue at the outset of the hearing.

With respect to exhibits: Giving the timing of the PI hearing we ask that you file your exhibit list at noon tomorrow but will not object to a reasonable supplement filed by noon Saturday.

Please copy the full Debevoise team on further emails regarding this matter.

Erica

On Nov 6, 2025, at 10:35 PM, Niles-Weed, Robert <Robert.Niles-Weed@weil.com> wrote:

**\*EXTERNAL\***

Erica and Jamie,

We write to memorialize our meet and confer regarding the preliminary injunction hearing scheduled to take place on Monday, November 10, at 9 am CT.

We met to confer regarding the depositions of Mr. Moore and Mr. James and the parties' requests for production. As we explained, Mr. Moore's availability is extremely limited in the coming days, not least because he is working around the clock in an effort to preserve the business and meet with key customers. We also emphasized the unreasonable and burdensome scope of your document requests and the impossibility of complying with them in advance of a hearing next week. You expressed your position that you will not be offering Mr. James for a deposition or to testify at the hearing under any circumstances, and do not believe you have any obligation to produce any documents in response to our comparatively limited requests.

You offered to forego deposing Mr. Moore before the hearing if he is made available for cross examination at the hearing. We agreed, in light of your offer to forego deposing Mr. Moore, to forego a deposition of Mr. James before the hearing, while reserving all rights to depose Mr. James at a later date (or to insist on his deposition before the hearing if your position changes regarding Mr. Moore's deposition before the hearing). Regarding documents, the parties agreed to produce only the documents underlying the parties' exhibit lists, including documents supporting Mr. Moore's statements in his affidavit, while deferring the parties' other requests for production.

Importantly, you insisted that the hearing proceed on Monday, notwithstanding Mr. Moore's limited availability and our reasonable request to postpone the hearing even by a few days.

**We write to follow up on your insistence on the Monday hearing date and to inform you that we intend to seek relief from the Court tomorrow morning and will ask the court to reschedule the hearing for later in the week if we are unable to reach agreement to postpone the hearing.** Mr. Moore's availability on Monday is extraordinarily limited. He has a business-critical customer meeting on the West Coast and is available only remotely and only before 1030am CT, 830am PT. As you can well understand, forcing Mr. Moore to wake up before dawn for a remote cross-examination in this matter risks significantly impairing his ability to effectively represent the business later that morning in a customer meeting.

As we have said before by phone and by email on multiple occasions, and we emphasize again: we remain available and willing to negotiate modifications to the temporary restraining order in good faith to ensure that the Court's order does not unduly restrict any critical business and personal expenses—both through the hearing on the motion for a preliminary injunction and

beyond. Our sole and stated purpose in securing an injunction is to protect the estates by preventing Mr. James and the Defendants from dissipating estate property beyond the reach of the Debtors and their creditors and the Court, which he now has notice of. In light of that, we will not object to modifying the order to allow for necessary business and personal expenses, provided the Defendants account for their transfers to the Debtors and the Court in a manner that preserves our right to object.

We have already successfully worked together to negotiate a stipulation regarding the four operating businesses you identified. We are, of course, willing to extend that existing stipulation through any extended hearing date, with proportional increases to the agreed-upon expenditure caps to account for any additional time until the hearing. We urge you to propose any additional stipulation that you believe is necessary and appropriate to avoid the concerns you raise regarding Defendants' unwillingness to live under the injunction. We will continue to consider any proposal you make in good faith in an effort to reach agreement on a reasonable ongoing construct that addresses your concerns while ensuring that Defendants cannot dissipate the property of the estates.

**Please let us know immediately if you will agree to postpone the hearing or if we will have to raise the issue with the Court tomorrow morning at 9am CT. Additionally, given these ongoing conversations and potential court intervention, we ask that you agree to extend the time for exchange exhibit and witness lists to Saturday at noon central time.**

We look forward to hearing from you.



**Robert B. Niles-Weed** (he/him/his)
Partner and Appeals and Strategic Counseling Co-Head

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
+1 212 310 8651 Direct