IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

------------------------------------------------------------x----------------------------------------------------
|  |  |
| In re | : | **Chapter 11** |
|  | : |  |
| **FIRST BRANDS GROUP, LLC, *et al.*,**[1] | : | **Case No. 25-90399 (CML)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |
------------------------------------------------------------x----------------------------------------------------

|  |  |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | : |  |
|  | : |  |
| **Plaintiffs,** | : | **Adv. Pro. No. 25-03803 (CML)** |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| **PATRICK JAMES, THE PATRICK JAMES TRUST, ALBION REALTY, LLC, ALESTER TECHNOLOGIES LLC, BATTERY PARK HOLDINGS LLC, LARCHMONT LLC, PEGASUS AVIATION, LLC, MICHAEL BAKER, PETER ANDREW BRUMBERGS, STEPHEN GRAHAM, JOHN AND JANE DOE(S) 1-100, and ABC CORPORATION(S) 1-100,** | : |  |
|  | : |  |
| **Defendants.** | : |  |

## AMENDED COMPLAINT

---

[1]     A complete list of Debtors in these chapter 11 cases may be obtained on the website of Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

First Brands Group, LLC and its debtor affiliates ("**Debtors**", "**First Brands**", or "**Company**") as debtors and debtors in possession in the above-captioned chapter 11 cases, by their attorneys, Weil, Gotshal & Manges LLP, file this adversary proceeding against Patrick James ("**James**"); the Patrick James Trust; Albion Realty, LLC ("**Albion Realty**"), Alester Technologies LLC ("**Alester**"), Battery Park Holdings LLC ("**Battery Park**"), Larchmont LLC ("**Larchmont**"), Pegasus Aviation, LLC ("**Pegasus Aviation**") (the "**Entity Defendants**"); Michael Baker, Peter Andrew Brumbergs, Stephen Graham, John and Jane Doe(s) 1-100, and ABC Corporation(s) 1-100 (together, "**Defendants**").

## NATURE OF THE ACTION

1.      This action concerns grievous misconduct by Patrick James, the founder and former Chief Executive Officer of First Brands, who fraudulently secured billions of dollars of financing for First Brands, only to turn around and enrich himself and his family by misappropriating hundreds of millions (if not billions) of dollars from First Brands, which contributed to First Brands' insolvency and occurred while First Brands was insolvent or nearing insolvency.

2.      Founded by James in 2013, First Brands—spanning five continents and comprising over 100 entities, all entirely though indirectly owned by James—is a global supplier of aftermarket automotive parts, including brakes, filters, wipers, lights, pumps, and towing solutions. First Brands employs approximately 26,000 individuals worldwide and purported to generate net sales of approximately $5 billion in 2024.

3.       James—who resigned from his role as Chief Executive Officer on October 13, 2025—commandeered the enterprise to engage in fraudulent conduct to enrich himself and his family at the expense of First Brands and its creditors. First Brands' investigation thus far shows that James misrepresented First Brands' financial position to secure billions in debt financing and

2

inappropriately used First Brands' funds for his and his family's personal benefit.

4. Specifically, James, working with others, including First Brands' former Chief Corporate Strategy Officer Michael Baker, former Vice President of Finance Peter Andrew Brumbergs, and former Chief Financial Officer Stephen Graham, deployed at least four discrete strategies to perpetuate this fraud and secure financing from third-party lenders.

5. *First*, James caused First Brands to incur at least $2.3 billion in accounts receivable factoring liabilities based, at least in significant part, on non-existent or doctored invoices.

6. *Second*, James engaged in financing transactions involving special purpose vehicles ("**SPVs**"), which incurred another at least $2.3 billion in debt, including by double-pledging collateral that First Brands could not itself borrow against a second time.

7. *Third*, James engaged in supply chain financing ("**SCF**") arrangements to factor its accounts payable, incurring at least approximately $900 million in unsecured liabilities that were not recorded on First Brands' balance sheet.

8. *Fourth*, James concealed First Brands' true financial condition from counterparties, creditors, and lenders by directing the alteration of First Brands' financial statements.

9. James did not act alone in carrying out these activities. Rather, as further alleged below, certain senior executives and directors, including Baker, Brumbergs, and Graham, knowingly participated in, substantially assisted, and/or conspired with James in implementing each of the foregoing plans.

10. As he secured this financing, James—aided and abetted by the other Defendants, including, Baker, Brumbergs, Graham, Jane and John Does 1-100, and ABC Corporations 1-100— secretly pilfered First Brands' assets to fund his and his family's lavish lifestyle. In short, he lined his pockets at the expense of First Brands and its creditors.

11.     James did not fraudulently transfer First Brands' assets just once. Instead, he orchestrated an elaborate process through which he effectuated hundreds of transfers to himself and entities under his control, or to third parties for his or his family's personal benefit. A chart identifying the transferors, transferees, transfer dates, and transfer amounts of a significant subset of the transfers that occurred from 2018 to 2025 is attached as Exhibit A to this Amended Complaint.[2] The transfers reflected in Exhibit A trace estate funds directly from identified First Brands accounts to James, entities under his control, or third parties for his and his family's personal benefit.

12.     In total, hundreds of millions of dollars were transferred from accounts belonging to First Brands directly to James and entities under his control, or to third parties for James' or his family's personal benefit from 2018 to 2025, with the majority of such transfers by value occurring between 2023 and 2025.

13.     In a rinse and repeat cycle, James caused First Brands to fraudulently incur debt financing only to then divert—routinely and regularly—funds from First Brands for his and his family's personal benefit. These practices contributed to First Brands' insolvency. Aside from entries in the Company's general ledger, the Company's advisors are unaware of any formal documentation indicating that these payments constituted dividends or tax distributions in the ordinary course.

14.     Upon information and belief, James and his family are also believed to have used the misappropriated funds to pay for or otherwise maintain, among other personal expenses, an extensive collection of lavish homes and cars.

---

[2]     Exhibit A reflects a non-exhaustive set of improper transfers. First Brands reserves the right to present evidence of additional transfers at trial.

15.     The results of James' actions culminated on September 24, 2025 and September 28, 2025 (the "**Petition Date**"), when First Brands Group, LLC and 111 affiliated debtors, including certain First Brands SPV entities (the "**SPV Debtors**"), each filed with the Court a voluntary case under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), commencing the above-captioned chapter 11 cases. As of the commencement of these chapter 11 cases, First Brands—which is comprised of entities reported to have had approximately $5 billion in net annual sales and at least approximately $11.5 billion in total debt obligations and other financing liabilities—held just $12 million in cash in its corporate bank accounts, a staggering dissipation of assets.

16.     James' conduct would have continued unabated if certain lenders had not, in July 2025, started asking questions and demanding a quality of earnings report before they would consider issuing any additional debt financing to First Brands. It soon became clear that the quality of earnings report would not be done in any period of time necessary for a refinancing. With the pipeline of future financing screeched to a halt, First Brands was exposed as undercapitalized and unable to meet its most basic payment obligations—including employee payroll. This led to, among other things, the appointment of an independent special committee and commencement of an investigation that continues to uncover the full extent of James' and others' misconduct.

17.     James' actions contributed to First Brands' insolvency and continued while First Brands was nearing insolvency and insolvent. Indeed, James was instrumental in causing First Brands to incur substantial debt through off-balance sheet financing that First Brands could not pay as those debts came due. And because James used a complicated web of corporate entities under his control to secretly conduct fraudulent transfers, the full extent of his misconduct may not be known at this time.

18.     First Brands brings this action to recover significant sums of money—totaling hundreds of millions, if not billions, of dollars—from James, the Patrick James Trust, the Entity Defendants which constitute business entities controlled by James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, John and Jane Doe(s) 1-100, and ABC Corporation(s) 1-100, for the benefit of the Debtors' estates and their creditors.

## THE PARTIES

### A.  Plaintiffs

19.     Plaintiff First Brands Group, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.[3] Founded by James in 2013, First Brands—through its subsidiaries and portfolio of brands—operated as a supplier of aftermarket automotive parts, including brakes, filters, wipers, lighting, pumps, and towing products. As alleged below, First Brands' business model relied heavily on serial acquisitions, price increases, and debt-financed liquidity structures (including factoring, SPV, and SCF arrangements).

### B.  Defendants

20.     Defendant Patrick James is First Brands' founder, ultimate owner, former Chief Executive Officer, and former manager. James resigned from all positions he held as an officer, director, or manager at all First Brands' entities on October 13, 2025. Upon information and belief, James resides in the state of Ohio.

21.     Defendant Patrick James Trust was created on March 10, 2005, with Patrick James as Grantor and Thomas A. Haught as Trustee.

22.     Defendant Albion Realty, incorporated on August 4, 2020, is a Delaware limited

---

[3]     Plaintiffs in this action are First Brands Group, LLC and its debtor affiliates. Information about these entities may be obtained on the website of Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.

liability company under the control of Patrick James.

23.     Defendant Alester, incorporated on May 18, 2020, is a Delaware limited liability company under the control of Patrick James.

24.     Defendant Battery Park, incorporated on May 30, 2013, is a Delaware limited liability company under the control of Patrick James.

25.     Defendant Larchmont, incorporated on April 17, 2006, is an Ohio limited liability company under the control of Patrick James.

26.     Defendant Pegasus Aviation, incorporated on August 24, 2021, is a Delaware limited liability company under the control of Patrick James.

27.     Defendant Michael Baker is First Brands' former Chief Corporate Strategy Officer. Baker resigned from all positions he held as an officer, director, or manager at all First Brands' entities on September 25, 2025. Upon information and belief, Baker resides in the state of New Jersey.

28.     Defendant Peter Andrew Brumbergs is First Brands' former Vice President of Finance. On October 30, 2025, Brumbergs was terminated from all positions he held as an executive at all First Brands' entities. Upon information and belief, Brumbergs resides in the state of Ohio.

29.     Defendant Stephen Graham is First Brands' former Chief Financial Officer. On October 30, 2025, Graham retired from all positions he held as an officer, director, or manager at all First Brands' entities. Upon information and belief, Graham resides in the state of Ohio.

30.     Defendants John and Jane Doe(s) 1-100 are persons yet to be identified that, on information and belief, received fraudulent transfers and/or participated or aided and abetted in various frauds committed by Defendants. Debtors may further amend this Complaint to show the

true names and capacities of John and Jane Doe(s) 1-100 when the same have been ascertained.

31.     Defendants ABC Corporation(s) 1-100 are business entities or trusts yet to be identified that, on information and belief, received fraudulent transfers and/or participated or aided and abetted in various frauds committed by Defendants. Debtors may further amend this Complaint to show the true names and capacities of ABC Corporation(s) 1-100 when the same have been ascertained.

## JURISDICTION AND VENUE

32.     The United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**" or the "**Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

33.     This adversary proceeding is commenced pursuant to Sections 105(a), 502, 542, 544, 548, 550, and 551 of the Bankruptcy Code, Rules 3007, 6009, and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 7008-1 of the Local Rules of the Bankruptcy Court (the "**Local Rules**"), and applicable non-bankruptcy law.

34.     This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H), and (O), and this Court has jurisdiction to hear and determine this proceeding and to enter a final order and judgment. If this Court or any other court finds any part of this adversary proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to Debtors' bankruptcy cases and will have a material impact on the administration of Debtors' estates.

35.     Debtors consent to entry of final orders and judgments by this Court in this adversary proceeding pursuant to Bankruptcy Rule 7008 and Local Rule 7008-1. Debtors also consent to entry of final orders or judgment by this Court if it is determined that this Court cannot

8

enter final orders or judgments consistent with Article III of the United States Constitution absent consent of the parties.

36. Venue in this Court is proper pursuant to 28 U.S.C. § 1409 because it arises under the Bankruptcy Code or arises in, or is related to, Debtors' bankruptcy cases pending before this Court.

## **PERSONAL JURISDICTION**

37. Defendants are subject to personal jurisdiction pursuant to Bankruptcy Rule 7004 because Defendants have established minimum contacts with the United States. Where a federal statute or rule provides for nationwide service of process, as does Bankruptcy Rule 7004, a federal court has personal jurisdiction over any defendant having minimum contacts with the United States.

38. Each Defendant has established minimum contacts with the United States by conducting business within the United States, including, but not limited to, the following:

a) Defendant Patrick James owns interests in, and served as an executive of, a United States-based company relevant to the causes of action asserted herein; owns real and personal property in the United States; and fraudulently transferred money from a United States-based company into other accounts within the United States, including to accounts belonging to several United States-based companies controlled by him as well as to accounts belonging to Defendant Patrick James Trust, which, as set forth below, was created in and continues to be held in the United States. Defendant James is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

b) Defendant Patrick James Trust was created in, and continues to be located in, the

United States. Defendant Patrick James Trust holds bank accounts located in the United States.

c) Defendant Albion Realty was created in, and continues to operate in, the United States. Defendant Albion Realty is incorporated in Delaware and holds bank accounts located in the United States.

d) Defendant Alester was created in, and continues to operate in, the United States. Defendant Alester is incorporated in Delaware and holds bank accounts located in the United States.

e) Defendant Battery Park was created in, and continues to operate in, the United States. Defendant Battery Park is incorporated in Delaware and holds bank accounts located in the United States.

f) Defendant Larchmont was created in, and continues to operate in, the United States. Defendant Larchmont is incorporated in Ohio and holds bank accounts located in the United States.

g) Defendant Pegasus Aviation was created in, and continues to operate in, the United States. Defendant Pegasus Aviation is incorporated in Delaware and holds bank accounts located in the United States.

h) Defendant Michael Baker served as an officer and executive of a United States-based company relevant to the causes of action asserted herein. Defendant Baker is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

i) Defendant Peter Andrew Brumbergs served as an executive of a United States-based company relevant to the causes of action asserted herein. Defendant

Brumbergs is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

j)  Defendant Stephen Graham served as an officer and executive of a United States-based company relevant to the causes of action asserted herein. Defendant Graham is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

39.  Accordingly, this Court has personal jurisdiction over Defendants based on their contacts with the United States.

## FACTUAL ALLEGATIONS

### I.  DEFENDANTS CAUSED FIRST BRANDS TO FRAUDULENTLY INCUR BILLIONS OF DOLLARS IN FINANCING

40.  As of the Petition Date, First Brands had approximately $6 billion in aggregate principal of on-balance sheet outstanding funded debt obligations, at least $2.3 billion in factoring liabilities, at least $2.3 billion in aggregate "off-balance sheet" financings incurred through SPVs, and at least approximately $900 million in unsecured SCF liabilities.

41.  Despite reported annual net sales of approximately $5 billion, First Brands' cash position on the Petition Date was dire, and remains so. As of the Petition Date, First Brands had only approximately $12 million in cash in corporate bank accounts.

42.  Since the Petition Date, First Brands has investigated James' conduct, the conduct of his co-conspirators, including Baker, Brumbergs, Graham, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, and the Patrick James Trust, and potential claims held by First Brands against those individuals and entities.

43.  That investigation has revealed that James, through Baker, Brumbergs, and Graham, improperly secured funding from third parties for First Brands. First Brands brings this

11

action to recover assets that properly belong to the estates based on the results to date of its ongoing investigation.

44.     As described below, James and his co-conspirators' activities included, at a minimum, causing First Brands to fraudulently incur financing by: (a) using erroneous or fabricated invoices in connection with accounts receivable factoring activities; (b) executing off-balance sheet financing transactions through SPVs; (c) incurring liabilities through off-balance sheet SCF arrangements; and (d) altering First Brands' financial statements.

45.     In order to line his own pockets, James induced third-party lenders to lend to First Brands, including on terms First Brands would never be able to repay, by misrepresenting its true financial condition.

### A.  Third-Party Factoring

46.     Prior to the Petition Date, First Brands used a variety of factoring arrangements to obtain liquidity. Under these arrangements, First Brands would sell accounts receivable generated from the sale of goods in exchange for near-term payment on invoices with extended payment terms.

47.     Before the Petition Date, First Brands entered into factoring arrangements with unaffiliated third parties ("**Third-Party Factoring**") in which it would transfer a receivable to a third-party factor in exchange for a near-term discounted payment on an invoice with lengthy payment terms. The third-party factor would purchase invoices from First Brands, and First Brands was then required to turn over the payment, once received, to the third-party factor.

48.     At least $2.3 billion in debt has accrued with respect to Third-Party Factoring arrangements as of the Petition Date.

49.      To date, First Brands has identified three significant issues or discrepancies with

First Brands' prepetition Third-Party Factoring practices under James' leadership and direction, and the actions of Brumbergs (among others):

a) **_First_**, in many instances, the amount set forth on a factored invoice did not accurately reflect a customer's order, without any apparent reason for the discrepancy. For example, in some instances, the amount set forth in a factored invoice was ten or more times higher than the actual amount of an invoice.

b) **_Second_**, in many instances, purported invoices representing customer orders were created and submitted to Third-Party Factoring parties for payment even though First Brands' books and records, in some cases, do not reflect that such customer invoices existed.

c) **_Third_**, in many instances, the same invoice was factored more than once to different third-party factors. There were also instances of factoring the same receivable to both a customer partner factor and a separate third-party factor.

50.     In other words, in certain instances First Brands sold erroneous or fabricated invoices to the third-party factors or sold duplicate invoices to multiple counterparties.

51.     As an example, on May 9, 2025, Brake Parts Inc LLC sold automotive parts to General Motors Corporation SPO. An invoice for this sale shows a total of $179.84. On May 19, 2025, that invoice, along with thousands of others, was sent to Brumbergs as part of a package of invoices to be nominated to Katsumi Global, LLC, d/b/a JA Mitsui Capital Americas ("**Katsumi**") for factoring. When Brumbergs sent the list to Katsumi later that day, it listed the very same Brake Parts Inc LLC invoice, but this time with a value of $9,271.25, representing an extreme increase from the original May 9, 2025 invoice amount of $179.84. The values of numerous other invoices in the package also had been changed, including some invoices that were listed at net values and

purchase prices more than $15,000 higher and $12,000 higher, respectively, than the invoice values listed in the original documents. Ultimately, the factoring company purchased the package of invoices including the modified invoice (along with other invoices) at a cost of approximately $11.18 million, but the actual value of the invoices was only approximately $2.3 million.[4]

52. In addition, First Brands, at James' direction, fabricated and sold non-existent receivables to third parties, totaling millions of dollars.

### B. Off-Balance Sheet Financing Practices

53. Certain First Brands entities are party to off-balance sheet financing structures, including lease, inventory sale-leaseback, and equipment financing arrangements. These arrangements include the CarVal Facilities (the "**CarVal Facilities**"), Aequum Facilities (the "**Aequum Facilities**"), Evolution Facilities (the "**Evolution Facilities**"), and the Onset Master Lease and transactions related thereto (the "**Onset Facilities**").

54. Under the CarVal Facilities, lenders provided asset-based revolving credit facilities to certain SPV Debtors. Under these facilities, these SPV Debtors could engage certain First Brands subsidiaries to manufacture inventory on their behalf and could purchase manufactured inventory such as brake parts or raw materials from First Brands and use that inventory as a borrowing base to obtain credit from the lenders.

55. Under the Aequum Facilities, lenders provided asset-based revolving credit facilities to certain SPV Debtors. Under these facilities, the SPV Debtors could purchase inventory,

---

[4] First Brands presented evidence of these transactions and other instances of Defendants' misconduct, including over sixty exhibits and several hours of sworn testimony, at the preliminary injunction hearing in this matter. First Brands incorporates by reference all evidence offered at that preliminary injunction hearing. This evidence includes, among other things, bank records reflecting transfers from First Brands accounts to James, entities under his control, or third parties for his and his family's personal benefit.

finished parts, raw materials, or semi-finished products directly from certain other Debtors, and utilize that inventory as a borrowing base to obtain credit from the lenders. These facilities also permitted SPV Debtors to sell the inventory back to the other Debtors.

56.    Under the Onset Facilities and the Evolution Facilities, an SPV Debtor could (i) first purchase inventory and/or equipment from certain subsidiaries of First Brands and then (ii) utilize those assets either as (a) collateral to support a loan (in the case of the Evolution Facilities) or (b) in connection with an alleged sale-leaseback transaction (in the case of the Onset Facilities).

57.    First Brands' investigation, however, has identified multiple issues with these arrangements.

58.    *First*, in the case of the Aequum and CarVal Facilities the agreements entered into by the SPVs did not reflect the commercial reality of their transactions. The SPVs associated with these facilities purported to purchase materials or inventory from specific First Brands entities, but sent funds obtained through the transactions to entities other than the supposed sellers of inventory under their agreements.

59.    *Second*, in the case of the Onset Facilities, in many cases, the amounts paid from the off-balance sheet SPV to the First Brands subsidiary for inventory and/or property, plant and equipment ("**PP&E**") were less than the stated sale price specified in the relevant asset purchase agreements.

60.    *Third*, it appears that inventory that was purportedly transferred by First Brands subsidiaries to the SPV Debtors in connection with certain of the off-balance sheet facilities, namely the Evolution Facilities and the Onset Facilities, remained on the First Brands subsidiaries' balance sheets, notwithstanding the alleged transfers. Also, the value of such inventory appears to

15

have remained in the borrowing base for the First Brands credit facilities, including Debtors' ABL Facility. Accordingly, the value of the same inventory was used to support loans to both (i) the First Brands subsidiaries and (ii) the SPV Debtors.

61.     *Fourth*, funds were transferred from SPV Debtors to a non-Debtor entity controlled by James known as "Bowery Finance II." Inadequate books and records were maintained for these SPV Debtors, and cash that was supposed to be transferred to the First Brands subsidiaries under the applicable transaction documents was transferred to Bowery Finance II instead. Upon information and belief, the Bowery Finance II account was used as a slush fund. From 2022 through 2025, nearly $12 billion flowed through the account, including transfers between Patrick James, the Patrick James Trust and his affiliated entities, and transfers with First Brands and First Brands' business units. The transfers were apparently made in order to meet repayments due to Onset and third-party factors.

### C.  Supply-Chain Financing Practices

62.     First Brands incurred at least approximately $900 million in unsecured SCF liabilities that were not fully recorded as liabilities on First Brands' balance sheet, further obscuring First Brands' true financial condition. These liabilities, together with off-balance sheet SPV and factoring obligations, contributed to approximately $5.5 billion in unrecorded or under-recorded debt.

63.     In the SCF program, First Brands used third-party platforms to factor the Company's accounts payable, thereby extending payment terms for the amounts due to vendors and suppliers. The SCF program principally operated through two methods: (1) direct factoring, and (2) bill payers. In the first method, vendors would upload invoices to an SCF platform and choose whether to immediately receive funds or wait until the invoice matured. In the second

method, First Brands would upload customer invoices to a third-party payment processing entity, often in the form of a "cover" invoice that consolidated multiple vendor invoices, and the payment processing entity would make payment on those invoices using funds sourced through the SCF platforms.

64.     First Brands' investigation has uncovered, however, misconduct by certain Defendants in connection with the SCF program. Senior finance executives acting at the direction of James, through Brumbergs, created false "cover invoices" to submit to processors such as NextProcess LP and VERCYFi LLC—entities used to process payments to third parties on behalf of First Brands—that, either in whole or in part, did not reflect actual accounts payable due to vendors or suppliers. Instead, these invoices used fictitious amounts to ensure that First Brands drew the maximum amount of cash permitted under the SCF platforms' credit limits.

65.     Upon information and belief, rather than directing that the payment processors use such funds to pay First Brands' vendors or suppliers, James, through Brumbergs, directed that such funds be paid to non-Debtor entities including Bowery Finance II, to conceal that the funds were simply returning to First Brands in what were internally referred to as "round trips," "RT," or "corporate initiatives." Upon information and belief, James, Brumbergs, and Graham regularly reviewed the Company's cash position, including the availability of "round trip" funding obtained through the SCF program. James would determine how such funds were spent, and Brumbergs would direct the Finance department to distribute the funds accordingly.

66.     By using SCF financing, James and Brumbergs greatly increased First Brands' liabilities, but James, through Brumbergs, coordinated with senior First Brands executives to conceal the extent of SCF financing. Moreover, Brumbergs and Graham were directly involved in preparing and reviewing financial statements related to SCF disclosures, which failed to disclose

17

a substantial portion of the liabilities that First Brands had incurred through the SCF program. Notably, immediately prior to the Petition Date, Brumbergs instructed individuals in First Brands' Accounting department to record a $1.2 billion liability related to the SCF program, which had not previously been reflected on First Brands' balance sheet.

### D.  Altered Financial Statements

67.     In addition to the above practices, James, through the actions of Brumbergs and Graham, concealed First Brands' true financial condition from counterparties, creditors, and lenders by personally directing the alteration of First Brands' financial statements.

68.     Specifically, James directed senior First Brands executives, including Brumbergs, to make these alterations. In turn, Brumbergs manually reclassified expenses as assets, inflated sales figures, and placed certain expenses "below the line" for purposes of EBITDA calculations.

69.     The intentional alteration of First Brands' financial statements led to material misstatements of First Brands' financial condition. When considered alongside the off-balance sheet financings, such alterations made it difficult, if not impossible, to accurately assess the Company's financial condition and solvency.

## II.    DEFENDANTS' MISAPPROPRIATION OF FIRST BRANDS' FUNDS FOR JAMES' AND HIS FAMILY'S PERSONAL BENEFIT

70.     At the same time James and his co-conspirators were manipulating First Brands' books and records to bring funds into First Brands, James and his co-conspirators were misappropriating massive sums—totaling hundreds of millions, if not billions, of dollars—from First Brands to fund James' and his family's lavish lifestyle. This misconduct is not new for James, who has been previously accused of engaging in fraudulent and deceptive business practices to

divert corporate proceeds to enrich himself.[5]

71.     First Brands has uncovered that hundreds of millions of dollars were transferred from First Brands directly to James and entities under his control, or to third parties for his personal benefit from 2018 to 2025. The scale of James' transfers increased in recent years, with the majority of such transfers occurring between 2023 and 2025. These transfers continued unabated into 2025 and continued until days before the Petition Date.

72.     In total, Exhibit A reflects **835 transfers totaling at least approximately $830 million** from 2018 to 2025. First Brands' review of the corresponding accounts has not identified consideration constituting reasonable value for the transfers reflected therein. First Brands has likewise not found ordinary-course documentation reflecting that these transfers were made for a legitimate business purpose. First Brands reserves the right to supplement Exhibit A, and to challenge additional transfers, as additional bank records and discovery are obtained.

---

[5]     In 2009, Tristate Capital Bank filed a lawsuit against James and companies under his control for repeatedly misleading a borrower group about the nature and value of collateral, the condition of the businesses, and the disposition of assets and proceeds. *Tristate Capital Bank v. Red Rock Stamping LLC et al.*, No. 09-cv-01455 (N.D. Ohio June 26, 2009). James, and companies under his control, allegedly (1) overstated eligible accounts receivable by concealing substantial offsets owed to major customers; (2) manipulated internal records to hide these offsets (3) transferred collateral inventory to a related entity without consideration; (4) diverted substantial "management" and "consulting" fees despite subordination and distribution restrictions; and (5) withheld collateral and business records after default and execution of a wind-down agreement. The case settled and James agreed to pay $1 million.

In 2011, Fortress Value Recovery Fund filed a similar lawsuit against James and companies under his control. Plaintiff, an unpaid creditor, accused James of creating and using a web of affiliated entities to move money from James' heavily indebted company, Columbus Components Group, LLC ("**CCG**"), to other management entities. *Fortress Value Recovery Fund I LLC v. Columbus Components Group, LLC et al.*, No. 11-cv-200 (N.D. Ohio Jan. 27, 2011). The creditor alleged that tens of thousands of dollars per month were diverted in "management fees," including during periods when CCG was in default and prohibited from making such payments. CCG, at James' direction or with his knowledge, allegedly withheld accurate information to avoid triggering an event of default, thereby allowing continued fee payments to James' affiliated companies. James' company settled this lawsuit for $6 million. *Fortress Value Recovery Fund I LLC v. Columbus Components Group*, *LLC et al.*, No. 11-cv-200 (N.D. Ohio July 6, 2011).

73.     While James asserts that he "transferred (at least) tens of millions of dollars into First Brands," James has never provided an accounting of these relatively limited transfers. ECF No. 108 ¶ 6. Even if James had transferred money back into First Brands, doing so would not absolve him of liability for his misappropriations. The ultimate result of James' actions was that First Brands was left with just $12 million in cash in its corporate bank accounts as of the Petition Date.

74.     James' misappropriated funds from First Brands involved, at a minimum, improper "dividends" or "distributions" to the Patrick James Trust, and brazen use of First Brands' funds to pay for James' and his family's lifestyle and personal businesses. These transfers occurred between 2018 and 2025, with the majority of transfers by value occurring in the two years prior to the Petition Date. The recipients, ostensible purpose, and total amount of such transfers are described below.

### A.  Improper Transfers to Defendant Patrick James Trust

75.     Based on evidence uncovered to date, the vast majority of the misappropriated funds—**totaling approximately $708 million, with over $229 million in 2025 alone**—were transferred to Defendant Patrick James Trust. First Brands is not aware of any information demonstrating that these transactions were made for any benefit or consideration received by First Brands.

76.     Transfers to Defendant Patrick James Trust comprise payments originating from accounts belonging to First Brands Group, LLC, Brake Parts Inc LLC, and various SPV Debtors— including accounts belonging to Carnaby FA, LLC and Carnaby Inventory IV, LLC.

77.     James personally directed these distributions from the Company to Defendant Patrick James Trust, specifying the amount and destination accounts for each payment.

78.     For example, on April 5, 2022, James' Chief of Staff emailed Brumbergs, writing that James "wants a $10M tax distribution paid to him this week." Brumbergs wrote to members of the First Brands Finance department that he had discussed the payment and timing with James and instructed them to make a transfer at the end of the week. On April 8, 2022, First Brands transferred $10 million to Defendant Patrick James Trust.

79.      Similarly, in January 2024, internal communications among Brumbergs and other senior individuals at First Brands indicated that James "wanted to have the distribution funds sent" to two accounts belonging to Defendant Patrick James Trust, divided into batches of $21 million and $4 million. That day, First Brands distributed $25 million into an account belonging to Defendant Patrick James Trust.

80.     Again, in October 2024, Brumbergs indicated that he had been "instructed to make a $25 million USD distribution" to a Patrick James Trust account. First Brands distributed $25 million into the specified account that same day.

81.     First Brands is unaware of any documentation, aside from entries in the Company's general ledger, indicating that these payments constituted dividends or distributions in the ordinary course. To the extent the transfers were properly considered dividends or distributions, the sum total of the payments far exceeded the consideration provided to First Brands in return.

82.     At the time these transfers were made, the entities from which the transfers were made lacked sufficient surplus, net profits, or distributable capital to lawfully authorize dividends or distributions under applicable law. Transfers to the trust reflected in Exhibit A rendered First Brands and/or the relevant transferor entity insolvent or occurred as they were nearing insolvency and later, further exacerbated their insolvency.

83.     Simply put, upon information and belief, there was no legitimate business reason

for James to transfer hundreds of millions of dollars from First Brands to Defendant Patrick James Trust, leaving First Brands insolvent and with just $12 million in the bank as of the Petition Date.

**B. James Commingled His Personal Accounts with Company Accounts and Diverted First Brands' Funds to Pay for His and His Family's Lavish Lifestyle**

84.     Upon information and belief, James also intentionally commingled First Brands' business accounts with personal funds and used First Brands' funds for his and his family's personal expenses and personal businesses.

85.     Indeed, upon information and belief, certain of the Debtors' cash was frequently commingled with the cash of non-Debtor entities, including Bowery Finance II, controlled by James.

86.     James also caused First Brands to pay numerous third parties that serviced his personal lifestyle and family office—rather than First Brands' business—using First Brands' funds. These payments included salaries, benefits, and compensation for current and former employees of Defendant Larchmont LLC, James' family office, paid both from First Brands Group, LLC and Trico Products Corporation, to the employees directly and through Larchmont's vendor, Consociate Group LLC[6]; security and consulting services paid to CTC International Group, Inc.; interior design and furnishing expenses paid to Meribear Productions, Inc. d/b/a Meridith Baer Home; rent, utilities, and related housing expenses paid through MRRDISON LLC for James' personal New York City residence; automotive and transportation-related services paid to Carcorp USA; financial advisory and wealth-management services paid to Sequoia Financial Group, LLC, as well as direct payments to Thomas A. Haught, trustee of Defendant Patrick James

---

[6]     These employees are identified by a numerical designation in Exhibit A to preserve their anonymity. Exhibit B to this Complaint, filed under seal, identifies these individuals by name. *See* ECF No. 408 ¶14.

Trust and CEO of Sequoia Financial Group, LLC, including for services overlapping with James' family office and Defendant Patrick James Trust; purported IT services paid to Banshee Computer Consulting Corp.; personal moving and logistics services paid to Meridian Moving and Storage, Inc.; and over $400,000 paid to James' private celebrity chef. These payments conferred no benefit on First Brands, were not made in the ordinary course of business, and were made solely to subsidize James' and his family's personal and family-office expenses.

87.     Payments were also made from First Brands to entities controlled by James, named as Defendants in this action. For example, Defendant Battery Park—which is not directly affiliated with First Brands—is 100% owned by James and is described as a "personal" business in James' financial documents. On information and belief, more than $18 million was transferred from First Brands to Battery Park from 2019 to 2025 to pay James and his family's personal expenses, including approximately $150,000 for a personal trainer and hundreds of thousands of dollars for personal travel, security, transportation, and other costs that should have been borne by James and his family personally.

88.     James orchestrated both the amounts and timing of numerous transfers to Defendant Battery Park. For instance, on July 19, 2022, an employee of Defendant Larchmont, James' family office, emailed First Brands to request payment, indicating that "Patrick has asked that we invoice weekly." On October 31, 2022, the same Larchmont employee submitted an invoice to First Brands for more than $400,000, writing: "Per Patrick, this should be paid tomorrow."

89.     Other communications from James' family office indicate that he personally dictated what should be submitted for reimbursement. For example, on December 31, 2022, a Larchmont employee stated that James "had us go back and recode" certain charges so that

expenses borne by Defendant Battery Park would be reimbursed by First Brands.

90.     The conduct by which James enriched himself at the expense of First Brands continued well into 2025. For instance, on March 5, 2025, a Larchmont employee sent an email to First Brands, which noted that James had asked that a $468,000 invoice be "paid this week if possible."

91.     Upon information and belief, James also directed employees to submit invoices to First Brands for reimbursement to Defendant Battery Park wherein line items for personal and business expenses were included in the same invoice. For example, in an invoice submitted by Battery Park to First Brands on August 23, 2023, Battery Park sought reimbursement for over $110,000 for a six week "Southampton hotel" stay for two individuals who worked for James personally.

92.     James and others acting at his direction at times sought to conceal the nature of certain payments to Defendant Battery Park. For instance, on January 3, 2025, Battery Park submitted a $1.7 million invoice to First Brands. Instead of paying this invoice directly from First Brands Group, LLC accounts, Brumbergs arranged that funds be transferred first to Patterson Inventory, LLC ("**Patterson**"), an SPV Debtor, through a third-party payment processor. Patterson subsequently transferred those funds to Defendant Battery Park.

93.     In another instance, on March 21, 2024, an employee of Defendant Larchmont sent First Brands a $412,000 invoice with no detail regarding its contents. The employee wrote that Battery Park would no longer provide detailed invoices, and that he had been instructed to provide any necessary detail directly to Brumbergs.

94.     As Exhibit A illustrates, the other Entity Defendants likewise received transfers from First Brands during the relevant period.

95.    From 2018 to 2025, First Brands transferred approximately $38 million to Defendant Larchmont. Although these payments were mostly characterized as "management fees," upon information and belief, Defendant Larchmont provided no services to First Brands and instead provided personal services to James and his family. Indeed, in one case when an auditor asked what services Larchmont provided to First Brands in return for the "management fee," a senior member of the Accounting team replied: "Patrick James."

96.    James often dictated the timing and quantity of payments to Defendant Larchmont. For example, on April 12, 2021, Brumbergs stated to another member of the Finance team that James "wants the entire Q2 amount paid today." That day, First Brands transferred $1.25 million to Larchmont. On July 6, 2021, Brumbergs indicated that he would "check with PJ" regarding the timing and amount of subsequent payments to Larchmont.

97.    Further, a total of at least $34 million was transferred to Defendant Alester through a third-party payment processor, purportedly as part of a licensing agreement under which Alester allowed First Brands to use certain intellectual property. In reality, however, that intellectual property should have belonged to First Brands. Specifically, in connection with acquisitions by First Brands of entities including Horizon Global Corporation ("**Horizon**"), Cardone Industries, Inc., and TAE Brakes, LLC, the acquired entities executed agreements purporting to contribute substantial portions of their intellectual property portfolios to Alester. First Brands subsidiary Carter Carburetor Holdings, LLC also executed a similar agreement, again purporting to contribute intellectual property to Alester. These purported contributions occurred even though no corresponding consideration or payments had been provided to First Brands. James' and Alester's misappropriations thus also included misappropriation of valuable intellectual property belonging to First Brands. Alester thereafter licensed certain of that intellectual property—including

Horizon's intellectual property—back to First Brands at a 3.5% royalty on net sales. Records related to Alester reflect that funds received by Alester from a Horizon subsidiary, Horizon Global Americas Inc., were characterized as "royalty" payments under these agreements. Notably, among other transfers, $7 million of "royalty" funds received were subsequently transferred by Alester to Defendant Patrick James Trust as a purported loan repayment.

98.     Significant additional transfers totaling in the millions of dollars were also made from First Brands to James' real estate holding company, Defendant Albion Realty, over the same period including payments made directly to Albion Realty by First Brands' subsidiaries Champion Laboratories, Inc. and FRAM Group Operations LLC. Although these were purportedly lease payments, upon information and belief, the value of such transfers far exceeded the reasonable value of any purported lease. And between 2022 and 2025, First Brands also transferred over $1 million, including through ASC Industries, Inc., to Pegasus Aviation, James' personal aircraft company.

99.     Money transferred from First Brands to James also occurred in close proximity to his acquisition of various real estate properties and cars. For example, in the two months prior to purchasing a home in Malibu on September 13, 2019, various entities unrelated to First Brands over which James has complete control received disbursements from First Brands amounting to several million dollars. Likewise, in the two months prior to purchasing a home in the Hamptons on August 31, 2021, certain entities controlled by James received over $1 million from First Brands.

100.     On information and belief, James owns at least seven properties. James also owns an extensive car collection, including at least seventeen exotic cars. On information and belief, these purchases were made at least in part using the improperly transferred funds.

101. The transaction documentation that First Brands has uncovered fails to show that James' transfers were made for any legitimate business purpose. These transfers were not documented or treated by First Brands as ordinary dividends or distributions and contributed to First Brands' insolvency or occurred while First Brands was insolvent or nearing insolvency.

102. Many of the transfers seem to have been made without any contemporaneous documentation of their purpose.

### C. The Improper Transfers Contributed to First Brands' Insolvency and Occurred While First Brands Was Insolvent or Nearing Insolvency

103. First Brands' inadequate capitalization, lack of sufficient equity, and insolvency did not arise suddenly in the lead-up to the Petition Date. Rather, the Company was nearing insolvency or rendered insolvent well before the Petition Date and, at Defendants' direction, engaged in a series of increasingly complex and intentionally deceptive off-balance sheet arrangements in part designed to conceal First Brands' true financial condition.

104. Based on information known to date, the Company's actual financial condition demonstrates that it was insolvent or nearing insolvency well before the Petition Date, including while James was the recipient of unlawful distributions and fraudulent transfers. As reflected by the timing and frequency of the transfers identified in Exhibit A, the diversion of funds accelerated as First Brands' unrestricted cash balances declined and its obligations to creditors increased, leaving First Brands with only approximately $12 million in cash in its corporate bank accounts as of the Petition Date.

105. There were several widespread issues with First Brands' accounting and business practices that plagued First Brands well before the Petition Date and that indicate First Brands was insolvent or nearing insolvency at the time of—or rendered insolvent by—the above-described transfers to Defendants. Chief among these issues was First Brands' systemic and purposeful

27

failure to accurately and completely report its liabilities. Of the approximately $11.5 billion in debt and liabilities incurred as of the Petition Date, approximately $2.3 billion arose from off-balance sheet financing through SPVs. The Company also had approximately $2.3 billion in aggregate factoring liabilities and $900 million in unsecured SCF liabilities that were not recorded as liabilities on the Company's balance sheets.

106. The debt resulting from off-balance sheet financing, factoring liabilities, and unsecured SCF liabilities, did not appear overnight. First Brands' practices in incurring these obligations, and its deliberate and repeated failure to record them, long predate the Petition Date. The off-balance sheet financing transactions, factoring arrangements, and SCF obligations should have been recognized as liabilities in the Company's books and records when the debts were actually incurred. But the historical accumulation of this debt—particularly SPV-related obligations—was not transparently recorded on First Brands' books and materially distorted the Company's true financial condition. On information and belief, had these liabilities been properly accounted for, they would have demonstrated that First Brands was insolvent or nearing insolvency at the time of—or rendered insolvent by—the improper transfers.

107. Moreover, First Brands also overstated the gross book value of its inventory, which improperly inflated the value of its assets. Specifically, the Company failed to write down significant excess and obsolete inventory at multiple locations.

108. Determining First Brands' true financial position is complicated further by numerous instances in which Brumbergs and others, at James' direction, made unsupported, manual changes to the Company's financial statements, such as by reclassifying expenses as assets, inflating sales figures, and reclassifying certain expenses "below the line" in EBITDA calculations.

**D. First Brands Received Less Than Reasonably Equivalent Value in Exchange for the Improper Transfers**

109.    First Brands did not receive reasonably equivalent value in exchange for any of the transfers identified in Exhibit A.

110.    Indeed, for the vast majority of transfers, First Brands did not receive any consideration at all.

111.    For example, upon information and belief, none of the purported distributions or dividends paid to Defendant Patrick James Trust appear to have been made for any consideration or legitimate business purpose. Although these transfers were sometimes labeled as "dividends" or "distributions," there are no accompanying documents or records specifying what consideration James provided to First Brands or why such payments were appropriate at the times they were made. To the extent James directed that First Brands classify these payments as tax "distributions," he did not provide First Brands with documentation verifying his own tax payments. Moreover, to date, First Brands has not uncovered any legitimate business justification for these transfers. Accordingly, none of the transfers labeled as "distributions" or "dividends" were made for reasonably equivalent value.

112.    Nor were any of the transfers used to fund James and his family's lavish lifestyle made for reasonably equivalent value. Each of these transfers personally benefitted James or his family and did not provide any value to First Brands.

**III.    THE INVOLVEMENT OF BAKER, BRUMBERGS, AND GRAHAM**

113.    The scale of Defendant James' misconduct—involving billions of dollars of financing secured from multiple counterparties, and the transfer of hundreds of millions of dollars over the course of several years—required James to enlist the help of other individuals.

114.    Although James was the ringleader of the process through which the above-

29

described improper transfers occurred, Baker, Brumbergs, and Graham provided substantial assistance to James, either by helping the Company incur financing through fraudulent means, and/or by ensuring the delivery of funds to James, his family trust, or third parties acting for James' and his family's benefit. In doing so, Baker, Brumbergs, and Graham leveraged their positions and breached their fiduciary duties to assist James at the Company's expense.

115.    James worked closely with Baker, Brumbergs, and Graham to implement the fraudulent financings and improper transfers. Baker, Brumbergs, and Graham were involved in structuring financing facilities, communicating with counterparties, and authorizing or directing improper payments to benefit James. And although James was the ultimate decision-maker, he sometimes delegated authority to Baker, Brumbergs, or Graham, or allowed them some autonomy, in how to accomplish the various misconduct. In doing so, James appears to have been careful to try and conceal his own role in the misconduct. James endeavored to limit communications in writing and instead communicated with Baker, Brumbergs, and Graham, as well as other employees, primarily by telephone.

116.    In addition to enriching James and his family, Baker, Brumbergs, and Graham benefitted from the misconduct themselves through the receipt of generous compensation packages. For example, from 2020 through 2025, Baker received a total of $13.1 million in compensation, Brumbergs received a total of $10.5 million in compensation, and Graham received a total of $27.8 million in compensation from First Brands. Thus, while Baker, Brumbergs, and Graham were contributing to the misconduct described above, they were simultaneously rewarded with high compensation.

### A.  Baker

117.    Baker served as First Brands' Chief Corporate Strategy Officer. In that role, he was

responsible for evaluating, structuring, and implementing financing initiatives and strategic transactions, including off-balance sheet SPV structures. This position afforded him regular access to and communication with James and senior finance personnel concerning financing strategy, liquidity needs, and certificates submitted to counterparties. Upon information and belief, Baker reviewed, authorized, or directed the preparation and transmission of borrowing base certificates, amendments, and related transaction documents.

118. Baker exercised responsibility over the design and negotiation of the financing structures at issue and had visibility into the collateral and cash movements those structures required. Contemporaneous emails, call notes, and executed certifications reflect his direct involvement in: (i) coordinating borrowing-base submissions and amendments; (ii) communicating with lenders and financing counterparties regarding collateral; (iii) creating facilities in which the same inventory was presented as collateral to multiple lenders; and (iv) assisting James in structuring transactions between First Brands and entities he controlled, resulting in the transfer of First Brands' funds to those entities.

### B. Brumbergs

119. Brumbergs was a central participant in the fraudulent financing and transfers at issue. As Vice President of Finance, Brumbergs directly controlled the mechanics by which First Brands incurred factoring, SPV, and SCF liabilities, and directed the movement of cash from First Brands to Defendants' accounts.

120. For example, Brumbergs was directly involved in the First Brands' factoring practices. Not only did he directly supervise First Brands' factoring program, but Brumbergs personally participated in the factoring fraud, including by altering invoice nomination files and submitting fake invoices to multiple third-party factors.

121.     Upon information and belief, Brumbergs was also a key participant in the SPV financing arrangements. Brumbergs personally caused First Brands to transfer cash among SPV entities. As the Vice President of Finance, Brumbergs oversaw and provided instructions regarding the treatment of inventory, including how transactions related to the SPV financings should be executed or recorded.

122.     Brumbergs also played a substantial role in First Brands' SCF arrangements. Specifically, he was aware of the use of false invoices as part of that program; passed instructions to employees regarding the use of SCF funds, including for vendor payments; and supervised the Finance team responsible for the SCF program. In fact, immediately prior to the Petition Date, Brumbergs instructed the Accounting department to record a $1.2 billion liability related to SCF that had not previously been reflected on the Company's balance sheet.

123.     In addition to his involvement in the various financing arrangements, Brumbergs also provided substantial assistance to James in effectuating the transfer of funds to entities under James' control and for James' and his family's benefit. James would provide Brumbergs with detailed instructions regarding the amount and recipient of the transfers. In turn, Brumbergs would direct First Brands' Financing or Accounting departments to transfer funds accordingly.

**C.   Graham**

124.     Graham, as Chief Financial Officer and Treasurer, oversaw First Brands' financial reporting, accounting, and treasury practices, and participated in communications with lenders and financing counterparties, affording him visibility across First Brands' business and financial practices and placing him in regular communication with senior leadership and James. In that role, he routinely received and reviewed lender-facing materials, provided financial information in response to lender requests, and participated in communications concerning financing capacity and

availability. Upon information and belief, Graham regularly corresponded with James regarding these issues as well. Graham failed to implement controls or halt financing practices that caused First Brands to incur obligations far beyond its ability to repay. By continuing to manage lender communications and financial disclosures under these circumstances, Graham knowingly—or, at a minimum, recklessly—assisted in concealing the Company's true financial condition and facilitating James' misconduct.

125. Upon information and belief, as CFO, Graham supervised or permitted manual changes to Company financial statements, including reclassifications and adjustments, that masked deteriorating liquidity and mounting covenant pressure, and bore responsibility for the accuracy of First Brands' financial reporting and certifications. Upon information and belief, Graham approved, reviewed, and/or signed financial statements, management representations, and lender certifications for First Brands and its subsidiaries, and coordinated with James and senior finance personnel regarding the presentation of EBITDA, classification of expenses, and timing of liability recognition.

126. Upon information and belief, at times, Graham personally directed transfers of First Brands' funds to James or entities under his control, thereby participating in or facilitating the misappropriations. Upon information and belief, Graham took these actions at the direction of James.

## COUNT I

**Turnover of Estate Property**
**Pursuant to 11 U.S.C. § 542**
**(Against Patrick James, the Patrick James Trust, and the Entity Defendants)**

127. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

33

128. Under Section 542(a), an entity in possession of Debtors' property or an entity that owes a debt to the debtor shall deliver such property or pay such debt.

129. As of the date of this Amended Complaint, Defendants, and/or other entities and trusts James controls, have possession, custody, or control over property of the estate. Such property and debts belonging to the estate include, without limitation, cash, accounts receivable, intellectual property, and other matured payment obligations due and payable to the creditors, and any proceeds thereof.

130. Under Section 542(a), Defendants shall deliver to Debtors and account for such property or the value of such property.

131. Defendants' refusal to deliver property impedes administration of the estate. Turnover is appropriate because the property is estate property within Section 541 and is necessary to the administration of this case.

132. Debtors seek an order compelling an immediate turnover and a full accounting, with appropriate safeguards for any proven lienholder's interest.

## COUNT II

**Actual Fraudulent Transfer**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b), Ohio Rev. Code Ann. § 1336.04(A)(1),**
**6 Del. Code § 1304(a)(1)**
**(Against Patrick James, the Patrick James Trust, and the Entity Defendants)**

133. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

134. On information and belief, James secured funding from lenders based on false representations that James knowingly and intentionally made about First Brands' financial position.

135. On information and belief, James caused First Brands to complete payment of

34

numerous transfers made to benefit James, his family, and/or his personal affiliates.

136.    James directed First Brands to pay Defendants with the actual intent of hindering, delaying, and/or defrauding First Brands' creditors and investors.

137.    Each transfer was made to or for the benefit of James—an insider of First Brands— or to entities under his control.

138.    The transfers were made for less than reasonably equivalent value, inadequate consideration, or no consideration at all.

139.    James commingled First Brands' funds with his personal accounts.

140.    James used First Brands' funds to subsidize his and his family's personal expenditures.

141.    Each relevant payment was made by First Brands at James' direction.

142.    Patrick James and the Entity Defendants were initial transferees, or entities for whose benefit the transfers were made under Section 550(a)(1); and to the extent any Defendant is a subsequent transferee, recovery is sought under Section 550(a)(2).

143.    James did not direct any of the transfers in good faith.

144.    At the time of each of the transfers, First Brands had at least one general unsecured creditor holding an allowable claim who, but for Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover actual fraudulent transfers.

145.    Each of the transfers was made or could only have been discovered within the applicable lookback period.

146.    The payments to James and the Entity Defendants are voidable pursuant to Section 548(a)(1)(A) and may be recovered from Defendants pursuant to Section 550.

147.    Accordingly, Debtors are entitled to a judgment (1) avoiding the fraudulent

transfers under Section 548(a)(1)(A) and/or Section 544(b), 6 Del. C. § 1307, and Ohio Rev. Code Ann. § 1336.07, and (2) recovering and preserving all such avoided transfers under Sections 550 and 551, 6 Del. C. § 1307, and Ohio Rev. Code Ann. § 1336.07.

## COUNT III

**Constructive Fraudulent Transfer**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 544(b), Ohio Rev. Code Ann. § 1336.04(A)(2),**
**6 Del. Code § 1304(a)(2)**
**(Against Patrick James, the Patrick James Trust, and the Entity Defendants)**

148. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

149. Debtors seek to avoid the fraudulent transfers made on numerous occasions from First Brands' accounts to James' personal accounts and affiliated entities, including, but not limited to, Defendant Patrick James Trust and the other named Defendants, and to recover and preserve the value thereof.

150. On information and belief, James caused First Brands to complete numerous transfers to benefit Defendants and/or James' family and personal affiliates.

151. First Brands did not receive reasonably equivalent value in exchange for the transfers. Hundreds of transfers, totaling at least approximately $830 million from 2018 through 2025, including payments to Battery Park, transfers for James' family payroll expenses, payments for James' New York City townhouse, and purported distributions to Defendant Patrick James Trust, conferred no value whatsoever on First Brands.

152. Each of the transfers was made or could only have been discovered within the applicable lookback period.

153. On the date of each relevant transfer, First Brands: (1) was insolvent, nearing insolvency, or became insolvent as a result of such transfer; (2) engaged in a business dealing or a

transaction, or was about to engage in a business dealing or a transaction, for which any property remaining with Debtors was unreasonably small in relation to the business or transaction; or (3) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

154. At the time of each of the fraudulent transfers, First Brands had numerous unsecured creditors holding an allowable claim who, but for Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover constructive fraudulent transfers.

155. Each of the transfers was made to or for the benefit of James—an insider to First Brands' entities—or to entities under James' control.

156. Patrick James and the Entity Defendants were initial transferees, or entities for whose benefit the transfers were made under Section 550(a)(1); and to the extent any Defendant is a subsequent transferee, recovery is sought under Section 550(a)(2).

157. Accordingly, Debtors are entitled to a judgment (1) avoiding the fraudulent transfers under Sections 548(a)(1)(B) and/or 544(b) of the Bankruptcy Code, 6 Del. C. § 1307, and Ohio Rev. Code Ann. § 1336.07, and (2) recovering and preserving all such avoided transfers under Sections 550 and 551 of the Bankruptcy Code, 6 Del. C. § 1307, and Ohio Rev. Code Ann. §1336.07.

## COUNT IV

**Money Had and Received**
**Pursuant to Ohio Law**
**(Against Patrick James, the Patrick James Trust, and the Entity Defendants)**

158. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

159. Defendants received money from First Brands without providing valuable

consideration.

160.   By receiving funds from First Brands' accounts for personal gain, Defendants wrongfully had or held money that belongs to First Brands in equity and good conscience.

161.   Defendants have been unjustly enriched by retaining funds belonging to First Brands.

162.   Inequity and injustice would result if Defendants were permitted to retain the funds.

163.   Accordingly, Debtors are entitled to equitable recovery of any benefits Defendants received that rightfully belong to First Brands.

## COUNT V

**Unjust Enrichment**
**Pursuant to Delaware and Ohio Law**
**(Against Patrick James, the Patrick James Trust, and the Entity Defendants)**

164.   Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

165.   Defendants were enriched and received direct, concrete economic benefits without legal or equitable justification, including, but not limited to, through the diversion and receipt of funds from First Brands.

166.   Defendants have unjustly retained the sums procured through, funded by, or serviced with First Brands' assets—sums to which Defendants had no lawful claim and for which First Brands received no reciprocal benefit—to the detriment of First Brands and its creditors, thereby shifting value from the enterprise to Defendants.

167.   First Brands suffered financial losses as a result of these transactions. Among other losses, First Brands did not receive reasonably equivalent value for any of the transfers; the challenged conduct facilitated and perpetuated efforts that siphoned substantially all of First

Brands' assets; and the estates were left burdened with liabilities without corresponding assets or value.

168.    There is a direct, proximate, and traceable relationship between Defendants' enrichment and the losses accrued by First Brands: the transfers emanated from First Brands' accounts and were made directly to Defendants, other entities or affiliates owned or controlled by or related to James, or third parties for the benefit of James and his family.

169.    No legitimate corporate purpose, consideration, or fair value supports these transfers. They were the product of self-dealing and other misconduct, conferred unique personal benefits upon James that were not shared by First Brands or its stakeholders, and were not supported by reasonably equivalent value or fair consideration.

170.    First Brands conferred a benefit in the form of corporate funds and value, Defendants were aware of and accepted that benefit, and Defendants' continued retention of that benefit would be unjust and inequitable under the circumstances.

171.    Equity and good conscience will not permit Defendants to retain the benefits they wrongfully obtained at First Brands' expense. Legal remedies are inadequate to the extent the relief required is restitutionary and equitable in nature, including the recovery of specific, identifiable funds or assets traceable to James' unjust enrichment.

172.    Accordingly, Debtors are entitled to judgment for restitution in the amount of the benefits unjustly obtained, together with disgorgement of all proceeds traceable to the transfers, the imposition of a constructive trust and/or equitable lien over assets and proceeds in James' control, an accounting, and pre- and post-judgment interest at the maximum rate permitted by law, as well as such other and further equitable relief as the Court deems just and proper.

## COUNT VI

**Constructive Trust**
**Pursuant to Delaware and Ohio Law**
**(Against Patrick James, the Patrick James Trust, and the Entity Defendants)**

173.   Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

174.   A constructive trust is a claim for relief as well as an equitable remedy imposed to prevent unjust enrichment where a defendant, through fraud, breach of fiduciary duty, unfair or unconscionable conduct, commission of a wrong, duress, or abuse of confidence, acquires or retains property that which in equity and good conscience belongs to another.

175.   As detailed in this Amended Complaint, Defendants—acting at James' direction and in breach of his fiduciary duties to First Brands—engaged in fraudulent, unfair, and unconscionable conduct, including the diversion and misappropriation of corporate funds.

176.   By virtue of this misconduct, Defendants were directly and materially enriched. Defendants obtained and continue to retain specific, identifiable property traceable to First Brands' entities.

177.   Defendants received and retain the fraudulent transfers by fraud, self-dealing, and wrongful diversion. Continued possession of such property is inequitable and would unjustly enrich Defendants at the expense of Debtors and their creditors.

178.   Equity therefore deems Defendants constructive trustees of the fraudulent transfers and all traceable proceeds, substitutions, and products (collectively, the "**Constructive Trust Property**") for the benefit of Debtors in their chapter 11 cases.

179.   The Constructive Trust Property is sufficiently specific and traceable: the transfers to Defendants identified in Exhibit A and described herein originated from identified First Brands'

accounts or First Brands' entities' accounts. At Defendants' direction, these funds were directed to James or other entities and accounts he owned or controlled, and can be further traced to property acquired therewith.

180. Legal remedies are inadequate because Debtors seek restitutionary, in-kind relief as to specific funds and assets; equitable relief is necessary to permit tracing, preserve the Constructive Trust Property, and avoid dissipation. An accounting is warranted to identify all property constituting or derived from the Constructive Trust Property.

181. Accordingly, Debtors seek entry of judgment: (a) declaring and imposing a constructive trust over the Constructive Trust Property and all proceeds, products, offspring, and substitutions thereof; (b) directing James, as constructive trustee, to convey, transfer, and turn over the Constructive Trust Property to First Brands; (c) imposing, in the alternative, an equitable lien to the extent any portion of the Constructive Trust Property cannot be specifically traced; (d) ordering an accounting and tracing of all relevant accounts and assets; and (e) awarding pre- and post-judgment interest and such other equitable relief as the Court deems just and proper.

## COUNT VII

**Accounting**
**Pursuant to Delaware and Ohio Law**
**(Against Patrick James)**

182. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

183. James possesses fraudulently obtained funds belonging to First Brands that he is obliged to surrender based on his fiduciary relationship to First Brands.

184. The facts surrounding James' unlawful actions and the accounts mentioned herein are so complex that adequate relief may not be obtained through standard discovery procedures,

such as production and interrogatories.

185.     Accordingly, Debtors are entitled to an equitable accounting.

### COUNT VIII

**Illegal Dividend and Unlawful Distribution**
**Pursuant to 8 Del. C. § 170, 8 Del. C. § 174, and 6 Del. C. § 18-607**
**(Against Patrick James and the Patrick James Trust)**

186.     Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

187.     While serving as the Manager, President, CEO, and beneficial owner of First Brands, and while serving on the board of directors for numerous First Brands entities, James directed First Brands to approve and complete numerous distributions to himself and the Patrick James Trust, and other entities under his control that constituted illegal dividends and unlawful distributions.

188.     *First*, none of these distributions constituted reasonable compensation for present or past services or reasonable payments made in the ordinary course of business. Rather, as described above, each of these distributions served only to provide James with a windfall to fund his and his family's lavish lifestyle at the expense of First Brands.

189.     *Second*, the distributions rendered First Brands and/or the relevant transferor entity insolvent or occurred while First Brands was insolvent or nearing insolvency. Alternatively, and in addition, First Brands' and/or the relevant transferor entity's liabilities exceeded its assets such that they did not have a capital surplus at the time James directed dividend distributions to himself. First Brands' and/or the relevant transferor entity's net profits also were insufficient to fund James' dividend distributions.

190.     James knew or was aware that none of the distributions constituted reasonable

compensation for present or past services. He also knew or was aware that the distributions rendered First Brands insolvent or occurred while First Brands was insolvent or nearing insolvency.

191.    James was aware of his fraudulent conduct and misrepresentations, and he knew his obfuscation would deceive creditors. Accordingly, the distributions were not lawful under the Delaware General Corporate Law and the Delaware LLC Act.

192.    James orchestrated the purported dividends and distributions to himself and entities under his control for his and his family's personal benefit and therefore is liable for the amount of the distributions.

## **COUNT IX**

**Breach of Fiduciary Duty**
**Pursuant to Delaware Law**
**(Against Patrick James, Michael Baker, Peter Andrew Brumbergs, and Stephen Graham)**

193.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

194.    At all relevant times, James, Baker, Brumbergs, and Graham owed fiduciary duties to First Brands. Each was obligated to faithfully conduct business in First Brands' best interests.

195.    James breached his fiduciary duties by consciously and recklessly subordinating First Brands' interests, including to secure fraudulent financing and to divert Company funds for his personal use.

196.    Among other misconduct, James intentionally caused, directed, approved, and/or knowingly permitted the transfer of First Brands' funds from First Brands' accounts for his personal use and benefit, including through the improper transfers described above. James was self-interested in these transfers, which directly and proximately caused damage to First Brands.

By orchestrating these transfers, James did not act in good faith to advance First Brands' best interests.

197.    James' conduct was undertaken in bad faith: it was a conscious and intentional disregard of his obligations to First Brands, and was pursued for his own benefit while exposing First Brands to ruinous liabilities. That willful misconduct and bad faith breach the duties of loyalty and good faith.

198.    Among other misconduct, Baker breached his fiduciary duty by helping structure off-balance sheet debt and SPV financing facilities, ultimately causing First Brands to incur debt that it could not repay; and by failing to ensure First Brands implemented any reporting or information systems or controls, or by consciously failing to monitor or oversee First Brands' operations such that he disabled himself from being informed of the risks or problems with First Brands' fraudulent financing.

199.    Among other misconduct, Brumbergs breached his fiduciary duties through his direct involvement in the factoring practices, including double pledging; his active participation in the SPV and supply-chain financing agreements; and through his role in effectuating the improper transfers for James' benefit.

200.    Among other misconduct, Graham breached his fiduciary duty by failing to ensure First Brands implemented any reporting or information systems or controls, or by consciously failing to monitor or oversee First Brands' operations such that he disabled himself from being informed of the risks or problems with First Brands' fraudulent financing. These breaches facilitated and concealed the extensive misappropriations described herein.

201.    By engaging in the above actions and other misconduct, James, Baker, Brumbergs, and Graham each engaged in willful misconduct that was a direct and proximate cause of First

Brands' injuries. Each is therefore liable to Debtors for all resulting damages, disgorgement of ill-gotten gains, and all other appropriate equitable and legal relief.

202.   Any exculpation or fiduciary duty limitations in applicable LLC or corporate governance documents do not extend to the bad faith, willful misconduct, and self-dealing alleged herein.

203.   To the extent any of First Brands' organizational documents exculpate directors for monetary liability for breaches of the duty of care in a manner permitted by applicable law, Debtors seek relief against such defendants only to the maximum extent permitted by applicable law, including for breaches of the duty of loyalty, acts or omissions not in good faith, willful misconduct, knowing violations of law, and equitable remedies not subject to exculpation. Debtors also seek monetary relief against individuals who are not exculpated under such provisions.

204.   Debtors are entitled to damages and equitable relief against James, Baker, Brumbergs, and Graham for their breaches of fiduciary duties, including but not limited to: (a) the avoidance and recovery of each improper transfer; (b) damages sufficient to place Debtors in the same position they would have occupied absent the fiduciary breaches; (c) disgorgement, restitution, fee forfeiture, constructive trust, and other equitable remedies; and (d) any and all other relief the Court deems just and proper.

## COUNT X

**Aiding and Abetting Breach of Fiduciary Duty**
**Pursuant to Delaware Law**
**(Against Patrick James, Michael Baker, Peter Andrew Brumbergs, and Stephen Graham)**

205.   Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

206.   James, Baker, Brumbergs, and Graham each owed fiduciary duties to First Brands.

207.    James, Baker, Brumbergs, and Graham breached such duties to First Brands by, among other misconduct, causing the Company to engage in improper financings, orchestrating fraudulent transfers, and misappropriating estate funds.

208.    James, Baker, Brumbergs, and Graham each knew or acted with reckless disregard for the fact that the others were engaging in conduct that constituted breaches of their fiduciary duty.

209.    James, Baker, Brumbergs, and Graham knowingly participated in such breaches by providing substantial assistance to one another including by structuring fraudulent financing arrangements, facilitating the improper factoring practices, coordinating communications and certifications to counterparties, and assisting with the payment of fraudulent transfers.

210.    First Brands suffered damages as a direct and proximate cause of these breaches of fiduciary duties.

211.    Debtors are thus entitled to judgment against James, Baker, Brumbergs, and Graham for aiding and abetting breach of fiduciary duties in an amount to be proven at trial.

## COUNT XI

**Conspiracy**
**Pursuant to Ohio Law**
**(Against Patrick James, Michael Baker, Peter Andrew Brumbergs, and Stephen Graham)**

212.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

213.     James, together with (at least) Baker, Brumbergs, and Graham, formed a malicious combination or combinations through express agreement or common understanding to effectuate the fraud and misconduct that caused First Brands to suffer damages.

214.    In furtherance of the conspiracy or conspiracies, James, Baker, Brumbergs, and

46

Graham worked in concert to, among other misconduct, coordinate (a) off-balance sheet SPV facilities and related cash flows; (b) third-party factoring and supply-chain financing practices; (c) unsupported, manual financial statement changes and reclassifications that obscured First Brands' true financial condition; and (d) improper transfers to James, his trust, entities under his control, or other third parties for James' benefit. By engaging in this conspiracy or conspiracies, James, Baker, Brumbergs, and Graham caused Debtors to sustain damages in an amount to be determined at trial.

215.    Each conspirator acted outside the scope of legitimate corporate duties and for independent, personal motives aligned with James' self-dealing, thereby exceeding the reach of legitimate corporate activity.

216.    Accordingly, Debtors are entitled to money damages, including compensatory and punitive damages, and such other relief as is fair, just, and equitable as a remedy for the conspiracy or conspiracies among James, Baker, Brumbergs, and Graham.

## RESERVATION OF RIGHTS

217.    During the course of this proceeding, Debtors may learn through discovery or otherwise of additional claims or causes of action that are actionable under the provisions of the Bankruptcy Code or other applicable law. Debtors reserve all rights to amend this Complaint to, among other things: (i) modify or revise Defendants' names; (ii) add additional defendants; and/or (iii) add claims or causes of action, if applicable, that may become known to Debtors at any time during this adversary proceeding, through formal discovery or otherwise, and for such amendments to relate back to the filing of the Complaint.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Debtors respectfully request that this Court

enter judgment against Defendants:

a) Freezing any and all bank accounts and other property owned or controlled by Defendants or any other entities under their control;

b) Avoiding and recovering the fraudulent transfers as actual or constructive fraudulent transfers, in an amount to be determined at trial;

c) Declaring that Defendants were unjustly enriched at the expense of Debtors, and awarding damages in an amount to be determined at trial;

d) Avoiding and recovering any improper transfer of First Brands' property, including intellectual property, and directing reversion of title to First Brands, together with appropriate injunctive and other equitable relief;

e) Imposing a constructive trust upon Defendants' accounts with respect to the fraudulent transfers;

f) Awarding compensatory, consequential, and punitive damages, in amounts to be determined, together with pre- and post-judgment interest, at the maximum rate allowed by law;

g) Ordering an equitable accounting;

h) Awarding pre- and post-judgment interest;

i) Awarding attorneys' fees and costs as permitted by law; and

j) Granting such other and further relief as this Court deems just and equitable.

Respectfully submitted on the 19th day of January, 2026.

Houston, Texas

        */s/ Clifford W. Carlson*
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email:  gabriel.morgan@weil.com
       clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
David Lender (admitted *pro hac vice*)
Nili T. Moghaddam (admitted *pro hac vice*)
Robert Niles-Weed (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email:  matt.barr@weil.com
       sunny.singh@weil.com
       david.lender@weil.com
       nili.moghaddam@weil.com
       robert.niles-weed@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

## **VERIFICATION**

I, Charles Moore, hereby certify and verify under penalty of perjury that:

I am the interim Chief Executive Officer of First Brands Group, LLC, the Debtor in the above-captioned cases. I have read the factual allegations contained in the Verified Amended Complaint and affirm such allegations are true and correct to the best of my knowledge, information, and belief.


Dated: January 19, 2026

By: First Brands Group, LLC

Signed: */s/ Charles M. Moore*

Name: Charles Moore

Title: Interim Chief Executive Officer, First Brands Group, LLC